# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| THE JUNEAU GROUP LLC, | No. 4:24-cv-02856 |
| *Plaintiff,* | JURY DEMANDED |
| *v.* | |
| VENDERA MANAGEMENT HOLDINGS, LLC *d/b/a* VENDERA RESOURCES, | |
| *Defendant.* | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KANE RUSSELL
COLEMAN LOGAN PC
5151 San Felipe, Suite 800
Houston, Texas 77056
TELEPHONE 713 425.7400
FAX 713 425.7700

Thomas G. Ciarlone, Jr.
State Bar No. 24075649
*tciarlone@krcl.com*

Demetri J. Economou
State Bar No. 24078461
*deconomou@krcl.com*

*Attorneys for Defendant Vendera Management
Holdings, LLC d/b/a Vendera Resources*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................i

INDEX OF AUTHORITIES ..............................................................ii

I.    REQUIRED PREFATORY SECTIONS.......................................1

    A.    Nature and Stage of the Proceeding ....................................1

    B.    Statement of Facts ...........................................................1

    C.    Statement of Issues and Standard of Review .......................6

    D.    Summary of the Argument................................................8

II.    ARGUMENT....................................................................9

    A.    The alleged "trade secret" was not secret.............................9

    B.    The alleged "trade secret" was not misappropriated........................16

III.    ATTORNEY'S FEES ............................................................18

PRAYER.................................................................................18

# INDEX OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    106 S.Ct. 2505 (1986) ..................................................................................8

*Armstrong v. City of Dallas*,
    997 F.2d 62 (5th Cir. 1993) .........................................................................8

*Carson Prods. Co. v. Califano*,
    594 F.2d 453 (5th Cir. 1979)........................................................................8

*Celotex Corp. v. Catrett*,
    106 S. Ct. 2548 (1986) ............................................................................ 7–8

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994).................................................................. 7–8

*Trilogy Software, Inc. v. Callidus Software, Inc.*,
    143 S.W.3d 452 (Tex. App.—Austin 2004)............................................. 9

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
    926 F. Supp. 2d 935 (S.D. Tex. 2013) ..................................................... 8

## STATUTES

TEX. CIV. PRAC. & REM. CODE
    134A.001 ................................................................................................ 6
    134A.002(3) .............................................................................. 6–7, 16–17
    134A.002(6) ......................................................................................... 6, 9
    134A.005(3) ...........................................................................................18

## RULES

FED. R. CIV. P.
    56 .......................................................................................................... 7

# I.    REQUIRED PREFATORY SECTIONS

## A.    Nature and Stage of the Proceeding.

This case was removed to federal court on July 31, 2024, the day after it was filed in Harris County, Texas. Dkt. No. 1. Immediately prior to filing this suit, Plaintiff voluntarily dismissed a prior iteration that had joined another defendant, BOKF, National Association *d/b/a* Bank of Texas. That case had also been removed. No. 4:24-cv-02821, *The Juneau Group LLC v. BOKF, National Association d/b/a Bank of Texas, et al.*, United States District Court, Southern District of Texas, Houston Division.

Vendera has answered. Dkt. No. 8. As there is already dispositive evidence fatal to Plaintiff's sole claim for misappropriation of trade secrets, Vendera's motion for summary judgment is appropriate at this time.

## B.    Statement of Facts.

Plaintiff tells an outlandish story. The Juneau Group—a complete unknown in the oil and gas industry, without any identifiable corporate presence, employees, or operations—was allegedly poised to purchase $150 million worth of BP's assets. Dkt. No. 1-1 at ¶¶ 8 and 14. Plaintiff claims its sole member, Jacob Juneau, was contacted directly by BP in "late 2019 or early 2020" regarding this "lucrative investment opportunity." *Id.* at ¶ 8. Plaintiff asserts Juneau then sought financing

from Bank of Texas to purchase the assets, but the bank turned Juneau down. *Id.* at ¶ 9. Juneau contends that the assets were ultimately purchased by Vendera in 2021, and that—"on information and belief"—the bank leaked Juneau's "secret" purchase opportunity to Vendera. As demonstrated below, not only did this never happen, but BP advertised the same purchase opportunity on the open market as early as 2018. The purported "trade secret," in other words, was not secret at all.

The Juneau Group has a rich history of filing unsupported claims in federal court and seeking pie-in-the-sky damages. In fact, this appears to be the only thing Juneau does: file lawsuits.

In 2023, Juneau initiated an adversary proceeding in bankruptcy court seeking $1.56 billion in damages from American Express,[1] and also demanding that all "[e]xecutives of American Express International … be removed immediately or placed on leave[.]" Exhibit 1 at ¶¶ 9 & 14. Further, Juneau asserted that "within a 24–48 hour period," American Express should publicly post the "code" for "suboptimal or non-existent technology [which] results in the misappropriation of resources[.]" *Id.* at ¶ 11. American Express's actions were "materially criminal," according to Juneau, and also a violation of the Fourteenth Amendment. *Id.* at ¶ 7.

---

**1**    To resolve any doubts about this being a typo, that is "billion" with a 'b.'

Having lodged this bombastic complaint, Juneau did nothing to pursue it; the complaint was dismissed for want of prosecution in 2024. EXHIBIT 2.

In Georgia state court, Juneau filed another lawsuit—virtually identical to the adversary proceeding, seeking the same $1.56 billion in damages. This time, however, Juneau demanded that the software code be published within three hours, and that the American Express executives be "remov[ed]" without pay." *See* EXHIBIT 3 at ¶¶ 10–12.

Also in 2023, Juneau filed six duplicative $11 million secured claims in six jointly-administered bankruptcy cases. EXHIBIT 4 at ¶¶ 6; EXHIBIT 5 (exemplar claim). Juneau presented no support for its claims, and the debtor responded that, "after an investigation of the debtor's books and records, [it] cannot find any evidence of a liability owed to the Juneau Group." EXHIBIT 4 at ¶¶ 6–8. The records "similarly do not support the Juneau Group having any connection whatsoever" to five of the six debtors. *Id*. at ¶ 8. Juneau's sole connection was a small ($2,223) PPP loan originally serviced by one of the debtors. *Id*. at ¶ 9. The Juneau Group's claims were unsurprisingly disallowed. EXHIBIT 6.

Separately from the six $11 million claims, Juneau filed an administrative claim in one of the bankruptcy cases for $499,999.99 or, alternatively, $20,833 per month. EXHIBIT 7. In support of its claim, Juneau stated only that it "manufactures, among

other things, for industry," and that in the twenty days prior to debtor's petition, Juneau sold to the debtor certain goods described only as "TIME." EXHIBIT 8 at ¶¶ 3–4. As with the other claims, the debtors examined their books and records and determined "there is no evidence … that the Juneau Group has ever provided the Debtors with any goods or service[s] either before or after the Petition Date." *Id*. at ¶ 16. Debtors' counsel attempted to contact Juneau regarding these claims; Juneau failed to respond. *Id*. Juneau's administrative claim was disallowed. EXHIBIT 6.

In 2020, Juneau sent an unsolicited letter to U.S. Bankruptcy Judge Elizabeth Brown of the District of Colorado, concerning a Chapter 11 bankruptcy with which Juneau had no apparent connection. EXHIBIT 9. In the letter, Juneau levied the following accusations against the debtor (Sklar Exploration): "management grossly misallocated the resources of the company and abused shareholders (and creditors)—to put it lightly, a classic case of hubris was exhibited." *Id*. Juneau prescribed "a binary option" for the court: (i) allow Juneau to "inject growth capital into the company," or (ii) move the case to a Chapter 7 liquidation, in which Juneau planned to serve as a stalking horse bidder and ultimately "manage" the company. *Id*. Juneau also demanded access to the books and records of the debtor. *Id*.

Having apparently been denied access to the debtor's books and records, Juneau filed a "Preclusionary Motion to Quash Debtor and Affiliates' Attempt to

Delay Plan of Reorganization," in which he again invoked the debtors' alleged "negligence and mismanagement," demanded access to the debtors' books and records, and requested that the court "quash any attempt to extend the Debtor's period of exclusivity toward a reorganization plan due November 25, 2020." EXHIBIT 10. Juneau was ordered to obtain counsel in order to proceed with the motion (EXHIBIT 11), which it failed to do, resulting in the court striking Juneau's motion (EXHIBIT 12).

Finally, we address Bank of Texas. Juneau filed suit against Bank of Texas in an earlier iteration of this litigation, originally filed in state court on June 24th, removed to this Court on June 30th, and then immediately dismissed by Juneau the same day. No. 4:24-cv-02821, *The Juneau Group LLC v. BOKF, National Association d/b/a Bank of Texas, et al.*, United States District Court, Southern District of Texas, Houston Division, Dkt. Nos. 1 & 4. Juneau sued Bank of Texas for $150 million but, within a week of filing, jettisoned its claim against the bank without explanation. *Id.*

Time and again, Juneau has portrayed itself to the courts as an aggrieved party. It has filed preposterous claims with no evidentiary support, coupled with demands for astronomical damages, only to disappear into the ether once challenged. Now this Court is about to have its time and resources squandered by Juneau, which alleges trade secret misappropriation over information that was neither secret nor

misappropriated. In addition to the dismissal of Juneau's claims, there should be serious consequences for Juneau and its attorneys in order to discourage future actions of this stripe.

### C.    Statement of Issues and Standard of Review.

Juneau sues Vendera for misappropriation of trade secrets under the Texas Uniform Trade Secrets Act. TEX. CIV. PRAC. & REM. CODE §§ 134A.001, *et seq.* For its claim to survive, Plaintiff must show that there was a trade secret subject to protection and that it was misappropriated.

Trade secrets are defined as "all forms and types of information" which:

A.    the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

B.    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE §§ 134A.002(6)(A)–(B).

Misappropriation, in turn, is defined as:

A.    acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

B.    disclosure or use of a trade secret of another without express or implied consent by a person who:

    i.    used improper means to acquire knowledge of the trade secret;

    ii.    at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was;

        a.    derived from or through a person who used improper means to acquire the trade secret;

        b.    acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret;

        c.    derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or

    iii.    before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

*Id.* at § 134A.002(3).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The movant "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the

nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986)).

In response, the nonmovant "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (1986). "[S]ummary judgment is appropriate in any case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Little*, 37 F.3d at 1075–76 (quoting *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).

## D.    Summary of the Argument.

Juneau has a single claim in this lawsuit: misappropriation of trade secrets (specifically, the business opportunity to purchase certain BP assets). As described below, this was actually a public sale opportunity offered on the open market. BP advertised the opportunity aggressively at multiple public events—and made the opportunity available directly to Vendera's general counsel—all before Juneau is alleged to have received the same opportunity from BP in late 2019. BP continued its public marketing of the opportunity in 2020 and also presented it to Vendera's president. A public business opportunity is not a trade secret as a matter of law.

Further, the manner in which Vendera's personnel learned of the opportunity, directly and voluntarily from BP, is categorically not an act of misappropriation.

## II. ARGUMENT

### A. The alleged "trade secret" was not secret.

The Texas Uniform Trade Secrets Act defines trade secrets as "all forms and types of information" which "(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret";[2] and "(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." TEX. CIV. PRAC. & REM. CODE §§ 134A.002(6)(A)–(B).

It is "elemental that the subject matter of a trade secret must be secret." *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 959 (S.D. Tex. 2013) (quoting *Carson Prods. Co. v. Califano*, 594 F.2d 453, 461 (5th Cir. 1979)). The subject matter of the alleged trade secret "must not be of public knowledge or of general

---

**2**    The first element of an actionable trade secret claim is ownership. Because ownership is not germane to this motion, Vendera does not address ownership. Vendera reserves its rights to contest Juneau's alleged ownership in the future, as necessary.

knowledge in the trade or business." *Id.* "[I]nformation generally known and readily available is not protectable." *Id.* (quoting *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004)).

✳✳

The purchase opportunity was marketed publicly by BP as the "Diversified Non-Op Royalty and Working Interest Opportunities," totaling 1,320,000 net acres across the United States (collectively, the "Non-Op Assets"). Vendera's general counsel first became aware of the opportunity through a BP marketing document dated December 7, 2018, advertising "Project Thrones." This is another name for BP's "2019 Onshore Divestiture Program" (EXHIBITS 13–14):



*[continued ...]*

---

The marketing document was sent to Vendera's general counsel on November 14, 2019, by Mohit Singh, BPX Energy's Senior Vice President of Business Development and Exploration. EXHIBIT 13. The marketed opportunities included the Non-Op Assets, which are the subject of this lawsuit, as well as BP's onshore operated positions in the SWOOP, East Texas, San Juan, Wamsutter, Arkoma, and Anadarko plays. EXHIBIT 14 at 5–19.

Mr. Singh noted that the file was "a bit dated," at the time eleventh months old, but would "give you an idea" of the opportunities available. EXHIBIT 13. Indeed, Mr. Singh had presented all of this information publicly to the Society of Professional Engineers Business Development Study Group on February 27, 2019. EXHIBITS 15–16. With respect to the Non-Op Assets (which are the subject of this lawsuit), the February 2019 presentation and the Project Thrones marketing document given to Vendera's general counsel are identical:

*[continued …]*

**Project Thrones Marketing Document, EXHIBIT 14 at 19:**



**SPE Business Development Presentation, EXHIBIT 16 at 20:**



BP's aggressive marketing of these opportunities was also widely reported. The *Journal of Petroleum Technology* published a story on Project Thrones in February 2019, saying that BP was "looking for strategic buyers" for its onshore assets, "offering several packages for sale collectively called 'Project Thrones.'" EXHIBIT 17. The article mentions—in the same order as the Project Thrones marketing document—BP's operated positions in the SWOOP, East Texas, San Juan, Wamsutter, Arkoma, and Anadarko plays. *Id.*

In March 2019, *Oil & Gas Investor* reported that "BP plans to divest $5–$6 billion worth of assets during the next two years," including in "the Wamsutter gas field in Wyoming, the San Juan Basin in New Mexico, and the Arkoma Basin in Oklahoma" (again referencing assets offered under Project Thrones). EXHIBIT 18 at 86.

Even more specifically, in April 2019, *Oil & Gas Investor* reported on BP's Mohit Singh's presentation at Hart Energy's DUG Haynesville conference on February 20, 2019. EXHIBIT 19 at 86. The article explained that BP's divestitures were "being offered in seven packages," and then repeated the same acreage offerings depicted earlier in the Project Thrones marketing paper and later advertised at the SPE presentation. *Id.* The Non-Op Position detailed in *Oil & Gas Investor* is the

same, acre for acre, as in the other materials presented to Vendera's general counsel and made available publicly (1,320,000 net acres):

### *Oil & Gas Investor*, Exhibit 19 at 86:

**BPX's Divestment Packages**

| | Mboe/d | OCF | % Gas | % NGL | % Oil | Wellbores (Vt%) | | Acres |
|---|---|---|---|---|---|---|---|---|
| Shallow Woodford Oklahoma Oil Play (SWOOP) | 4 | $37MM | 10 | 15 | 75 | 19 | (0%) | 35k |
| East Texas | 6 | $35MM | 75 | 20 | 5 | 600 | (77%) | 45k |
| San Juan | 102 | $239MM | 94 | 6 | 0 | 9,500 | (99%) | 567k |
| Wamsutter | 38 | $187MM | 69 | 21 | 10 | 2,500 | (99%) | 500k |
| Anadarko | 19 | $91MM | 62 | 31 | 7 | 3,600 | (73%) | 511k |
| Arkoma | 34 | $103MM | 100 | 0 | 0 | 1,800 | (67%) | 440k |
| Legacy Non-Op Minerals/Leasehold - Multiple Basins | | $18MM | | | | | | 1,320k |

Note: Unless otherwise stated, all production and acreage figures are net to BP. Production figures 2018LE. OCF is annualized based on 2018 YTD Actuals through October.
Source: BPX Energy

The *Oil & Gas Investor* article quoted Mr. Singh: this is "a little bit of a coming out party [and] one of the things we want to do going forward is be a little more visible externally so we can get our message out." *Id.* BP wanted to be visible externally. It wanted to sell its assets to the highest bidder. So, it marketed the assets directly to potential buyers, but also publicly to the oil and gas industry writ large.

BP also presented these opportunities at the North American Prospect Expo (NAPE) in February 2020, as relayed to Vendera's president by BPX Energy's

Business Development Project Manager Tony Webb on September 30, 2020. EXHIBIT 20. Mr. Webb attached BP's NAPE handout covering the Non-Op Assets to his e-mail (EXHIBIT 21):

<u>**NAPE Handout, EXHIBIT 21:**</u>



All this public disclosure is irreconcilable with Juneau's claim for misappropriation of trade secrets. There was no secret about BP's asset divestiture or the specific assets being offered; in fact, taking Juneau's pleadings at face value, any attentive oil and gas investor would have known about the purchase opportunity through public means before BP reached out to Jacob Juneau. Consequently, it is not a trade secret, and Juneau may not recover under the Texas Uniform Trade Secrets Act.

**B.    The alleged "trade secret" was not misappropriated.**

Because the disputed business opportunity is unquestionably not a trade secret, Juneau's claim does not proceed to the second-level analysis of whether it was misappropriated. We cover this nonetheless for the sake of completeness. In general, the Texas Uniform Trade Secrets Act prohibits three species of misappropriation:

1.    *Improper means.* The acquisition by improper means or use of a trade secret acquired by improper means (Tex. Civ. Prac. & Rem. Code §§ 134A.002(3)(A), (B)(i) & (B)(ii));

2.    *Duty of Secrecy.* Use or disclosure of a trade secret by a person who obtained it under a duty of secrecy, or obtained it from a person owing a duty of secrecy (*Id.* at §§ 134A.002(3)(B)(ii)(b) & (B)(ii)(c)); and

3.    *Knowing Use of Mistakenly Acquired Secret.* Use or disclosure of a trade secret by a person who knew or should have known it was acquired by mistake (*Id.* at § 134A.002(3)(C)).

*See supra* at Part I.C.

Both "improper means" and "proper means" are defined by the Act. "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." Tex. Civ. Prac. & Rem. Code § 134A.002(2). Conversely, "proper means" is

defined as "discovery by independent development, reverse engineering unless prohibited, or any other means that is not improper means." *Id.* at § 134A.002(4).

Vendera's executives learned about the Non-Op Assets directly from the seller, BP. EXHIBITS 13 & 20. BP's personnel shared this information with Vendera's executives—information which, of course, they had previously shared with the public—voluntarily and without limitation or restriction. It cannot be disputed that BP itself originally secured the purchase opportunity by proper means, because BP developed it. Consequently, there was neither acquisition by improper means nor acquisition from another who previously acquired it by improper means.

BP did not attach any duty of secrecy to its transmission of the sale opportunity—and, indeed, there was none. BP authored the information, transmitting it at various times to the public and to Vendera's general counsel and president. The correspondence between BP's and Vendera's personnel is clear and unambiguous; it was not a case of mistaken transmission. Therefore, the remaining paths to misappropriation (mistake and duty of secrecy) also fail.

*[continued …]*

### III.  ATTORNEY'S FEES

Texas Civil Practice & Remedies Code § 134A.005(3) allows for an award of attorney's fees to the prevailing party if a claim of misappropriation is made in bad faith. *Id.* Following a Rule 54(d) motion and an opportunity to be heard, Vendera urges the Court to award its reasonable and necessary attorney's fees.

### PRAYER

For the reasons stated above, Vendera respectfully requests that the Court grant summary judgment and for such other relief as Vendera may be entitled.

DATED: August 15, 2024

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By: _____

**THOMAS G. CIARLONE, JR.**
TEXAS BAR NO. 24075649
E-MAIL | *tciarlone@krcl.com*
**DEMETRI J. ECONOMOU**
TEXAS BAR NO. 24078461
E-MAIL | *deconomou@krcl.com*

MAIN | 713 425.7400
DIRECT | 713 425.7428
FACSIMILE | 713 425.7700

Sage Plaza
5151 San Felipe, Suite 800
Houston, Texas 77056

*Attorneys for Defendant*
*Vendera Management Holdings*
*d/b/a Vendera Resources*

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that on August 14, 2024, I attempted to confer with Plaintiff's counsel (Mr. Gibson) and the conference did not result in a resolution. Therefore, we presume Plaintiff to be opposed to this dispositive relief.

_____
**THOMAS G. CIARLONE, JR.**

## <u>WORD COUNT CERTIFICATE</u>

I hereby certify that that the foregoing document contains 3,149 words, as measured by Microsoft Word, excluding the portions specified in the Judge's Procedures.

_____
**THOMAS G. CIARLONE, JR.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2024, a true and correct copy of this instrument was served on all counsel of record, in accordance with the Federal Rules of Civil Procedure.

_____
**Thomas G. Ciarlone, Jr.**