# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

THE JUNEAU GROUP LLC,

*Plaintiff,*

*v.*

VENDERA MANAGEMENT HOLDINGS,
LLC *d/b/a* VENDERA RESOURCES,

*Defendant.*

No. 4:24-cv-02856

JURY DEMANDED

## EXHIBIT CONTENTS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | The Juneau Group's Adversary Complaint dated April 24, 2023, Dkt. No. 787, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 2 | Order Dismissing The Juneau Group's Adversary Complaint dated October 16, 2023, Dkt. No. 5, Adv. Pro. 23-50371-CTG, *The Juneau Group, LLC v. Kabbage, Inc., et al.*, United States Bankruptcy Court, District of Delaware, Main Case No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 3 | The Juneau Group's Complaint filed in Hall County, Georgia, dated February 21, 2023, Dkt. No. 1002-1, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |

| EXHIBIT | DESCRIPTION |
|---|---|
| 4 | Debtor's Objection to The Juneau Group's Claims dated December 28, 2023, Dkt. No. 998, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 5 | Exemplar $11 Million Secured Claim filed November 28, 2022, Claim No. 91, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 6 | Order Disallowing Claims Filed by The Juneau Group dated April 4, 2024, Dkt. No. 1034, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 7 | The Juneau Group's Motion for Allowance of Administrative Expense Claim dated December 6, 2022, Dkt. No. 345, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 8 | Debtors' Objection to The Juneau Group's Motion for Allowance of Administrative Expense Claim dated February 17, 2023, Dkt. No. 547, No. 22-10951-CTG, *In re KServicing Wind Down Corp.*, United States Bankruptcy Court, District of Delaware. |
| 9 | The Juneau Group's Letter to Judge Elizabeth E. Brown dated June 1, 2020, Dkt. No. 377, No. 20-12377-EEB, *In re Sklar Exploration Company, LLC*, United States Bankruptcy Court, District of Colorado. |
| 10 | The Juneau Group's Preclusionary Motion to Quash Debtor and Affiliates' Attempt to Delay Plan of Reorganization dated November 20, 2020, Dkt. No. 684, No. 20-12377-EEB, *In re Sklar Exploration Company, LLC*, United States Bankruptcy Court, District of Colorado. |
| 11 | Order Regarding Compliance with Rules dated November 23, 2020, Dkt. No. 688, No. 20-12377-EEB, *In re Sklar Exploration Company, LLC*, United States Bankruptcy Court, District of Colorado. |

EXHIBIT CONTENTS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 12 | Order Striking Motion dated December 8, 2020, Dkt. No. 688, No. 20-12377-EEB, *In re Sklar Exploration Company, LLC*, United States Bankruptcy Court, District of Colorado. |
| 13 | E-mail from Mohit Singh to Collin Lensing dated November 15, 2019, and other e-mails in same thread, with attachment "Project Thrones—2019 Onshore Divestiture Program" (*Project Thrones US Paper – V22 Small.pdf*). |
| 14 | Attachment to e-mail: "Project Thrones—2019 Onshore Divestiture Program" (*Project Thrones US Paper – V22 Small.pdf*). |
| 15 | "BP's $10B BHP Acquisition and Plans to Leverage Multilateral Well Design" by Rollyn Reyes, dated March 4, 2019, Linkedin.com, and linked attachment, available at: *https://www.linkedin.com/pulse/bps-10b-bhp-acquisition-plans-leverage-multilateral-well-rollyn-reyes/* |
| 16 | Linked attachment to prior article: "Transformation of the BPX Energy Portfolio—SPEGC BD Study Group," available at *https://www.spegcs.org/media/files/files/9a93d18e/mohit-singh-bpx-energy-spe-bd-feb-27-vfinal.pdf* |
| 17 | "What Happened to all the E&P Deal-Making?" by Matt Zborowski, dated February 4, 2019, *Journal of Petroleum Technology*, available at *https://jpt.spe.org/what-happened-all-ep-deal-making* |
| 18 | "A&D's Long and Twisted Road" by Darren Barbee, *Oil & Gas Investor*, March 2019 edition. |
| 19 | "A&D Watch: BP's BPX Energy Pursues U.S. Shale Mission" by Velda Addison, *Oil & Gas Investor*, April 2019 edition. |
| 20 | E-mail from Tony Webb to A. Wood Brookshire dated September 20, 2020, and other e-mails in same thread, with attachment "Diversified Non-Op Royalty and Working Interest Opportunities" (*NAPE 2020 BPX Mineral - RI - ORRI Divestment NAPE Handout.2-4-20.pdf*). |

EXHIBIT CONTENTS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 21 | Declaration of Demetri J. Economou. |
| 22 | Business Records Declaration. |

# EXHIBIT **1**

FILED

SOUTHERN DISTRICT OF INDIANA
BANKRUPTYC COURT: ADVERSARY 2023 APR 24 PM 2: 19
PROCEEDING

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------- x
                                                   :        Chapter 11
In re                                              :
                                                   :        Case No. 22-10951 (CTG)
KABBAGE, INC. d/b/a KSERVICING, et al.,            :
                                                   :        (Jointly Administered)
         Debtors*.                                 :
                                                   :
                                                   :
------------------------------------------------- x        Objection Deadline: April 6th, 2023
------------------------------------------------- x


------------------------------------------------- x
                                                   :
The Juneau Group, LLC.:
Plaintiff(s)
                                                   :
                                                   :
    vs.                                            :
                                                   :
                                                   :
KABBAGE, INC. d/b/a KSERVICING, et al.,            :
AMERICAN EXPRESS INTERNATIONAL, INC.
Defendant                                          :
------------------------------------------------- x
------------------------------------------------- x
```

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309

RLF1 28271248v.1

## COMPLAINT

Plaintiff(s) The Juneau Group, LLC, via Pro Se representation, files this Complaint pursuant to:

FRBP 7001(6) 523(a)(2), 7001(6) 523(a)(4), 7001(1).

FRBP 7001(8) Subordination of Claim or Interest.

FRBP 7001(10) Determination of Removed Action.


Against Debtor, KABBAGE, INC. d/b/a KSERVICING, et al., and alleges the following in support of requested relief:

## JURISDICTION

Venue is proper under 28 U.S.C. 1409.

## PARTIES

**[1]** Debtor Counsel

**RICHARDS LAYTON AND FINGER, P.A.**

DANIEL J. DEFRANCSCHI

AMANDA R STEELE, ESQ.

ZACHARY I. SHAPIRO ESQ.

MATHEW P MILANA, ESQ.

**WEIL, GOTSHAL & MANGES LLP**

RAY C. SCHROCK, P.C.

CANDACE M. ARTHUR, ESQ.

NATASHA S. HWANGPO, ESQ.

**[2]** Claims Agent: OMNI AGENT SOLUTIONS.

**[3]** Plaintiff: THE JUNEAU GROUP, LLC.

## BACKGROND FACTS

[1] The Defendant, formerly known as Kabbage, processed more than $7 billion worth of Paycheck Protection Program (PPP) loans before the company's "artificial intelligence" technology and a portion of its team were acquired by American Express in 2020, leaving behind the holding company, KServicing, to administer the remaining $1.3 billion portfolio of COVID relief loans.

[2] Defendent is using the bankruptcy process to obtain a reprieve from having to constantly defend against several federal and state investigations into its handling of the loans. In the pandemic, Defendant delivered more than $7 billion in PPP loans to more than 300,000 borrowers, making it the second-largest PPP lender in the nation by application volume, the company noted in its bankruptcy filing.

[3] The Defendant, which is in the process of winding down its operations, is "overburdened" by a number of disputes regarding its lending practices, requiring the firm to expend significant time and resources defending itself across "multiple costly fronts," the filing claims.

[4] In response to these circumstances, Defendant has chosen to rush through bankruptcy process, in District Court of Delaware in hopes of eliminating the liability of a broader suit targeted at parent American Express, Inc.

[5] A material class action suit is highly likely to be granted against American Express Inc. The change of branding and grey area of liability exchange serves as barrier to justice for all class action participants.

[6] In response to the risk listed above Defendant is issuing millions in legal fees per month for over-representation to accelerate the reorganization process. All of which materially impact creditors, and potential class action participants.

[7] Too much responsibility and suboptimal or non-existent technology, results in the misappropriation of resources. Issues which existed for Defendant during operation prior to bankruptcy proceedings are now extending into bankruptcy proceedings. All of which point to not only to Kabbage, Inc. but also American Express International, Inc. The newly formed parent corporation of the majority of entities within Kabbage, Inc's previous corporate structure. Negligence and unwillingness to act responsibly prior, during, and immediately following an acquisition is materially criminal.

## CAUSE(S) OF ACTION

FRBP 7001(6) 523(a)(2), 7001(6) 523(a)(4), 7001(1).

FRBP 7001(8) Subordination of Claim or Interest.

FRBP 7001(10) Determination of Removed Action.


[9] Violation of 14th amendment.

## DEMAND

[10] $1,560,000,000. American Express International, Inc. distributes roughly $1,560,000,000 to shareholders in dividends annually. A dividend is a stream of cash-flows. Public shareholders are not responsible for holding C-Suite liability. If executives determine an acquisition is accretive and strategic a deal is consummated. Financial risk, operational risk, organizational risk, and legal risk are all evaluated prior to inking a deal. Logically, evidence suggest American Express International did not "miss" anything. A decision was made in the C-Suite of Kabbage, Inc. and American Express International. Passing legal and financial liability from 300,000 small business borrowers of Kabbage Inc. to millions of public shareholders at American Express International in the clout of "technology" which does not exist.

[11] Judgement for evidence of "technology" at American Express International which was acquired, within a 24–48-hour period. Code to be published and reviewed by mutually acceptable third party.

[12] American Express International's ESG scores rank in the bottom quartile. Executives which "pass legal and financial liability" in the shroud of "technology" which does not exist is fraud and should be fired. No risk was passed at all, American Express International's acquisition of Kabbage Inc. was a hand-off.

[13] $1,560,000,000 is approximately one-year American Express dividend distribution (undiscounted). This value is right and just.

[14] Executives of American Express International should be removed immediately or placed on leave.

# EXHIBIT **2**

# UNITED STATES BANKRUPTCY COURT
## District of Delaware
## 824 Market Street, 3rd Floor
## Wilmington, DE 19801

**In Re:**                                              Bankruptcy Case No.: 22−10951−CTG
KServicing Wind Down Corp.
     Debtor                                   Bankruptcy Chapter:  11

The Juneau Group, LLC

     Plaintiff                                ADVERSARY No. 23−50371−CTG

     vs.

Kabbage, Inc., et al.
Kservicing

     Defendant

## <u>ORDER</u>

     **AND NOW**, the Plaintiff having commenced this adversary proceeding on 4/24/23 ;
**And** an Order having been entered on 8/25/2023 , giving notice that this proceeding would be dismissed for lack of prosecution unless the Plaintiff took appropriate action to prosecute this proceeding by a date certain;
**And** the Plaintiff having taken no action by such date or otherwise having responded to the notice, it is hereby
     **ORDERED** that the above−captioned Adversary Proceeding is **DISMISSED**.

Craig T Goldblatt
Bankruptcy Judge

Date: 10/16/23
(VAN−436)

# EXHIBIT **3**

## STATE COURT OF GEORGIA HALL COUNTY

```
----------------------------------------------------- x
                                                      :
In re                                                 :
                                                      :
The Juneau Group, LLC - Plaintiff

Vs

AMERICAN EXPRESS INTERNATIONAL
d/b/a Kabbage, Inc and/or KSERVICING -
Defendant.                                            :
                                                      :
                                                      :
                                                      :
----------------------------------------------------- x
```

### Complaint

Plaintiff(s) The Juneau Group, LLC files this complaint on basis of Fraud and Deceit against American Express International, formerly Kabbage, Inc. Presently doing business as KServicing. Under Georgia Title 51 Torts. Willful misrepresentation of material fact(s) which have resulted in injury to countless consumers nationwide. Including the State of Georgia. The Juneau Group, LLC alleges the following in support of requested relief.

**Jurisdiction**
Venue is proper. May be tried in Atlanta, GA, or New York. American Express or Kabbage, Inc.'s headquarters because both corporations are one. Summons may be served to either entity at either location on basis communication exist between each party. Counsel of each party may direct summons appropriately.

**Parties**
**Debtor Counsel**
**Richards Layton and Finger, P.A.**
**Weil, Gotshal and Manges LLP**
**Any newly appointed counsel by parent corporation – American Express International.**

**Claims Agent:**
**Omni Agent Solutions**

**Plaintiff:**
**The Juneau Group, LLC**

## Background Facts

[1] The Defendant, formerly known as Kabbage, Inc. processed more than $7 billion worth of paycheck protection program (PPP) loans before the company's "artificial intelligence" technology and a portion of its team were acquired by American Express in 2020. Leaving behind a shell company American Express "did not want to touch", KSERVICING, to administer $1.3 billion portfolio of COVID relief loans.

[2] Defendant is using bankruptcy process to obtain a reprieve from having to constantly defend against several federal and state investigations into its handling of the loans. During the pandemic Defendant delivered more than $7 billion in PPP loans to more than 300,000 borrowers, with a fraud rate of 57%. Making the Defendant the second largest PPP lender in the nation by application volume and first in fraud rating.

[3] The Defendant, which is in the process of winding down its subsidiary operations is "overburdened" by a number of disputes regarding its lending practices, requiring the firm to expend significant time and resources defending itself across "multiple costly fronts"

[4] In response to these circumstances, Defendant has chosen to rush through bankruptcy. In hopes of eliminating liability of a broader suit targeted a parent American Express International. Evidenced by the decision to pursue a plan of liquidation in Case No. 22-10951. Supported by further evidence of American Express's escrow holdings after Kabbage's acquisition as a safety blanket for potential cause of action against American Express ($38,000,000).

[5] A material class action suit magnitudes higher than American Express's escrow holding is highly likely to be granted against American Express. The change of branding and "gray area" of liability exchange serves as a barrier to justice for all class action participants.

[6] Too much responsibility and suboptimal execution too soon results in squandered resources and misappropriation of funds. Negligence and unwillingness to act responsibly prior, during and immediately following an acquisition is unlawful.

## Demand
[10] $1,560,000,000.

[11] Judgement for evidence of "technology" at American Express International in the form of cpu code to be published digitally within 3 hours. And subsequently reviewed by a mutually accepted 3rd party.

[12] Removal of executives of American Express International indefinitely without pay.

Verification

Name of filer: The Juneau Group LLC

Representative: JACOB Juneau

Signature:

Contact Information:

JJuneau 2021 @ outlook.com

Notary

# IN THE SUPERIOR COURT OF HALL COUNTY
## STATE OF GEORGIA

The Juneau Group, LLC
_____
Petitioner,

v.

American Express International
_____
Respondent.

§
§
§
§
§
§
§
§

CIVIL ACTION
FILE NO.: 23SV132JGB

## VERIFICATION

My name is _Jacob Juneau_____. I hereby swear or affirm before the undersigned Notary Public I have read the _Adversary Proceeding_____ that I am filing with this _Verification_ and the facts stated in it are true and correct to the best of my knowledge and belief.

This the _21st_ day of _February_, 20_23_. [date] [month] [year]

_____
Petitioner, Pro se

[print/type your name]: _Jacob Juneau_____

Sworn to and subscribed before me this
_21st_ day of _February_, 20_23_.

_____
NOTARY PUBLIC
My Commission Expires:
(Notary Seal)

JANNA L HILLABRAND
NOTARY
MY COMM.
EXPIRES
AUGUST 31, 2026
PUBLIC
HALL COUNTY, GA

**General Civil and Domestic Relations Case Disposition Information Form**

☐ Superior or ☑ State Court of ___Hall_____ County

FILED
HALL CO., GA
23 FEB 21 PM 3: 51
___ CLERK
STATE COURT
BY __KTS__

| For Clerk Use Only | |
|---|---|
| Date Disposed  02-23-2023 | Case Number  23SV1329B |
| **MM-DD-YYYY** | Case Style _____ |

Plaintiff(s)  The Juneau Group LLC
Juneau   Jacob

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

Defendant(s)
American Express International,

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Reporting Party** _____

**Plaintiff's Attorney** _____ State Bar Number _____ Self-Represented ☑

**Defendant's Attorney** _____ State Bar Number _____ Self-Represented ☐

**Manner of Disposition**
**Check Only One**

☑ **Jury Trial**
☐ **Bench/Non-Jury Trial**
☐ **Non-Trial Disposition, such as:**
  ☐ **Alternative Dispute Resolution**

☑ Check if any party was self-represented at any point during the life of the case.

☐ Check if the court ordered an interpreter for any party, witness, or other involved individual.

☐ Check if the case was referred/ordered to a court-annexed alternative dispute resolution process.

Version 1.1.20

# EXHIBIT **4**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| KServicing Wind Down Corp., *et al.*,[1] | Case No. 22-10951 (CTG) <br> (Jointly Administered) |
| Post-Confirmation Debtors. | **Objection Deadline: January 30, 2024 at 4:00 p.m. (ET)** <br> **Hearing Date: February 6, 2024 at 10:00 a.m. (ET)** |

## KSERVICING WIND DOWN CORP.'S OBJECTION
## TO THE JUNEAU GROUP'S CLAIMS

The above captioned post-confirmation debtors (collectively, "**KS Wind Down**") submit this objection pursuant to § 502 of the Bankruptcy Code, Rules 3003 and 3007 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), and Local Rule 3007-1 seeking an order disallowing and expunging claims filed by the Juneau Group, LLC (as set forth more fully below, "**Juneau Group Claims**") because the Juneau Group fails to provide adequate information to support its claims and KS Wind Down books and records do not reflect any such claims. In support of this objection, KS Wind Down relies upon the declaration of Jeremiah Foster, the Wind Down Officer of KS Wind Down (the "**Foster Declaration**") and the Request for Judicial Notice filed contemporaneously with this objection.

### Jurisdiction and Venue

1.     This Court has jurisdiction over this objection pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the

---

[1]     The post-confirmation debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, as applicable, are: KServicing Wind Down Corp. (f/k/a Kabbage, Inc. d/b/a KServicing) (3937); KServicing Wind Down Canada Holdings LLC (f/k/a Kabbage Canada Holdings, LLC) (N/A); KServicing Wind Down Asset Securitization LLC (f/k/a Kabbage Asset Securitization LLC) (N/A); KServicing Wind Down Asset Funding 2017-A LLC (f/k/a Kabbage Asset Funding 2017-A LLC) (4803); KServicing Wind Down Asset Funding 2019-A LLC (f/k/a Kabbage Asset Funding 2019-A LLC) (8973); and KServicing Wind Down Diameter LLC (f/k/a Kabbage Diameter, LLC) (N/A). The Debtors' mailing and service address is KServicing Wind Down Corp. c/o Resolute Commercial Services, 6750 E. Camelback Road, Suite 103, Scottsdale, AZ 85251.

District of Delaware, dated February 29, 2012. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and KS Wind Down confirms its consent pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("**Local Rules**") to the entry of a final order by the Court in connection with this objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are Bankruptcy Code § 502(b), Bankruptcy Rules 3001, 3003, and 3007, and Local Rules 1001-1(c) and 3007-2.

## Background

5.      On March 15, 2023, this Court entered an order [Doc 680] ("**Confirmation Order**") confirming the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors* attached thereto ("**Plan**").[2] The Effective Date of the Plan occurred on June 20, 2023, and under § 5.4(a) of the Plan, Jeremiah Foster was appointed as the Wind Down Officer to administer KS Wind Down. Under § 7.1(a) of the Plan, the Wind Down Officer, on behalf of KS Wind Down, has the sole authority to object to claims.

---

[2]      Capitalized terms used but not defined in this objection have the meanings given to them in the Plan.

## **The Juneau Group Claims**[3]

6.      The Juneau Group filed claims against each of the Debtors in the duplicative amounts set forth below:

| Claim No. | Debtor(s) | Amount |
|:---:|:---:|:---:|
| 2 | Kabbage Diameter, LLC | $11,000,000 |
| 2 | Kabbage Asset Funding 2017-A, LLC | $11,000,000 |
| 2 | Kabbage Asset Securitization, LLC | $11,000,000 |
| 2 | Kabbage Canada Holdings, LLC | $11,000,000 |
| 4 | Kabbage Asset Funding 2019-A, LLC | $11,000,000 |
| 91 | Kabbage, Inc. d/b/a KServicing | $11,000,000 |

7.      None of the above claims attached supporting documentation.

8.      Further, after an investigation of the Debtors' books and records, KS Wind Down cannot find any evidence of a liability owed to the Juneau Group. Specifically, the Debtors' records similarly do not support the Juneau Group having any connection whatsoever to any of the following Debtors: Kabbage Diameter, LLC, Kabbage Asset Funding 2017-A, LLC, Kabbage Asset Securitization, LLC, Kabbage Canada Holdings, LLC and Kabbage Asset Funding 2019-A, LLC. All such claims appear duplicative of the Juneau Group's claim number 91 against Debtor Kabbage, Inc. d/b/a KServicing ("**Debtor KServicing**").

9.      The only connection that one of the Debtors (Debtor KServicing) had with the Juneau Group was a small ($2,223) PPP Loan.[4] Accordingly, to avoid an improper recovery to the

---

[3]       In addition to the Juneau Group Claims and the § 503(b)(9) Claim described below, the Juneau Group also filed an adversary proceeding seeking, among other things, $1.56 billion from American Express for violation of the 14th Amendment. The Court entered an order dismissing that adversary proceeding on October 16, 2023, for lack of prosecution.

[4]       The Debtors, and their advisors, confirmed that the Juneau Group is a borrower of a small Paycheck Protection Program Loan ("**PPP Loan**") that Debtor KServicing previously serviced. Based on records from the Small Business Administration and Debtor KServicing, the PPP Loan amount issued to the Juneau Group was only $2,223, and such PPP Loan was guaranty purchased by the Small Business Administration on August 29, 2022.

Juneau Group, KS Wind Down seeks to disallow each of the Juneau Group Claims and to expunge such claims from the claims register.[5]

10.     Note that on December 18, 2023, KS Wind Down was forwarded a copy of a complaint and civil summons filed *pro se* on February 21, 2023 in the State Court of Georgia for Hall County *prior to the Plan Confirmation Date*, relating to an action captioned *In re the Juneau Group, LLC v. American Express International d/b/a Kabbage, Inc and/or KServicing*. A copy of the summons and complaint are attached to the Request for Judicial Notice as **Exhibit 1**. KS Wind Down investigated the complaint but, after investigating with the Hall County Court, was unable obtain a copy of the docket for the case or any additional information.

11.     Among other things, the complaint demands $1.56 billion, "[j]udgment for evidence of 'technology' at American Express International in the form of a cpu code to be published digitally with 3 hours. [sic] And subsequently reviewed by a mutually accepted 3rd party," and "removal of executives of American Express International without pay." *See* Ex. 1 at 3. Setting aside the fact that (a) Kabbage, Inc. is not appropriately named in the action and was never appropriately served and (b) filing this action may have violated the automatic stay and/or the injunctive provisions of the Plan,[6] recent correspondence indicates that, absent the relief requested in this objection, the Juneau Group will continue to pursue frivolous prepetition claims against the wind down estate.

12.     In addition to the unsupported, misclassified, and duplicative Juneau Group Claims described above, Juneau filed a *Motion of the Juneau Group for Allowance of Administrative*

---

[5]     This Court has already reclassified each of the above claims as nonpriority, general unsecured claims pursuant to this Court's First Omnibus Order [Doc 546] entered on February 17, 2023

[6]     KS Wind Down reserves all rights with respect to (a) disputing the complaint and (b) violations of the automatic stay, including the right to seek sanctions against the Juneau Group.

*Expense Claim* [Doc 345] ("**§ 503(b)(9) Motion**") asserting a claim in the amount of $499,999.99.

Juneau also filed an additional and seemingly related proof of claim, Claim 184, asserting a

§ 503(b)(9) claim that attached the § 503(b)(9) Motion (together with § 503(b)(9) Motion,

the "**§ 503(b)(9) Claim**"). The 503(b)(9) Claim asserted that Juneau had provided the Debtors

"TIME" in the 20 days before bankruptcy. Juneau did not attach any invoices or other evidence in

support of the § 503(b)(9) Claim. The Debtors objected to the 503(b)(9) Claim [Doc 547], noting

that "TIME" was not considered a good for purposes of a 503(b)(9) claim and that Debtors had

never received any goods from the Juneau Group at all. The Court held a hearing on the matter on

February 27, 2023. Juneau did not appear at the hearing, and the Court thereafter entered an order

denying the 503(b)(9) Motion observing that Juneau:

> "which bears the burden of proof to establish its administrative claim, did
> not appear at the hearing and provide no evidence in support of its claim. It
> did not meet its burden at the hearing. And perhaps more fundamentally,
> the motion on its face makes clear that it is not entitled to an
> administrative claim."

*See* [Doc 583] ("**§503(b)(9) Order**") (internal citations omitted).[7]

## Objection

13.    Bankruptcy Code § 502(a) provides, in pertinent part, that "[a] claim or interest,

proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest

. . . objects."[8] Once an objection to a claim is filed, the Court, after notice and a hearing, shall

determine the allowed amount of the claim.[9] Bankruptcy Code § 502(b)(1) provides, in part, that

---

[7]    KS Wind Down believes Claim 184 was included in the order denying the 503(b)(9) Motion; to the extent
that Claim 184 was not included in such order from this Court, KS Wind Down hereby seeks to disallow Claim 184
along with the other Juneau Group Claims.

[8]    11 U.S.C. § 502(a).

[9]    11 U.S.C. § 502(b).

16475499/1

a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."

14.     Once an objector raises facts refuting at least one of the central allegations to the claim, the burden reverts to the claimant to prove the validity of the claim by preponderance of the evidence.[10] The burden of persuasion with respect to the claim is always on the claimant.[11] In considering an objection to claims, the Court may take judicial notice of the underlying records in a bankruptcy case.[12]

15.     The Juneau Group has not included any documentation supporting its claims. Although the failure to attach supporting documentation is not grounds for automatic disallowance, the claimant loses the presumption of prima facie validity.[13] Moreover, the Juneau Group fails to even identify a basis for its claims at all, leaving Section 8 of each proof of claim form blank:[14]



*See, e.g.*, Claim 91 (Debtor Kabbage, Inc. d/b/a KServicing).

---

[10]     *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

[11]     *Payne v. Lampe (In re Lampe)*, 665 F.3d 506, 514 (3d Cir. 2011).

[12]     *See In re W.R. Grace & Co.*, 626 B.R. 217, 227 n. 5 (Bankr. D. Del. 2021).

[13]     *In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008); *In re Black, Davis & Shue Agency, Inc.*, 460 B.R. 407, 416 (Bankr. M.D. Pa. 2011).

[14]     Claim 184 identifies "time" as the basis of the claim, which was previously discarded as an invalid basis for recovery by the § 503(b)(9) Order.

- 6 -

16.     A claim that "gives not even an iota of information regarding what it is about" is a "nullity" and is subject to disallowance.[15] Here, the Juneau Group Claims failed to meet the basic evidentiary burden in demonstrating their merits. Further, the Juneau Group Claims are not reflected in the Debtors' books and records. Failure to disallow the Juneau Group Claims would result in the Juneau Group receiving an unwarranted recovery from the wind down estates to the detriment of similarly situated creditors. Accordingly, KS Wind Down requests that the Court disallow and expunge each of the Juneau Group's Claims from the claims register.

## Reservation of Rights

17.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Post-Confirmation Debtors; (b) a waiver of the KS Wind Down's right to dispute the amount of, basis for, or validity of, any claim against these estates, or (c) a waiver of any claim or cause of action which may exist against any creditor or interest holder, including but not limited to, any future objections to the Juneau Group Claims on substantive and/or non-substantive grounds.

## Notice

18.     Notice of this objection will be provided to the Juneau Group and any party that has requested notice pursuant to Bankruptcy Rule 2002. KS Wind Down believes that no further notice is required.

## No Prior Request

19.     No previous request for this relief has been made to this or any other court.

---

[15]     *In re MK Lombard Grp. I, Ltd.*, 301 B.R. 812, 817 (Bankr. E.D. Pa. 2003) (characterizing claim that "gives not even an iota of information regarding what it is about" as a "nullity").

For the reasons above, the KS Wind Down respectfully request entry of the proposed order attached as **Exhibit A** granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: December 28, 2023

**MORRIS JAMES LLP**

*/s/ Brya M. Keilson*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Tara C. Pakrouh (DE Bar No. 6192)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: bkeilson@morrisjames.com
E-mail: tpakrouh@morrisjames.com

and

**PERKINS COIE LLP**
Bradley A. Cosman (admitted *pro hac vice*)
Kathleen Allare (admitted *pro hac vice*)
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
E-mail: BCosman@perkinscoie.com
E-mail: KAllare@perkinscoie.com

and

John D. Penn (admitted *pro hac vice*)
500 North Akard Street, Suite 3300
Dallas, TX 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
E-mail: JPenn@perkinscoie.com

*Counsel to the Post-Confirmation Debtors, operating as the Wind Down Estates*

- 8 -

16475499/1

# EXHIBIT **5**

1041

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

**Fill in the information to identify the case (Select only one Debtor per form):**

☑ Kabbage, Inc. d/b/a KServicing (CASE NO. 22-10951)    ☐ Kabbage Asset Funding 2017-A, LLC (CASE NO. 22-10954)
☑ Kabbage Canada Holdings, LLC (CASE NO. 22-10952)    ☐ Kabbage Asset Funding 2019-A, LLC (CASE NO. 22-10955)
☐ Kabbage Asset Securitization, LLC (CASE NO. 22-10953)    ☐ Kabbage Diameter, LLC (CASE NO. 22-10956)

## Official Form 410
# Proof of Claim
04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that it is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing. In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions. The original of this Proof of Claim must be sent to: **Kabbage, Inc. d/b/a KServicing, et al., c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367 by November 30, 2022 at 5:00 pm prevailing Eastern Time or April 3, 2023 at 5:00 pm prevailing Eastern Time for governmental entities.**

---

### Part 1:    Identify the Claim

**1. Who is the current creditor?**

The Juneau Group, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

JACOB JUNEAU
Name

2300A Rice Blvd #232
Number    Street

Houston         TX      77005
City            State   ZIP Code

Contact Phone  337 286 9562
Contact email  JAKE Juneau@Live.com

Where should payments to the creditor be sent? (if different)

JACOB JUNEAU
Name

2300A Rice Blvd #232
Number    Street

Houston         TX      77005
City            State   ZIP Code

Contact Phone  337 286 9562
Contact email  JAKE Juneau@Live.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one)

**FILED**

**NOV 2 8 2022**

By Omni Agent Solutions, Claims Agent
For U.S. Bankruptcy Court
District of Delaware

**4. Does this claim amend one already filed?**
☑ No
☐ Yes    Claim Number on court claims registry (if known) _____    Filed On _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes    Who made the earlier filing? _____

---



951-91 KW

1233607212330000000145

## Part 2:  Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes    Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?**    $ 11,000,000    Does this amount include interest or other charges?

☑ No

☐ Yes    Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

_____

**9. Is all or part of the claim secured?**

☐ No

☑ Yes    The claim is secured by a lien on property

**Nature of property:**

☐ Real Estate   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*

☒ Motor Vehicle

☑ Other   Describe: _____

**Basis for perfection:**

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:**    $ $11,000,000

**Amount of the claim that is secured:**    $ _____

**Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate:**   (when case was filed)    9 %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No    In Part

☑ Yes    **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes    Identify the property: _____

**12. Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. §503(b)(9)).?**

☑ No

☐ Yes    Amount of 503(b)(9) Claim: $ _____

Official Form 410    **Proof of Claim**    Page 2

**13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes

*Check all that apply*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| ☑ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| ☑ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| ☑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| ☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5). | $ |
| ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
**18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowlegment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  11 / 14 / 2022
MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | JACOB | S. | Juneau |
| | First Name | Middle Name | Last Name |

| Title | X |
|---|---|

| Company | The Juneau Group, LLC |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 2366A  Rice Blvd #232 |
|---|---|
| | Number    Street |
| | Hwston          TX          77005 |
| | City          State      ZIP Code |

| Contact Phone | 337 288 9562 | Email | JAKeJuneau@Live.com |
|---|---|---|---|

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                 12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If any information reflected on the *Proof of Claim* form is incorrect or if the Proof of Claim form contains information that you do not agree with,** cross out such information and write in what you believe to be the correct information.

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information.** Leave out or redact confidential information both in the claim and in the attached documents.

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of the filed claims in this case by visiting the Claims Agent's website at https://omniagentsolutions.com/kservicing.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Uniform claim identifier:** An optional 24-character identifier that some creditors use to facilitate electronic payment.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

**Do not file these instructions with your form.**

Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If any information reflected on the *Proof of Claim* form is incorrect or if the Proof of Claim form contains information that you do not agree with,** cross out such information and write in what you believe to be the correct information.

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information.** Leave out or redact confidential information both in the claim and in the attached documents.

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child (John Doe, parent, 123 Main St., City, State)*. See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of the filed claims in this case by visiting the Claims Agent's website at https://omniagentsolutions.com/kservicing.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Uniform claim identifier:** An optional 24-character identifier that some creditors use to facilitate electronic payment.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

 **Offers to purchase a claim**

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

**Do not file these instructions with your form.**

| UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE | |
|---|---|
| **In re**<br><br>**KABBAGE, INC. D/B/A KSERVICING**, *et al.*,<br><br>**Debtors.** | **Chapter 11 Case Nos.: 22-10951 (CTG)**<br>**Through 22-10956**<br>**(Jointly Administered)** |

## NOTICE OF DEADLINES TO FILE PROOFS OF CLAIM

**TO: ALL PERSONS AND ENTITIES WHO MAY HAVE CLAIMS AGAINST ANY OF THE FOLLOWING DEBTOR ENTITIES:**

| **Name of Debtor** | **Case Number** | **Tax Identification Number** |
|---|---|---|
| Kabbage, Inc. | 22-10951 | 36-4973937 |
| Kabbage Canada Holdings, LLC | 22-10952 | N/A |
| Kabbage Asset Securitization, LLC | 22-10953 | N/A |
| Kabbage Asset Funding 2017-A LLC | 22-10954 | 61-1854803 |
| Kabbage Asset Funding 2019-A LLC | 22-10955 | 83-4698973 |
| Kabbage Asset Diameter, LLC | 22-10956 | N/A |

| **OTHER NAMES USED BY THE DEBTORS IN THE PAST 8 YEARS**: | |
|---|---|
| Kabbage, Inc. | d/b/a KServicing, Inc., KService Corp., KServicing, and Kabbage Platform (Kabbage Platform used solely in the state of New York) |

| **Attorneys for Debtors**<br>Daniel J. DeFranceschi (No. 2732)<br>Zachary I. Shapiro (No. 5103)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701 | **Attorneys for Debtors**<br>Ray C. Schrock, P.C.<br>Natasha S. Hwangpo, Esq.<br>Chase A. Bentley, Esq.<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007 |

Address of the Clerk of the Bankruptcy Court
Clerk of the United States Bankruptcy Court,
824 North Market Street, 3rd Floor, Wilmington, DE 19801
Telephone: 302-252-2900
Hours Open: 8:00 a.m.–4:00 p.m. Monday–Friday

## PLEASE TAKE NOTICE THAT:

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY HAVE A CLAIM AGAINST THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES. THEREFORE, YOU SHOULD READ THIS NOTICE CAREFULLY AND CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.**

On October 3, 2022 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

On October 26, 2022, the Bankruptcy Court, having jurisdiction over the Chapter 11 Cases of the Debtors, entered an order (the "**Bar Date Order**") establishing the following Bar Dates:

    i.    **November 30, 2022** at **5:00 p.m. (Prevailing Eastern Time)** as the deadline for each person or entity (including individuals, partnerships, corporations, joint ventures, and trusts, but <u>not</u> including any governmental units (as defined in section 101(27) of the Bankruptcy Code) ("**Governmental Units**")), to file a proof of claim (each, a "**Proof of Claim**") in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including, for the avoidance of doubt, secured claims, unsecured priority claims, and unsecured non-priority claims (the "**General Bar Date**"), unless otherwise provided herein;

    ii.    **April 3, 2023** at **5:00 p.m. (Prevailing Eastern Time)** as the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**");

    iii.    **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Prevailing Eastern Time) on the date that is thirty (30) days from the date on which the Debtors serve an applicable claimant with notice of a previously unscheduled claim, an amendment to the Schedules (which, for avoidance of doubt, shall include a change to whether a claim is listed on the Schedules as "contingent," "unliquidated," or disputed,") or a supplement to the Schedules (as defined herein)** as the deadline by which claimants holding claims affected by such filing, amendment, or supplement must file Proofs of Claim with respect to such claim (the "**Amended Schedules Bar Date**"); and

    iv.    **the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (Prevailing Eastern Time) on the date that is thirty (30) days following the date an applicable claimant is served of an order approving rejection of any executory contract or unexpired lease of the Debtors** as the deadline by which claimants asserting claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file Proofs of Claim for damages arising from such rejection[1] (the "**Rejection Damages Bar Date**," and, collectively with the General Bar Date, the Governmental Bar Date, and the Amended Schedules Bar Date, the "**Bar Dates**").

You may be a creditor of one or more of the debtors.

**If you have any questions relating to this Notice, please feel free to contact Omni Agent Solutions ("Omni") at (866) 956-2138 (toll free) or (747) 226-5953 (international) or by e-mail at KServicingInquiries@OmniAgnt.com.**

NOTE: The staff of the Bankruptcy Clerk's Office, the Office of the United States Trustee, and the Debtors' Claims and Noticing Agent cannot give legal advice.

## INSTRUCTIONS:

### 1.    WHO MUST FILE A PROOF OF CLAIM

Except as otherwise set forth herein, the following entities holding claims against the Debtors arising prior to the Petition Date are <u>required to file Proofs of Claim</u> on or before the applicable Bar Date:

    a.    any person or entity whose claim against a Debtor is not listed in the applicable Debtor's Schedules or is listed as "~~contingent~~," "unliquidated," or "disputed," if such entity desires to participate in any of these Chapter 11 Cases or share in any distribution in any of these Chapter 11 Cases;

---

[1] Provided that notwithstanding the foregoing, a party to an executory contract or unexpired lease that has not been rejected by the Debtors by the date of entry of the Bar Date Order who asserts a claim on account of unpaid amounts accrued and outstanding as of the Petition Date pursuant to such executory contract or unexpired lease (other than a rejection damages claim) must file a Proof of Claim for such amounts on or before the applicable Bar Date, unless an exception identified in this Motion or the Proposed Order applies.

b.    any person or entity that believes that its claim is improperly classified in the Schedules or is listed in an incorrect amount and that desires to have its claim allowed in a different classification or amount other than that identified in the Schedules; and

c.    any person or entity that believes that any prepetition claim as listed in the Schedules is not an obligation of the specific Debtor against which the claim is listed and that desires to have its claim allowed against a Debtor other than the Debtor identified in the Schedules.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "**claim**" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, and priority claims.

Pursuant to section 101(15) of the Bankruptcy Code and as used in this Notice, the term "**entity**" has the meaning given to it in section 101(15) of the Bankruptcy Code, and includes all persons, estates, trusts, and governmental units. In addition, the terms "persons" and "governmental units" are defined in sections 101(41) and 101(27) of the Bankruptcy Code, respectively.

## 2.    WHO NEED **NOT** FILE A PROOF OF CLAIM

The persons or entities (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, or Governmental Units) who hold the following claims are not required to file a Proof of Claim on or before the applicable Bar Date, solely with respect to the claims described below:

a.    any claim listed on the Schedules filed by the Debtors, and (i) the claim is not listed on the Schedules as "disputed," "contingent," or "unliquidated," (ii) the person or entity agrees with the amount, nature, and priority of the claim as set forth in the Schedules, and (iii) the person or entity agrees that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

b.    any claim as to which the holder already has filed a signed Proof of Claim with Omni against the respective Debtor(s) with respect to the claim being asserted, utilizing the Proof of Claim Form or the Official Bankruptcy Form No. 410 (the "**Official Form 410**"), and has otherwise complied with the Procedures;

c.    an administrative expense allowable under section 503(b) and 507(a)(2) of the Bankruptcy Code as an expense of administration (but not, for the avoidance of doubt, claims asserting priority pursuant to section 503(b)(9)[2] of the Bankruptcy Code);

d.    any claim that has been allowed by order of this Court entered on or before the applicable Bar Date;

e.    any claim that has been paid in full or will be paid in full in accordance with the Bankruptcy Code or an order of this Court;

f.    any claim for which a separate deadline has been fixed by an order of this Court entered on or before the applicable Bar Date;

g.    any equity interest in the Debtors, which interest exclusively is based upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; provided, that if any such holder asserts a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity

---

[2] A claim arising under Bankruptcy Code section 503(b)(9) is a claim arising from the value of any goods received by the Debtors within twenty (20) days before the Petition Date, provided that the goods were sold to the Debtors in the ordinary course of the Debtors' business.

interest), a Proof of Claim must be filed on or before the applicable Bar Date pursuant to the Procedures set forth herein;

h.      a claim held by a current employee of the Debtors, if an order of the Court authorized the Debtors to honor such claim in the ordinary course of business for wages, commissions, or benefits; provided, that a current employee must submit a Proof of Claim by the applicable Bar Date for all other claims arising before the Petition Date, including, but not limited to, claims with respect to the Debtors' non-qualified deferred compensation plan or for wrongful termination, discrimination, harassment, hostile work environment, and/or retaliation;

i.      any claim based on indemnification, contribution, or reimbursement of a current officer, director, or employee of any of the Debtors; and

j.      any claim held by a Debtor or non-Debtor subsidiary or affiliate against another Debtor.

**The fact that you have received this notice does not mean that you have claim or that the Debtors or the Court believe that you have a claim against the Debtors. You should not file a Proof of Claim if you do not have a claim against any of the Debtors.**

**3.      INSTRUCTIONS FOR FILING PROOFS OF CLAIM**

Except as otherwise set forth herein, each entity that asserts a claim against the Debtors that arose before the Petition Date **MUST** file a Proof of Claim.

**The following procedures with respect to preparing and filing of Proofs of Claim will apply:**

a.      Proofs of Claim must conform substantially to either (i) the Proof of Claim Form or (ii) the Official Form 410;[3]

b.      Proofs of Claim must be filed (i) electronically through the Omni's Proof of Claim website for these cases at https://omniagentsolutions.com/kservicing-claims by following instructions for filing proofs of claim electronically; or (ii) transmitted with the original proof of claim by hand delivery, U.S. Postal Service mail, or overnight delivery to Omni's Claims Processing Center for the Debtors at Kabbage, Inc. d/b/a KServicing, et al. Claims Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

c.      Proofs of Claim will be deemed filed only when received by the Omni on or before the applicable Bar Date;

d.      Proofs of Claim must (i) be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant under penalty of perjury; (ii) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available; (iii) be in the English language and (iv) be denominated in United States currency;

e.      Proofs of Claim must specify by name and case number the Debtor against which the claim is filed. If the holder asserts a claim against more than one Debtor or has claims against different Debtors, a separate Proof of Claim form must be filed with respect to each Debtor. If the holder lists multiple Debtors on the Proof of Claim, then the Debtors will treat such claim as if it is filed against the first listed Debtor. If the holder files a Proof of Claim without identifying a Debtor, such Proof of Claim will be deemed as filed only against Kabbage, Inc. d/b/a KServicing;

f.      Proofs of Claim sent by facsimile, telecopy, or electronic mail transmission **will not** be accepted.

---

[3] The Official Form 410 can be found at www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts. The Proof of Claim Form can be found at https://omniagentsolutions.com/kservicing, the website established by Omni for the Debtors' chapter 11 cases.

4.    **CONSEQUENCES OF FAILURE TO TIMELY FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE**

**Pursuant to the Bar Date Order and Bankruptcy Rule 3003(c)(2), any holder of a claim who is required to timely file a Proof of Claim on or before the applicable Bar Date as provided herein, but fails to do so, unless ordered otherwise by the Court, shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution in these Chapter 11 Cases on account of such claim.**

5.    **THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSEQUENCES OF AMENDMENT THEREOF**

You may be listed as the holder of a claim against the Debtors in the Debtors' Schedules of Assets and Liabilities (collectively, the "**Schedules**"). To determine if and how you are listed in the Schedules, please refer to the descriptions set forth on the enclosed Proof of Claim Form regarding the nature, amount, and status of your claim(s). If the enclosed Proof of Claim Form is blank, you are not identified in the Schedules as having a claim against the Debtors. If you believe that any information reflected in the Proof of Claim Form is incorrect or if the Proof of Claim Form includes information that you do not agree with, you may cross out such information and write in what you believe to be the correct information. If you received postpetition payments from the Debtors (as authorized by the Court) on account of your claim, the enclosed Proof of Claim Form will reflect the net amount of your claims. If the Debtors believe that you hold claims against more than one Debtor, you will receive multiple Proof of Claim Forms, each of which will reflect the nature and amount of your claim against each Debtor, as listed in the Schedules.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Debtors' Schedules and if your claim is not listed in the Schedules as "disputed," "contingent," or "unliquidated," you need not file a Proof of Claim. Otherwise, or if you decide to file a Proof of Claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' Chapter 11 Cases, which is posted (i) on the website established by Omni for the Debtors' cases at https://omniagentsolutions.com/kservicing and (ii) on the Court's website at www.deb.uscourts.gov. (A login and password to the Court's Public Access to Electronic Court Records ("PACER") are required to access the information on the Court's website and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov). Copies of the Schedules also may be examined between the hours of 8:00 a.m. and 5:00 p.m. (Prevailing Eastern Time) Monday through Friday at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, DE 19801. Copies of the Debtors' Schedules also may be obtained by written request to the Debtors' claims agent, Omni, at the address and telephone number set forth below:



**Kabbage, Inc. d/b/a KServicing, et al. Claims Processing**

c/o Omni Agent Solutions

5955 De Soto Ave., Suite 100

Woodland Hills, CA 91367

(866) 956-2138 (toll free)

(747) 226-5953 (international)

In the event that the Debtors amend or supplement their Schedules subsequent to date of entry of the Bar Date Order, the Debtors shall give notice of any amendment or supplement to the holders of claims affected by such amendment or supplement within fourteen (14) days after filing such amendment or supplement, and such holders must file a Proof of Claim by **the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. (Prevailing Eastern Time) on the date that is thirty (30) days following the date on which the Debtors serve an applicable claimant with notice of a previously unfiled Schedule or an amendment or supplement to the Schedules**, and such deadline shall be contained in any notice of such amendment or supplement of the Schedules provided to the holders of claims affected thereby.

**6.    RESERVATION OF RIGHTS**

Nothing contained in this Notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any filed claim or any claim listed or reflected in the Schedules as to the nature, amount, liability, or classification thereof; (b) subsequently designate any scheduled claim as disputed, contingent, or unliquidated; and (c) otherwise amend or supplement the Schedules.

---

**If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' Claims and Noticing Agent directly at: Kabbage, Inc. d/b/a KServicing, et al. c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; Telephone: (866) 956-2138 (toll free) or (747) 226-5953 (international); or by e-mail at KServicingInquiries@omniagnt.com.**

---

**A holder of a possible claim against the Debtors should consult an attorney if such holder has any questions regarding this Notice, including whether the holder should file a Proof of Claim.**

---

Dated:    Wilmington, Delaware            **BY ORDER OF THE COURT**
          October 26, 2022

| | |
|---|---|
| Ray C. Schrock, P.C.<br>Candace M. Arthur<br>Natasha S. Hwangpo<br>Chase A. Bentley<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Telephone:  (212) 310-8000<br>Facsimile:  (212) 310-8007 | Daniel J. DeFranceschi<br>Amanda R. Steele<br>Zachary I. Shapiro<br>Matthew P. Milana<br>RICHARDS, LAYTON & FINGER, PA<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile:  (302) 651-7701 |
| ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION | |

Kabbage Inc. dlbla KServicing
et al., Clo omni Agent Solutions,

5955 Desoto Avenue Suite 100

Woodland Hills, LA 91367

DeaD Line

November 30  4pm CT

MAIL to

**FROM:**

# PRIORITY®
# ★ MAIL ★



**UNITED STATES**
**POSTAL SERVICE** ®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

**FROM:**

The Juneau Group LLC
2380A Rice Blvd #232
Houston Texas 77005

RECEIVED

NOV 28 2022

Omni Agent Solutions

**TO:**

Kabbage Inc d/b/a Kservicing
et Al; Omni Agent Solutions
5955 De Soto Avenue Suite 100
Woodland hills, CA 91367

Label 228, March 2016          FOR DOMESTIC AND INTERNATIONAL USE

# EXHIBIT **6**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KSERVICING WIND DOWN CORP., *et al.*,<br><br>      Post-Confirmation Debtors. | Chapter 11<br><br>Case No. 22-10951 (CTG)<br>(Jointly Administered)<br><br>**Related Docket No. 998** |

### ORDER DISALLOWING CLAIMS FILED BY THE JUNEAU GROUP, LLC

The Juneau Group, LLC, a legal entity, filed various proofs of claim against several of the debtors in the above-captioned bankruptcy cases. In December 2023, the post-confirmation debtors objected to the allowance of those claims [D.I. 998]. The deadline for responding to the claims objection was January 30, 2024. On that date, the Juneau Group, LLC filed a document captioned "Response to Disallowance of Claim" [D.I. 1006]. That pleading was stricken from the docket on the ground that it was filed *pro se* (through the principal of the Juneau Group), whereas a legal entity may only appear in court through licensed counsel.[1] The order striking the objection, dated January 30, 2024, stated that if "the Juneau Group, LLC wishes to respond to the objection to its proofs of claim, it must do so through licensed counsel admitted to practice before this Court." [D.I. 1015]

Despite the passage of ample time since this Court's January 30,2024 order, the Juneau Group has not, to date, responded to the claims objection through counsel

---

[1] *See generally Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-202 (1993) ("It has been the law for the better part of two centuries, for example, that a corporation may appear in the federal courts only through licensed counsel…. As the courts have recognized, the rationale for that rule applies equally to all artificial entities.").

or otherwise indicated to the Court (despite a number of communications with chambers) that it has retained counsel for the purpose of doing so.

Accordingly, the following claims, which are the subject of the claims objection, are hereby disallowed:

| Claim No. | Debtor(s) | Claim Amount |
|---|---|---|
| 2 | Kabbage Diameter, LLC | $11,000,000.00 |
| 2 | Kabbage Asset Funding 2017-A, LLC | $11,000,000.00 |
| 2 | Kabbage Asset Securitization, LLC | $11,000,000.00 |
| 2 | Kabbage Canada Holdings, LLC | $11,000,000.00 |
| 4 | Kabbage Asset Funding 2019-A, LLC | $11,000,000.00 |
| 91 | Kabbage, Inc. d/b/a KServicing | $11,000,000.00 |
| 184 | Kabbage, Inc. d/b/a KServicing | $499,999.99 |

The Post-Confirmation Debtors, the Wind Down Officer, the Claims Agent, and the Clerk of this Court are authorized to take appropriate action to give effect to this Order.

Dated: April 12, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT **7**

# 503(b)(9) Administrative Expense Claim

The following is an illustrative MOTION OF [SUPPLIER] FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. 503(b)(9). Increasingly, Bankruptcy Courts are modifying the approved standard claims form to allow for assertion of an administrative priority claim under 503(b)(9). The local rules and the orders entered in the applicable bankruptcy case should be carefully reviewed.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 Case No. 22-10951 |
|  | ) | Chapter 11 Case No. 22-10952 |
| Kabbage, Inc, d/b/a K-Servicing | ) | Chapter 11 Case No. 22-10953 |
|  | ) | Chapter 11 Case No. 22-10954 |
| Reorganized Debtor. | ) | Chapter 11 Case No. 22-10955 |
|  | ) | Chapter 11 Case No. 22-10956 |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| The Juneau Group, LLC | ) |  |
|  | ) | Chapter 11 Case No. 22-10951 |
| Plaintiff, | ) | Chapter 11 Case No. 22-10952 |
|  | ) | Chapter 11 Case No. 22-10953 |
| v. | ) | Chapter 11 Case No. 22-10954 |
|  | ) | Chapter 11 Case No. 22-10955 |
| Kabbage, Inc, d/b/a K-Servicing | ) | Chapter 11 Case No. 22-10956 |
|  | ) |  |
| Defendant | ) |  |
|  | ) |  |

MOTION OF THE JUNEAU GROUP, LLC FOR ALLOWANCE OF

ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. 503(b)(9)

THE JUNEAU GROUP, LLC ("[Supplier]"), by and through its undersigned attorneys, hereby requests the entry of an order, pursuant to 11 U.S.C. § 503(b)(9), allowing The Juneau Group, LLC an administrative expense claim in the amount of $20,833/month for the duration of the case. In support of its Motion, [Supplier] states as follows:

## JURISDICTION

1. On October 3rd, 2022 (the "Petition Date"), each of the above-captioned debtors (collectively, the "Debtors") filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §157 and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (B). Venue is proper in this District pursuant to 28 U.S.C. §1408 and 1409.

## BACKGROUND

3. THE JUNEAU GROUP, LLC manufactures, among other things, for industry. THE JUNEAU GROUP regularly sold some of these products to KABBAGE, INC before the Petition Date.

4. In the 20 days preceding the Petition Date, KABBAGE INC, received goods that THE JUNEAU GROUP, LLC sold on credit to KABBAGGE, INC in the ordinary course of KABBAGES's business. Such goods included TIME (the "Goods") and had an aggregate value of $499,999.99, as identified on the invoices and proofs of delivery attached hereto as Exhibit A.

5. As of the date of this Motion, THE JUNEAU GROUP, LLC has not received payment for the Goods.

## RELIEF REQUESTED

6. THE JUNEAU GROUP, LLC respectfully requests that this Court allow THE JUNEAU GROUP's administrative expense claim in the amount of $499,999.99 for the Goods pursuant to section 503(b)(9) of the Bankruptcy Code.

## BASIS FOR RELIEF

7. Section 503(b)(9) of the Bankruptcy Code provides, in pertinent part, that:

After notice and a hearing, there shall be allowed, administrative expenses... [for] the value of any goods received by the debtor within 20 days before the date of commencement of a

case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9).

8. THE JUNEAU GROUP, LLC reserves its right to assert claims against the Debtors for amounts not contemplated by this Motion or allowed by the Court pursuant to section 503(b)(9) and to amend, modify and/or supplement this request, as appropriate under the circumstances.

WHEREFORE, THE JUNEAU GROUP, LLC respectfully requests that the Court enter an order substantially in the form attached hereto as Exhibit B: (i) allowing THE JUNEAU GROUP's administrative expense claim in the amount of $499,999.99 pursuant to section 503(b)(9) of the Bankruptcy Code and (ii) granting such other and further relief as may be just and proper under the circumstances.

Jacob Juneau
The Juneau Group, LLC
Telephone: 337 288 9562
Email: JakeJuneau@live.com
Signature

# EXHIBIT **8**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

----------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **KABBAGE, INC. d/b/a KSERVICING**, *et al.*, | : | **Case No. 22-10951 (CTG)** |
|  | : |  |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |

----------------------------------------------------------- x     **Re: D.I. No. 345**

## DEBTORS' OBJECTION TO THE MOTION OF THE JUNEAU GROUP, LLC FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO SECTION 503(b)(9) OF THE BANKRUPTCY CODE

Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this objection (the "**Objection**") to the *Motion of the Juneau Group, LLC for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(9)* (the "**503(b)(9) Motion**") [Docket No. 345] filed by the Juneau Group, LLC (the "**Juneau Group**").[2]  In support of this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] The Debtors note that the Juneau Group has filed the 503(b)(9) Motion without the assistance of counsel.  It is established in both Delaware and Federal case law that a corporate entity cannot appear *pro se* and must be represented by counsel. *See e.g. Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries, for example, that a corporation may appear in the federal courts only through licensed counsel."); *Carickhoff v. Occupational Med. Clinics (In re Cal Dive Int'l, Inc.)*, No. 15-10458 (CSS), 2018 WL 456156 at *2 n.8 (Bankr. D. Del. Jan. 16, 2018) (finding that the defendant, a limited liability company, improperly appeared *pro se* and directing the defendant to retain counsel); *Gavin Solmonese, LLC v. True Line Wire (In re Boomerang Sys., Inc.)*, No. 15-11729 (MFW), 2017 WL 4221095 at *3 (Bankr. D. Del. Sept. 21, 2017) (stating that "[i]t is well-settled that a corporation must retain licensed counsel to appear in federal court" and directing the defendant, a corporation, to retain counsel); *Transpolymer Indus., Inc. v. Chapel Main Corp.*, 582 A.2d 936 (Table), 1990 WL 168276 at *1 (Del. 1990) ("[A] corporation, being an artificial entity, can only act through its agents and, before a court only through an agent duly licensed to practice law.").

Objection, the Debtors submit the declaration of Thora Thoroddsen, attached hereto as **Exhibit A** (the "**Thoroddsen Declaration**") and respectfully state as follows:

### General Background

1.      On October 3, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are authorized to continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

2.      Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Chapter 11 Cases are being jointly administered under the above captioned case.

3.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Deborah Rieger-Paganis in Support of the Chapter 11 Petitions and First-Day Pleadings* [Docket No. 13] (the "**First Day Declaration**").[3]

### Specific Background

4.      On October 26, 2022, this Court entered the *Order (I) Establishing a General Bar Date to File Proofs of Claim, (II) Establishing a Bar Date to File Proofs of Claim by Governmental Units, (III) Establishing an Amended Schedules Bar Date, (IV) Establishing a Rejection Damages Bar Date, (V) Approving the Form and Manner for Filing Proofs of Claim, (VI) Approving the Proposed Notice of Bar Dates, (VII) Approving Procedures with Respect to*

---

[3] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

*Service of the Proposed Notice of Bar Dates, and (VIII) Granting Related Relief* [Docket No. 161] (the "**Bar Date Order**").

5.      Among other things, the Bar Date Order established **November 30, 2022 at 5:00 p.m. (Prevailing Eastern Time)** as the deadline by which all entities, not including governmental units, holding claims (whether secured, unsecured priority (including claims under section 503(b)(9) of the Bankruptcy Code), or unsecured nonpriority) against the Debtors that arose prior to the Petition Date must file proofs of claim (the "**General Bar Date**").

6.      Prior to the General Bar Date, on November 28, 2022, the Juneau Group submitted a proof of claim, Claim No. 951-184 ("**Claim No. 184**"), asserting an administrative expense claim identical to the 503(b)(9) Claim (as defined below) asserted in the 503(b)(9) Motion. *See* Claim No. 951-184.[4] On January 27, 2023, the Debtors filed their first omnibus objection [Docket No. 491] (the "**First Omnibus Objection**") seeking to reclassify Claim No. 184 as a general unsecured claim without prejudice to the Debtors' rights to object to such claim on additional grounds.[5]

7.      Then, on December 6, 2022, the Juneau Group filed the 503(b)(9) Motion requesting payment on account of an alleged $499,999.99 administrative expense claim (the "**503(b)(9) Claim**") pursuant to section 503(b)(9) of the Bankruptcy Code.[6]  *See* 503(b)(9)

---

[4] In addition to the 503(b)(9) Claim and Claim No. 184, the Juneau Group also filed multiple other proofs of claim, including Claim Nos. 951-91, 955-4, 952-2, 953-2, 954-2, and 956-2, against certain of the Debtors asserting an $11,000,000 secured and priority claim (collectively, the "**Other Juneau Group Claims**").

[5] All of the Other Juneau Group Claims are also subject to the First Omnibus Objection.  The response deadline for the First Omnibus Objection was February 15, 2023, at 4:00 p.m. (Prevailing Eastern Time).  No creditor, including the Juneau Group, filed, and the Debtors did not receive, any responses to the First Omnibus Objection.  On February 17, 2023, the Court entered an order [Docket No. 546] sustaining the First Omnibus Objection, thereby reclassifying the Other Juneau Group Claims and Claim No. 184 to general unsecured claims.

[6] The Debtors, and their advisors, confirmed that the Juneau Group is a borrower of a Paycheck Protection Program Loan ("**PPP Loan**") that the Debtors service.  The Juneau Group's PPP Loan was guaranty purchased by the Small Business Administration (the "**SBA**") on August 29, 2022, and the total value of the loan is only $2,223.  As of the date of filing this Objection, the Juneau Group has not applied for SBA forgiveness of its PPP Loan.

Motion ¶ 4.[7]  Specifically, the Juneau Group asserts that it "manufactures, among other things, for industry" and that, in the twenty days prior to the Petition Date, the Debtors received goods that the Juneau Group sold to the Debtors in the ordinary course of business.  *See id.* at ¶¶ 3-4.  Further, the Juneau Group describes such goods as "TIME" with an aggregate value of $499,999.99.  *See id.* at ¶ 4.  The Juneau Group also asserts "an administrative expense claim in the amount of $20,833/month for the duration of the case." *See id.*  In support of its 503(b)(9) Claim, the Juneau Group references invoices and proofs of delivery attached as Exhibit A to the 503(b)(9) Motion but fails to attach such supporting documentation.[8]  *See id*. at ¶ 4.

8.     For the reasons set forth below, and in the Thoroddsen Declaration, the Court should deny the 503(b)(9) Motion for allowance of the 503(b)(9) Claim.

## Objection

**I.     The Court Should Deny the 503(b)(9) Motion Because the Juneau Group is not Entitled to an Administrative Expense Claim Under Section 503(b)(9) of the Bankruptcy Code**

9.     Section 503(b)(9) of the Bankruptcy Code provides administrative expense priority for "the value of any *goods* received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9) (emphasis added).  To establish an administrative priority claim under section 503(b)(9), a claimant must show that "(1) the vendor sold 'goods' to the debtor; (2) the goods were received by the debtor within twenty days prior to filing; and (3) the goods were sold to the debtor in the ordinary course of business."  *See In re NE Opco, Inc.*, 501 B.R. 233, 240-41 (Bankr. D. Del. 2013); *see also In re Goody's Family Clothing,*

---

[7] The 503(b)(9) Motion was docketed by the Court on December 8, 2022.

[8] Claim No. 184 and the Other Juneau Group Claims also fail to attach any supporting documentation.

*Inc.*, 401 B.R. 131, 133 (Bankr. D. Del. 2009).  It is well settled that a party requesting payment of an administrative expense claim bears the burden of proof in establishing that its claim is entitled to administrative expense status.  *See, e.g., In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001).  For the reasons set forth below, the Juneau Group has failed to demonstrate how its 503(b)(9) Claim satisfies the standards for an administrative expense claim under section 503(b)(9) of the Bankruptcy Code.[9]

### A. "TIME" Does Not Constitute "Goods" Under Section 503(b)(9) of the Bankruptcy Code

10.     Section 503(b)(9) of the Bankruptcy Code affords administrative expense priority status for claims arising from "goods" received by the debtor, in the ordinary course, within the twenty days prior to the filing of a bankruptcy petition.  The Bankruptcy Code, however, does not define what constitutes "goods".  *See In re NE Opco,* 501 B.R. at 241.   In the absence of a definition in the Bankruptcy Code, courts, including this Court, typically adhere to the definition of "goods" in the Uniform Commercial Code (the "**UCC**").  *See, e.g.*, *id.* (noting that "this Court has previously adopted the definition of goods in the Uniform Commercial Code").  Under the UCC, goods mean "things" that are "moveable at the time of identification to the contract for sale."  UCC § 2-105(1); *see also In re NE Opco,* 501 B.R. at 241 (quoting UCC § 2-105(1)).

11.     Applying this straight-forward definition, courts in this and other jurisdictions, have excluded from section 503(b)(9) claims for any non-goods items, including claims for services rendered.  *See In re NE Opco,* 501 B.R. at 250 (illustrating the difference

---

[9] As set forth in the Thoroddsen Declaration, the 503(b)(9) Motion appears to assert both a claim under section 503(b)(9) of the Bankruptcy Code for prepetition services and a post-petition claim in the amount of "$20,833/month for the duration of the case".  The Juneau Group has not provided *any* goods or services to the Debtors either before or after the Petition Date.  Accordingly, the 503(b)(9) Motion should also be denied to the extent it seeks payment of an administrative expense for the provision of post-petition goods or services to the Debtors.

between a good and a service). *See also In re O.W. Bunker Holding N.A. Inc.*, 607 B.R. 47, 66 (Bankr. D. Conn. 2019) (excluding claims for services from the 503(b)(9) claim); *In re Goody's Family Clothing, Inc.*, 401 B.R. at 135 (explaining that a claim for an administrative expense under 503(b)(9) cannot be a claim for services provided); *In re SemCrude, L.P.*, 416 B.R. 399, 405 (Bankr. D. Del. 2009) (explaining services are not goods within the meaning of section 503(b)(9)); *In re Sklar Expl. Co., LLC*, 638 B.R. 627, 632 (Bankr. D. Colo. 2022) (explaining 503(b)(9) requires a distinction between goods and services).

12. In *NE OPCO*, the claimant was a utility provider that asserted an administrative expense priority claim pursuant to section 503(b)(9) for electricity and natural gas, including incidental services and fees, it provided to the debtors twenty days prior to the debtors' bankruptcy. *See NE OPCO*, 501 B.R. at 236-37. Applying the UCC's definition, and illustrating the difference between services and goods, the Court determined that only the natural gas constituted a "good" under the UCC and section 503(b)(9). The Court subsequently denied the claimant's argument that the related services and fees provided in connection with the natural gas constituted "goods" under 503(b)(9), or were otherwise entitled to administrative expense priority:

> "As to the natural gas provided by Westfield — the Court finds that natural gas is a good. However, the Court . . . will award Westfield an administrative priority claim . . . for the value of the natural gas provided, but not the associated services."

*Id*. at 260.

13. As an additional example, in *Goody's Family Clothing*, the debtors, an apparel retailer, objected to section 503(b)(9) claims filed by one of their vendors for certain services rendered within the twenty days prior to the petition date. Such services included inspecting, ticketing, and repackaging apparel purchased from other vendors. *See* 401 B.R. at 133. The debtors objected to the claims on the basis that services are not "goods" as required by section

503(b)(9). *See id*. Finding that the UCC definition applied to the meaning of "goods" under section 503(b)(9), the Court sustained the debtors' objection and held that the services the vendors provided did not constitute goods for purposes of an administrative expense claim pursuant to section 503(b)(9). *Id*. at 135-36.

14. As described above, the Juneau Group asserts that twenty days prior to the Petition Date it sold goods described as "TIME" to the Debtors in the ordinary course of business, and such goods have an aggregate value of $499,999.99. *See* 503(b)(9) Motion ¶ 4. Applying the relevant case law, the 503(b)(9) Claim for "TIME" is not a "good" within the meaning of the UCC and section 503(b)(9), and at most is a claim for services similar to those in *NE OPCO* or *Goody's Family Clothing* that is not entitled to administrative expense priority.[10] Accordingly, the Juneau Group's alleged 503(b)(9) Claim is not entitled to administrative priority.

### B. The Juneau Group's Claim Should Be Expunged, Or At Least Reclassified, Because It Has Failed to Provide Any Support For its 503(b)(9) Claim

15. The framework for assessing the validity of a claim filed in a bankruptcy proceeding is a burden shifting one. *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992). The burden rests initially on the claimant to provide sufficient evidence to support a finding that their claim is "prima facie" valid. *See id*. at 173 ("If the averments in [the] filed claim meet this standard of sufficiency, it is '*prima facie*' valid.) (citing *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)). The Juneau Group's alleged 503(b)(9) Claim has provided no support whatsoever for its assertion that it sold "goods" to the Debtors, the amount of the "goods," and that such goods were provided within twenty days of the Petition Date. The 503(b)(9) Motion simply makes conclusory statements without including any description of the goods sold, the date the goods were

---

[10] For the avoidance of doubt, the Juneau Group has not provided any services to the Debtors.

received by the Debtors, or the invoice for such goods. As such, the 503(b)(9) Claim does not set forth a prima facie showing necessary to state a claim nor a showing that any such claim is an administrative claim. *See In re New Century TRS Holdings, Inc*., 446 B.R. 656, 662 (Bankr. D. Del. 2011) (denying a claimant's asserted administrative expense claim after finding the claimant failed to provide sufficient facts to support a valid claim). Further, the 503(b)(9) Motion references that supporting documentation, including invoices and proofs of delivery, is attached as an exhibit to the 503(b)(9) Motion but fails to attach such documentation.[11] It is the Juneau Group's burden to support its claim and it has failed to do so. *See In re Unidigital*, 262 B.R. at 288. For these reasons, the Court should deny the 503(b)(9) Motion.

## II. The Debtors Have No Record of Receiving Any Goods or Services from the Juneau Group

16. Finally, prior to the filing of this Objection, the Debtors diligently inspected their books and records and did not locate any invoices, proofs of delivery, or other records indicating the existence of the "goods" the Juneau Group alleges the Debtors received twenty days prior to the Petition Date. *See* Thoroddsen Declaration ¶ 4. Additionally, the Debtors coordinated with their advisors who confirmed no records exist of the Debtors ever receiving any other goods or services from the Juneau Group. *See id*. Further, the Debtors attempted to contact the Juneau Group to obtain more information regarding the 503(b)(9) Claim in an effort to reach a mutual understanding and to the extent possible, a resolution of the dispute. However, after initiating contact via various modes of communication (via email and telephone, utilizing the information

---

[11] In addition, no such documentation is attached to Claim No. 184 or the Other Juneau Group Claims.

set forth on the 503(b)(9) Motion and the email address used to contact the Court's Chambers), the Juneau Group failed to respond to the Debtors.  *See id* at ¶ 5.

## **Reservation of Rights**

17.     The Debtors reserve the right, without limitation, to: (a) dispute any and all facts in the 503(b)(9) Motion in the context of the claims resolution process or for any other reason; (b) dispute the actual amount of the Juneau Group's claims as set forth in the 503(b)(9) Motion; (c) object to claims alleged in the 503(b)(9) Motion if such claims are supplemented with additional documentation (or additional amounts) on any grounds whatsoever at a later date; and (d) object to Claim No. 184 and the Other Juneau Group Claims on any and all grounds.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court deny the relief requested in the 503(b)(9) Motion.

Dated: February 17, 2023
Wilmington, Delaware

|  |
|---|
| /s/ Matthew P. Milana |

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
      steele@rlf.com
      shapiro@rlf.com
      milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
E-mail:    ray.schrock@weil.com
        candace.arthur@weil.com
        natasha.hwangpo@weil.com
        chase.bentley@weil.com

*Attorneys for Debtors and Debtors in Possession*

# EXHIBIT **9**



# The Juneau Group

2386A Rice BLVD #232│Houston, Texas 77005│ Phone: 337.288.9562│ Email: jakejuneau@live.com

To: Honorable Elizabeth E Brown                  Date: June 1st 2020
Colorado Bankruptcy Court
U.S. Custom House
721 19th St. Denver, CO 80202
Courtroom F

To: Judge Elizabeth E Brown:

I am filing a motion with regard to Case No. 1:20-bk-12377, the bankruptcy of Sklar Exploration Company, LLC and Sklarco, LLC. Evaluating the case from a higher level, it appears that the capital stack is divided into countless small creditors. In addition, management *grossly misallocated the resources of the company and abused shareholders (and creditors) – to put it lightly, a classic case of hubris was exhibited.* For these reasons, it appears to be common sense that it will be very difficult to resolve this case with current management in place and absent a 363 sale.

With your digression, I would like to work-out a solution for all parties involved (excluding management in place). I see a binary option. After evaluation of the assets, my company will inject growth capital into the company. All existing creditors will equitize their portion of debt in a new company, which is supplied with growth capital and management they can trust. Any hesitation of trust of my team can be discussed in future conversations. The other option (as hinted by recent motions filed) is to transfer the case to liquidation. In this event, I am happy to serve as the stalking horse bidder. In order to place a value for the assets and serve as a stalking horse bidder or management for a new company I need access to the books of the firm and data of the assets. Let this motion serve as a request for that information.

Regards,

Jacob Juneau
President

# EXHIBIT **10**



# The Juneau Group

2386A Rice BLVD #232|Houston, Texas 77005| Phone: 337.288.9562| Email: jakejuneau@live.com

To: Honorable Elizabeth E Brown                                    Date: November 20th, 2020
Colorado Bankruptcy Court
U.S. Custom House
721 19th St. Denver, CO 80202
*Case NO. 1:20-bk-12377*

To: Judge Elizabeth E Brown:

<u>Preclusionary Motion to Quash Debtor and Affiliates Attempt to Delay Plan of Reorganization Past November 25, 2020</u>

Judge Brown herein *lies a preclusionary motion to quash any attempt to extend the Debtor's period of exclusivity toward a reorganization plan due November 25, 2020.* I first addressed the court on June 1st, 2020, to address the negligence and mismanagement of Sklar Exploration Company, LLC and Sklarco, LLC. I pleaded with the court to allow my firm to work-out an out-of -court solution for all parties involved (excluding management in place). Looking back, I believe creditors (secured and unsecured) would have preferred this option in comparison to the continued delays and excuses the debtor and advisors have provided.

Since then, the debtor and advisors have failed to provide appropriate financial records and have been late providing evidence of third-party reserves. Reserve reports by any of the major third-party consulting firms take no longer than 2-3 weeks – customarily. This case has drug-out for nearly a year with the same sorry excuses. Furthermore, when reaching out to Debtor's counsel and advisors regarding access to the *public data room*, I was rejected access to the reserve report. I realize there is a period of exclusivity for the Debtor to come up with a reorganization plan by November 25, but does that suggest the public cannot access public information? This is obviously a stalling tactic to rob all creditors further from their already substantial losses.

If a delay in receiving the reserve report is used to delay the November 25th deadline, I encourage you to use your wisdom to <u>see *the debtor has no reorganization plan*</u>. The debtor is stalling so <u>management can continue to collect general and administrative expenses while praying for oil price recovery</u>. I do not believe creditors should be subsidizing this prayer. I also ask that you order Debtor counsel and restructuring advisors to grant my firm access to *public information*.

Kind Regards,

Jacob Juneau
President

# EXHIBIT **11**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Elizabeth E. Brown

In re:

Sklar Exploration Company, LLC,
EIN NO: 72-1417930

Debtor.

Bankruptcy Case No. 20-12377 EEB
Chapter 11

In re:

Sklarco, LLC,
EIN NO: 72-1425432

Debtor.

Bankruptcy Case No. 20-12380 EEB
Chapter 11

**Jointly Administered Under
Case No. 20-12377 EEB**

---

### ORDER REGARDING COMPLIANCE WITH RULES

THIS MATTER having come before the Court on the Preclusionary (sic) Motion to Quash Debtor and Affiliates Attempt to Delay Plan of Reorganization Past November 25, 2020, ("Motion") filed by The Juneau Group ("Juneau") on November 20, 2020. A review of the Motion indicates that provisions of the Federal Bankruptcy Rules, and Local Bankruptcy Rules of this Court have not been complied with. The Court being further advised in the premises, hereby

FINDS that Juneau may not appear before a bankruptcy court in this district unless it is represented by counsel:

No corporation, partnership, or other unincorporated organization, or entity may file a petition under Title 11, of the United States Code, or otherwise appear in cases or proceedings before this court, unless it is represented by an attorney authorized to practice this court. Where a corporate debtor is involved, the attorney representing such an entity must sign the petition and pleadings.

L.B.R. 9010-1(e).

Accordingly, it is hereby

ORDERED that The Juneau Group has to and including **December 4, 2020,** to comply with L.B.R. 9010-1(e), failing which Juneau's Motion will be stricken from the docket.

DATED this 23rd day of November, 2020.

BY THE COURT:

*Elizabeth E. Brown*
Elizabeth E. Brown, Bankruptcy Judge

# EXHIBIT **12**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: | Bankruptcy Case No. 20-12377 EEB |
| Sklar Exploration Company, LLC,<br>EIN NO: 72-1417930 | Chapter 11 |
| Debtor. | |
| In re: | Bankruptcy Case No. 20-12380 EEB |
| Sklarco, LLC,<br>EIN NO: 72-1425432 | Chapter 11 |
| Debtor. | **Jointly Administered Under**<br>**Case No. 20-12377 EEB** |

---

### ORDER STRIKING MOTION

---

THIS MATTER comes before the Court on the filing of Preclusionary [sic] Motion to Quash Debtor and Affiliates Attempt to Delay Plan of Reorganization Past November 25, 2020, filed by The Juneau Group ("Movant") on November 20, 2020. The Court, having reviewed the pleadings and being advised,

FINDS that the Court entered an Order Regarding Compliance with Rules on December 23, 2020, requiring the Movant to comply with L.B.R. 9010-1(e) or its Motion will be stricken. Movant has not timely complied by retaining counsel. It is therefore

ORDERED that the of Preclusionary [sic] Motion to Quash Debtor and Affiliates Attempt to Delay Plan of Reorganization Past November 25, 2020 is hereby STRICKEN from the docket.

DATED this 8th day of December, 2020.

BY THE COURT:

Elizabeth E. Brown, Bankruptcy Judge

# EXHIBIT **13**

**From:** Collin Lensing <clensing@venderaresources.com>
**Sent:** Thursday, August 8, 2024 9:50 AM
**To:** Demetri Economou
**Subject:** FW: BPX <—-> Vendera
**Attachments:** Project Throne US Paper - V22 small.pdf

**From:** Collin Lensing
**Sent:** Friday, November 15, 2019 4:27 PM
**To:** 'Mohit Singh' <mohit.singh@BPX.COM>
**Subject:** RE: BPX <—-> Vendera

Mohit – Good speaking with you today and thanks for sending over the asset package descriptions. One item I did not discuss is our royalty buying program. It looks like BPX has fee minerals in quite a few areas. I would definitely like to hear more about those or if there is an opportunity to evaluate those for sale. We also would be interested in the Arkoma properties. We have an operated property set that we bought from EnergyQuest last year that may complement that somewhat. If there is an opportunity to get more detail on the fee mineral position and the Arkoma properties, I would like to open that dialogue (CA/NDA). For fee minerals if you have a Section / Township / Range, acreage and royalty rate (if leased), we can work off that. For the Arkoma deal, if its possible to get an API list with WI/NRI and an LOS for the last 12 months we can work off that. Thank you again for taking the time today.

Best,
Collin



**Collin Lensing** | COO & General Counsel
**a:** Vendera Resources | 2602 McKinney Ave, Ste. 200 | Dallas, TX 75204
**e:** clensing@venderaresources.com | **w:** www.venderaresources.com
**p:** 469.206.0020 **c:** 214.287.7723
*Board Certified – Oil, Gas & Mineral Law*
*Texas Board of Legal Specialization*

**From:** Mohit Singh <mohit.singh@BPX.COM>
**Sent:** Friday, November 15, 2019 2:23 PM
**To:** Collin Lensing <clensing@venderaresources.com>
**Subject:** RE: BPX <—-> Vendera

Collin, as promised, here is a teaser (a bit dated) that would give you an idea

Thank you,

Mohit Singh

-----Original Appointment-----
**From:** Mohit Singh
**Sent:** Thursday, November 14, 2019 12:28 PM

1

**To:** Mohit Singh; Collin Lensing
**Cc:** Donna Teal
**Subject:** BPX <—-> Vendera
**When:** Friday, November 15, 2019 2:15 PM-2:45 PM (UTC-06:00) Central Time (US & Canada).
**Where:** Call Mohit at 281-221-8177

_____

**From:** Collin Lensing <clensing@venderaresources.com>
**Sent:** Thursday, November 14, 2019 12:18 PM
**To:** Mohit Singh <mohit.singh@BPX.COM>
**Cc:** Donna Teal <DONNA.TEAL@BPX.COM>
**Subject:** RE: BPX <—-> Vendera

That works, looking forward to it. Thanks.

Best,
Collin



**Collin Lensing** | COO & General Counsel
**a:** Vendera Resources | 2602 McKinney Ave, Ste. 200 | Dallas, TX 75204
**e:** clensing@venderaresources.com | **w:** www.venderaresources.com
**p:** 469.206.0020 **c:** 214.287.7723
*Board Certified – Oil, Gas & Mineral Law*
*Texas Board of Legal Specialization*

**From:** Mohit Singh <mohit.singh@BPX.COM>
**Sent:** Thursday, November 14, 2019 12:17 PM
**To:** Collin Lensing <clensing@venderaresources.com>
**Cc:** Donna Teal <DONNA.TEAL@BPX.COM>
**Subject:** RE: BPX <—-> Vendera

Hi Collin, can we talk at 215pm this Friday? Once you confirm, I will send a planner

**Mohit Singh**
SVP Business Development and Exploration
15377 Memorial Drive
Houston | TX | 77079
Office: 281.810.2119
Mobile: 281.221.8177
Email Address: mohit.singh@bpx.com



*This email and any attachments are intended only for the addressee(s) listed above and may contain confidential, proprietary, and/or privileged information. If you are not an intended recipient, please immediately advise the sender by return email, delete this email and any attachments, and destroy any copies of same. Any unauthorized review, use, copying disclosure or distribution of this email and any attachments is prohibited.*

**From:** Collin Lensing <clensing@venderaresources.com>
**Sent:** Thursday, November 14, 2019 12:10 PM
**To:** Mohit Singh <mohit.singh@BPX.COM>
**Subject:** RE: BPX <—-> Vendera

Thanks Shubi, moving you to bcc.

Mohit – It's great to be introduced, and I look forward to connecting in more depth. Would you be around for a call tomorrow or next week, and I can tell you more about Vendera? Thanks.

Best,
Collin



**Collin Lensing** | COO & General Counsel
**a:** Vendera Resources | 2602 McKinney Ave, Ste. 200 | Dallas, TX 75204
**e:** clensing@venderaresources.com | **w:** www.venderaresources.com
**p:** 469.206.0020 **c:** 214.287.7723
*Board Certified – Oil, Gas & Mineral Law*
*Texas Board of Legal Specialization*

---

**From:** Arora, Shubi <shubi.arora@kirkland.com>
**Sent:** Wednesday, November 13, 2019 8:55 PM
**To:** Collin Lensing <clensing@venderaresources.com>; Mohit Singh <mohit.singh@bpx.com>
**Subject:** BPX <—-> Vendera

Mohit- Thanks for the call - was great to catch up! As mentioned, connecting you to Collin at Vendera in Dallas. Collin- Mohit is taking the lead at several processes at BPX and they are also looking at opportunistically selling some smaller packages to right players. Thought you all might like to compare notes.
I'll let you guys take it from here.

**Shubi Arora, P.C.**

**KIRKLAND & ELLIS LLP**
609 Main Street, Houston, TX 77002
**T** +1 713 836 3524  **M** +1 832 330 8137
**F** +1 713 836 3601

901 Main Street, Dallas, TX 75202
**T** +1 214 972 1678  **M** +1 832 330 8137
**F** +1 214 972 1771

shubi.arora@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT **14**





**Project Thrones**
**2019 Onshore Divestiture Program**

# Legal Acknowledgement & Disclaimer

This marketing document is being furnished to procure interest in submitting proposals to acquire certain oil and gas assets of BP America Production Company (together with its affiliated companies, collectively, "BP"). By accepting it the recipient agrees to use and maintain the information contained herein consistently with the acknowledgements, agreements and disclaimers contained herein. IF THE RECIPIENT DETERMINES THAT IT CANNOT (OR IS UNWILLING TO) COMPLY WITH THESE CONDITIONS, THE RECIPIENT SHOULD IMMEDIATELY CEASE THE REVIEW AND RETURN THIS DOCUMENT TO BP.

All communications and inquiries relating to this potential sale should be addressed only to the designated individuals whose names are set forth herein. The recipient should not under any circumstances contact management representatives or any other employee or representative of BP with respect to this potential sale or any information contained herein.

Neither BP nor any of its officers, employees, agents or advisors accepts any responsibility for, or makes any representation or warranty, express or implied, as to, the accuracy, completeness, relevance, sufficiency or materiality of the information contained in, or any omissions from, this document (including any representation or warranty as to the achievement or reasonableness of any forward looking statements referred to herein or any of the assumptions underlying such statements), or accepts any responsibility for updating this document or correcting any inaccuracies herein. This document (a) does not constitute an offer or invitation to purchase any BP assets and (b) is not and does not purport to be comprehensive or to contain all information that a potential bidder may consider necessary or desirable as interested parties must conduct their own investigation and analysis of the potential opportunity. THE RECIPIENTS OF THIS DOCUMENT MUST INFORM THEMSELVES ABOUT AND OBSERVE ALL APPLICABLE LEGAL AND/OR REGULATORY REQUIREMENTS, INCLUDING, BUT NOT LIMITED TO, THOSE UNDER ANTI-TRUST OR SECURITIES LAWS AND REGULATIONS.

BP reserves the right, in its sole discretion, to negotiate with one or more parties at any time and at the same time and to enter into a written definitive agreement related to the potential opportunity without prior notice to any party. BP also reserves the right, for any or no reason, at any time and in any respect, to cancel this sale (in whole or in part) or to terminate discussions with any party or to negotiate in BP's sole discretion with any party with respect to a potential transaction. BP has no obligation to accept any offer, regardless of whether or not such offer represents the highest consideration proposed by any party. BP also reserves the right to modify, at any time, any procedures related to this potential opportunity without assigning reason thereto. BP will have no liability to any potential bidder or any other person as a consequence of the foregoing actions.

THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS NOT INTENDED TO BE AND SHOULD NOT BE CONSTRUED AS AN OFFER THAT MAY BE ACCEPTED BY THE RECIPIENT OF THIS DOCUMENT. Unless and until a definitive written agreement is executed and delivered by authorized representatives of BP and the recipient (if at all), BP shall not be under any obligation whatsoever (legal, equitable or otherwise) with respect to the assets described herein, including to enter into or to conclude a potential transaction regarding the same, whether by virtue of this document or otherwise. Written and oral communications, except to the extent expressly included in such executed definitive written agreement (if any), shall not be relied on by the recipient or any other party as the basis for taking any action, foregoing any opportunity or incurring any costs, nor shall they create any obligations whatsoever on the part of BP.

# Executive Summary

- BP is offering several of its US onshore assets for sale in multiple packages comprising core positions in the San Juan, Wamsutter, Anadarko, Arkoma, legacy East Texas and its SWOOP positions as well as diversified non-operated royalty and working interests across US Lower 48

- Highlights:

  - **SWOOP.** New, highly economic, de-risked, contiguous Shallow Woodford Oklahoma Oil Play (SWOOP), near the SCOOP and STACK plays, with strong well results and extensive running room

  - **East Texas.** Three operated East Texas fields (Glenwood, Woodlawn, Oak Hill) comprising ~45k largely contiguous acres, in a stacked pay basin with development and recompletion opportunities in the Cotton Valley, Haynesville, and several other horizons

  - **San Juan.** Leading position in the San Juan basin. Strong cash flow from low-decline production base. Additional upside growth opportunities in the Mancos and CBM redevelopment

  - **Wamsutter.** Premier position in the Northern Greater Green River basin. Existing cash flow from liquids-rich low decline base production complements horizontal redevelopment of Lewis and Almond

  - **Arkoma.** Two large core gas positions with extensive undeveloped horizontal potential in the Woodford Shale in the West and strong legacy cash flow and production in the East

  - **Anadarko.** Massive operated position in the core of Western Anadarko basin with stacked pay upside, high margins, material base production and Operating Cash Flow (OCF)

  - **Legacy Non-op Mineral and HBP Leasehold Assets** in multiple basins offering a variety of royalty, overriding royalty and working interest opportunities



| Legacy Non-Op Minerals/Leasehold - Multiple Basins | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| $18m OCF | 1,320k Acres | | | | | |

| **Wamsutter** | | | | | | |
| 38 Mboe/d | $187m OCF | 69% Gas | 21% NGL | 10% Oil | 2,500 Wellbores (Vt 99%) | 500k Acres |

| **San Juan** | | | | | | |
| 102 Mboe/d | $239m OCF | 94% Gas | 6% NGL | 0% Oil | 9,500 Wellbores (Vt 99%) | 567k Acres |

| **SWOOP** | | | | | | |
| 4 Mboe/d | $37m OCF | 10% Gas | 15% NGL | 75% Oil | 19 Wellbores (Vt 0%) | 35k Acres |

| **Anadarko** | | | | | | |
| 19 Mboe/d | $91m OCF | 62% Gas | 31% NGL | 7% Oil | 3,600 Wellbores (Vt 73%) | 511k Acres |

| **Arkoma** | | | | | | |
| 34 Mboe/d | $103m OCF | 100% Gas | 0% NGL | 0% Oil | 1,800 Wellbores (Vt 67%) | 440k Acres |

| **East Texas** | | | | | | |
| 6 Mboe/d | $35m OCF | 75% Gas | 20% NGL | 5% Oil | 600 Wellbores (Vt 77%) | 45k Acres |

*Note - Unless otherwise stated, all production and acreage figures are net to BP. Production figures 2018LE. OCF is annualized based on 2018 YTD Actuals through October*



# SWOOP

- New, highly economic, de-risked, contiguous shallow oil play
  - Unconventional Woodford play near SCOOP and STACK
  - ~35k net acres in McClain & Cleveland Counties, OK
  - Current production of ~4 net Mboe/d
  - Acreage is 60% Held by Production (HBP) as of Nov 1, 2018
  - High operated working interest of over 80%

- Strong well results have delineated play across acreage
  - No.1 Parker: IP30: 680 boe/d (88% oil)
  - No.2 Boechat: IP30: 930 boe/d (87% oil)
  - No.3 Brown: IP30: 918 boe/d (84% oil)
  - No.4 Norton: IP30: 1,005 boe/d (88% oil)
  - No.5 Brandt IP30: 915 boe/d (77% oil)

- Highly attractive F&D costs and operating margins
  - Woodford at only 7.5k ft TVD drives ~$8m D&C cost (10k ft lateral)
  - Rich gas stream of 1,450+ BTU
  - Crude oil quality, 40-48 API gravity oil
  - Crude quality and location drive attractive differential of ~$1.10/bbl
  - Low lifting costs due to location and available services

- Extensive running room in current Woodford play (many drill ready) and upside in Hunton and other horizons
  - Over 15 rig years of drilling inventory in Woodford alone

- Experienced & capable staff with significant knowledge of the basin

*\* OCF2018 LE is annualized based on 2018 YTD through October*



Frac on the Boechat well





**SWOOP Net Production**

average monthly growth rate = 27%

| ASSET | Production Mboe/d | % Gas | % NGL | % Oil | Net Acres (k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| SWOOP | 4 | 10% | 15% | 75% | 35 | 37 | 19 | 0 |



# EAST TEXAS

**121** NON-OPERATED WELL COUNT

**471** OPERATED WELL COUNT

**$35m** OPERATING CASH FLOW

**45k** NET ACRES

**20%** NGL

**5%** OIL

**75%** GAS

**6** MBOE/D

# East Texas

- Contiguous operated legacy fields
  - ~45k net acres total for all three fields
  - High average working interest of over 85%
  - 100% HBP to develop at own pace

- Material Cotton Valley and Haynesville undeveloped potential
  - Activity in area increasing with extended laterals and larger fracs
  - Over 50 horizontal upside locations identified to-date (50% Cotton Valley and 50% Haynesville)
  - Proven Haynesville at shallower depths than in the Shelby Trough
  - Active offset operators: Covey Park, RockCliff, Sabine, Sheridan, XTO, CCI, Valence, Tanos, and others
  - Attractive midstream terms and legacy pipeline close to Henry Hub contribute to attractive upside economics (Basin Diff ~ $0.20/mcf)

- Extensive behind pipe and cost reduction options
  - Stacked pay basin with Haynesville, Cotton Valley, Travis Peak, Pettet, James Lime, and others behind pipe for recompletions
  - Potential for further lifting cost reduction with small independent operating model

*\* OCF2018 LE is annualized based on 2018 YTD through October*





F12 Drill site in East Texas

**East Texas Net Production**



| ASSET | Production Mboe/d | % Gas | % NGL | % Oil | Net Acres (k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| East Texas | 6 | 75% | 20% | 5% | 45 | 35 | 471 | 121 |



# SAN JUAN

**5,500** NON-OPERATED WELL COUNT

**4,000** OPERATED WELL COUNT

**$239m** OPERATING CASH FLOW

**567k** NET ACRES

**6%** NGL

**94%** GAS

**102** MBOE/D

# San Juan

- Leading position in the San Juan Basin
  - Approximately 570k net acres in San Juan and Rio Arriba counties, NM and La Plata and Archuleta counties, CO
  - Stacked pay basin with ~9,500 wellbores and ~11,900 completions** (40% operated)
  - Average WI of ~71% for operated wells. Overall BP WI in the entire field is ~35%
  - 100% ownership in Florida River Midstream System
  - 50% ownership in Hilcorp-operated San Juan gas processing plant with surplus gas processing capacity

- Solid cash flow and low base decline (~5% over past 5 years) production profile
  - 2018 Latest Estimate (LE) OCF of $239m*
  - 2018 LE total BP net production of ~102 Mboe/d (94% gas)

- Additional low-risk growth opportunities
  - Predominantly HBP status affords buyer flexibility
  - Proven upside in CBM and dry gas Mancos
  - Potential Mesaverde downspacing

- Experienced & capable staff with significant knowledge of the basin

*OCF 2018 LE is annualized based on 2018 YTD through October*
*** Excludes wells where BP only has an ORI/RI*


Aztec drilling rig in Arboles, Colorado





**San Juan Net Production**

| ASSET | Production Mboe/d | % Gas | % NGL | % Oil | Net Acres (k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| North (CO) | 64 | 100% | 0% | 0% | 277 | 136 | ~1,400 | ~500 |
| South (NM) | 38 | 81% | 18% | 1% | 290 | 103 | ~2,600 | ~5,000 |
| **Total San Juan** | **102** | **94%** | **6%** | **0%** | **567** | **239** | **4,000** | **5,500** |



# WAMSUTTER

**350** NON-OPERATED WELL COUNT

**2,150** OPERATED WELL COUNT

**$187m** OPERATING CASH FLOW

**500k** NET ACRES

**21%** NGL

**10%** OIL

**69%** GAS

**38** MBOE/D

# Wamsutter

- Premier position in the Northern Greater Green River Basin
  - Approximately 500k net acres in Sweetwater and Carbon Counties WY
  - Stacked pay basin with interests in ~2,500 wellbores (99% vertical)
  - High average WI in operated wells (~79%)
  - HBP leases with low royalty burdens (average 15%)
- Opportunity to enter during early stages of basin horizontal redevelopment
  - Outstanding well results since inception of horizontal program in 2015
  - BP first to drill successful single section horizontal, extended reach horizontal and co-planar multilateral in the basin
  - Fox Hills/Lewis horizontal IP30's consistently exceeding 2 Mboe/d (over 40% Liquids)
  - Offset operators demonstrating excellent well results on adjacent acreage
- Solid cash flow from liquids – rich low decline base funds development
  - 2018 LE OCF of ~$187m
- Thousands of identified horizontal locations
  - Multiple distinct reservoir targets ranging from dry gas to rich condensate allows buyer to adjust drilling with commodity prices
  - Existing idle wet gas processing and residue export capacity
- Experienced & capable staff with significant knowledge of the basin

*\* OCF 2018 LE is annualized based on 2018 YTD through October*





Silhouette of drilling rig in Wyoming

## Wamsutter Net Production



| ASSET | Production Mboe/d | % Gas | % NGL | % Oil | Net Acres (k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|-------|-------------------|-------|-------|-------|---------------|------------------|---------------------|-------------------|
| Wamsutter | 38 | 69% | 21% | 10% | 500 | 187 | ~2,150 | ~350 |



# ANADARKO

**1,471** NON-OPERATED WELL COUNT

**2,151** OPERATED WELL COUNT

**$91m** OPERATING CASH FLOW

**511k** NET ACRES

**31%** NGL

**7%** OIL

**62%** GAS

**19** MBOE/D

# Anadarko

- Massive operated position in the core of the Western Anadarko basin
  - Over 500k net acre position in 13 counties in TX and OK
  - Contiguous, high operated working interests, and high net revenue interests in long held legacy position
  - Three separate sub-packages will be offered to better align with play boundaries (BP has a preference for a single buyer)
  - Over 98% HBP allows time to develop at buyer's pace

- Material production and cash flow underpin asset for years to come
  - ~19 Mboe/d net production (~38% liquids of which 7% is oil)
  - 2018 LE OCF of ~$91m
  - Further operating cost reduction opportunities identified

- Stacked pay provides numerous opportunities
  - With BP's development focus on other basins, numerous upside opportunities are still available to a new owner
  - Offset operators developing Oswego, Atoka, Cleveland, Granite Wash, Marmaton and others
  - New completion designs and extended laterals accelerating existing plays while new plays have been identified
  - Both oil- and gas-weighted plays provide product diversification

- Experienced & capable staff with significant knowledge of the basin

*\* OCF 2018 LE is annualized based on 2018 YTD through October*



Storage tank and a pumping jack at Anadarko operation site



**Anadarko Net Production**



| ASSET | Production Mboe/d | % Gas | % NGL | % Oil | Net Acres (k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| Cleveland/ Marmathon (P1) | 7 | 61% | 29% | 10% | 286 | 36 | 1,274 | 412 |
| Granite Wash (P2) | 8 | 56% | 37% | 7% | 147 | 40 | 592 | 572 |
| Western OK (P3) | 4 | 76% | 20% | 4% | 78 | 14 | 285 | 487 |
| Total Anadarko | 19 | 62% | 31% | 7% | 511 | 91 | 2,151 | 1,471 |



# ARKOMA

**949** NON-OPERATED WELL COUNT

**888** OPERATED WELL COUNT

**$103m** OPERATING CASH FLOW

**440k** NET ACRES

**100%** GAS

**34** MBOE/D

# Arkoma

- Two large core gas positions with extensive undeveloped potential
  - ~440k net acres (Arkoma West ~140k of total)
  - Arkoma West - a core of the core unconventional Woodford horizontal play with attractive IRRs and material running room
  - Arkoma East a largely conventional dry gas position in the Atoka, Spiro, Brazil, and Harthsorne Coal formations
  - High operated WI with average over 80% for both packages

- Highly economic Woodford horizontal development opportunity
  - Enhancements in completion design and longer laterals have improved returns and energized development in the area
  - BP's recent Resh Unit wells have IRRs greater than 35% at 12/5/18 Strip price
  - Frederick 26-7H has extended the play to the North and East
  - Strong offset operator activity in the area by Newfield, Bravo, Trinity, Canyon Creek, Calyx, Corterra, Antioch, and others
  - Emerging horizontal plays in Mayes and Caney horizons

- Substantial base production and operating cash flow
  - 2018 LE OCF of ~$103m with shallow base production declines (13%)
  - Smaller independent operating model could unlock LOE savings

- Experienced & capable staff with significant knowledge of the basin

*\* OCF 2018 LE is annualized based on 2018 YTD through October*



Arkoma Resh 3 well pad



## Arkoma Net Production



| ASSET | Production Mboe/d | % Gas | % NGL | % Oil | Net Acres (k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| Arkoma West (P1) | 21 | 99% | 1% | 0% | 140 | 64 | 153 | 463 |
| Arkoma East (P2) | 13 | 100% | 0% | 0% | 300 | 39 | 735 | 486 |
| Total Arkoma | 34 | 100% | 0% | 0% | 440 | 103 | 888 | 949 |



# DIVERSIFIED NON-OP ROYALTY AND WORKING INTEREST OPPORTUNITIES

**$18m** OPERATING CASH FLOW

**1,320k** NET ACRES

# Diversified Non-Op Royalty and Working Interest Opportunities

- Interests in legacy mineral and leaseholds in non-operated assets in multiple Lower 48 basins
  - Assets in 6 unconventional trends:
    - 1 Powder River    2 Williston
    - 3 Eagle Ford    4 Haynesville
    - 5 Stack/Scoop    6 Denver-Julesburg
  - Conventional assets in multiple states from Alabama to Utah
  - ~2/3 HBP Leasehold, 1/3 Minerals
  - Current OCF primarily Royalty/ORR
  - Some WI holdings in Williston basin
  - Proximity to existing production/infrastructure
- Initial Packages will be Powder River Basin (PRB) and Williston Basin
  - PRB primarily retained undeveloped deep rights
  - Williston ~250 ORR and 3-5% WI wells
  - Expect marketing 1Q2019
  - Additional packages planned for remainder of 2019

| ASSET | OCF 2018 LE ($m)* | Net Acres (k) |
|---|---|---|
| Powder River Basin | 0.5 | 51 |
| Williston Basin | 2.4 | 27 |
| Remainder | 14.7 | 1,242 |
| Total Non-Op Roy/WI | 17.6 | 1,320 |

*OCF 2018 LE is annualized based on 2018 YTD through October*





# Process Overview

- VDRs are expected to open from January 2019
- Upon execution and return of the Confidentiality Agreement, bidders will receive customary due diligence and support materials, including:
  - Reserve report from NSAI, Inc
  - 3P & resource ARIES database with development plans and costs
  - Environmental information including Phase 1 environmental study reports
  - Financial information including 24 months of LOSs
  - Asset information including master well list and acreage shape files
  - Dataroom presentation / Confidential Information Memorandum
- BP is intending to provide a staple financing package and hedging/marketing services to interested parties



# Contacts

**JOHN M. KAFFENES**

BP Americas -Director Mergers and Acquisitions

501 Westlake Park Blvd. – 3.254 W1

Houston, Texas 77079

**(281) 892-3020** (office)

**(281) 935-2101** (mobile)

Email: **john.kaffenes@bp.com**

**MOHIT SINGH**

SVP - Business Development and Exploration, BPX Energy

737 North Eldridge Parkway

Houston, Texas 77079

**(281) 810-2119** (office)

**(281) 221-8177** (mobile)

Email: **mohit.singh@bpx.com**



Mergers & Acquisitions
BP Americas, Inc.
501 Westlake Park Blvd.
WL1, Suite 3.262A
Houston, Texas 77079

Business Development
BPX Energy
737 North Eldridge Parkway
Houston, Texas 77079

# EXHIBIT **15**

       



# BP's $10B BHP Acquisition and Plans to Leverage Multilateral Well Design

 **Rollyn Reyes**
Co-CEO at Energia | MBA Candidate at The Wharton School

 

March 4, 2019

As previously discussed in my last article (https://www.linkedin.com/pulse/4-takeaways-from-2019-spe-ad-symposium-rollyn-reyes/), A&D activity since Q4 of 2018 has slowed compared to previous years primarily due to the return of commodity price volatility. While the number of deals has decreased, the trend of consolidation in the onshore unconventional space has certainly begun. One of the largest of these M&A deals was the divestiture of BHP Billiton's large positions in the Delaware, Eagle Ford, and Haynesville plays to BP's Lower 48 subsidiary which has recently rebranded itself to BPX.

On February 27, 2019, BPX SVP of Business Development and Exploration, Mo Singh, presented at SPE's February business development event. This article summarizes Mr. Singh's presentation as well as provide a quick primer on BPX's plan to leverage multi-lateral well designs. Is your company interested in the BPX divestitures? What do you think of BPX's plans for multi-laterals? Comment and share. I'm curious to hear everyone's take.



## The BHP Assets: Delaware, Eagle Ford, and Haynesville

Prior to the BHP acquisition, BPX's portfolio included 9400 operated wells producing ~315 mboed in 6 heavily gas weighted basins which included legacy East Texas Haynesville, Eagle Ford, Arkoma Woodford, Anadarko, San Juan, and the Wamsutteer. The BHP acquisition boosts BPX's future production to ~500 mboed with fewer operated wells, approximately 3500, while consolidating their position in the Haynesville and Eagle Ford, and incorporating a sizable position in the Delaware. According to Mr. Singh, BPX's plan is to use the free cash flow from the Haynesville and Eagle Ford, to fund growth in the oil weighted Delaware.



## Future Multilateral Well Designs

Prior to joining BPX, CEO Dave Lawler was COO of independent E&P SandRidge Energy. While at SandRidge, Dave and leadership successfully tested and executed multi-lateral well designs to develop the Mississippi Lime in Northern Oklahoma / Southern Kansas. Several iterations of these multilateral wells were tested including dual laterals, tri-laterals, and quad-lateral full section developments (FSD) to increase capital efficiency. In a nutshell, the idea is to maximize reservoir exposure through multiple laterals while minimizing capital expenditure via drilling only one vertical parent wellbore. In the February BD meeting, Singh brought up the concept of multilaterals and BPX's plan to test and develop multilateral well designs in the Eagle Ford and the Permian Delaware basins to further increase returns. Many wellbore design considerations such as lateral length, wellbore junction, and the number of laterals affect the productivity of each lateral and ultimately the well's IRR. It will be interesting to see which multilateral well designs prove to be most economic for BPX and how their strategy varies between the Delaware and Eagle Ford basins.

## The Divestitures: SWOOP, East Texas, San Juan, Wamsutter, Anadarko, Arkoma, and Non-op

BPX is working on divestiture packages for the SWOOP, East Texas, San Juan, Wamsutter, Anadarko, Arkoma, as well as their Non-op royalty and working interest positions in several other basins including the Powder River, Williston, and Eagle Ford. The divestitures present a wide variety of acreage from historical vertical gas plays such as the Wamsutter to oil weighted horizontal unconventional Woodford SWOOP acreage. Singh was keen to mention BPX's flexibility with closing these deals which included talks of partial financing through BPX as well as the option to pickup the experienced staff attached to each deal.

## Summary

As larger operators such as BPX consolidate their onshore positions, I see two trends emerging:

1. The continued leveraging of economies of scale for the larger consolidated companies which enables companies to take calculated risks such as experimentation with multilateral well designs.

2. Large company consolidation efforts lend themselves to divestitures, which provide opportunities for leaner independent E&Ps to pick up acreage and execute.

Report this article

## Comments



multilaterals, it caught my attention in terms of the potential to
further improve capital efficiency. ...more

Like · 👍 1 | Reply

↘ Load more comments

## Enjoyed this article?
Follow to never miss an update.



**Rollyn Reyes**

Co-CEO at Energia | MBA Candidate at The Wharton School

Follow

## More from Rollyn Reyes



**Comparing The Market Capitalization of Tech Companies vs Oil and Gas...**

Rollyn Reyes on LinkedIn



**4 Takeaways from the 2019 SPE A&D Symposium**

Rollyn Reyes on LinkedIn



**The Case for Continued Oil & Gas Investment**

Rollyn Reyes on LinkedIn

# EXHIBIT **16**





**Transformation of the BPX Energy Portfolio**
SPEGC BD Study Group

Mohit Singh
SVP & Head of BD and Exploration
BPX Energy

February 27, 2019



# Legal Disclaimer

This presentation ("Presentation") has been prepared solely for high-level informational purposes regarding a past transaction, potential divestments, and other matters pertaining to BP America Production Company ("BPAPC") and does not purport to be all-inclusive or to contain all information that you or your company may want to evaluate such transactions or matters.

BPAPC, its affiliates and its and their representatives (collectively, the "BP Group") expressly disclaim any and all liability and responsibility for and associated with the quality, accuracy, completeness, relevance or materiality of the information contained herein. The BP Group disclaims any and all representations and warranties with respect to the BP Group (including, without limitation, BPAPC) or its assets, express, statutory, implied or otherwise, including, without limitation, as to (i) location, capacity and status of any facilities, (ii) environmental or physical condition of any facilities (including absence of patent or latent defects), (iii) volumes of reserves or resources, (iv) existence of any and all prospects or opportunities, (v) costs, expenses, revenues, receipts, prices, accounts receivable or accounts payable, (vi) contractual, economic or financial information and data, (vii) operational or financial performance and viability, including without limitation, present or future value or anticipated income or profits, (viii) title to any assets, (ix) compliance with laws and regulations, and (x) federal, state or local income or other tax consequences, (xi) merchantability, and (xii) fitness for a particular purpose or any purpose.

Certain statements, estimates and projections by the BP Group with respect to anticipated future performance of BPAPC or its assets reflect various assumptions and analyses which may or may not prove to be correct and the actual performance may vary from historical performance and from the forecasted information and such variations may be material, and differing interpretations of contractual and other information and data may exist and you shall not rely on the BP Group's interpretation provided herein.

This presentation is for informational purposes only and is not an offer or solicitation for offers on BPAPC assets. Unless and until a definitive written agreement covering a transaction is executed by an authorized representative of BPAPC having the express authority to bind such party to a transaction, BPAPC will not be under any obligation whatsoever (legal or equitable) to conclude any transaction. Unless included in such definitive written agreement, no communications (written or oral) may be relied upon by a company as the basis for taking any action, foregoing any opportunity or incurring any costs, and no such communications create or will create any obligations whatsoever (at law or in equity) on the part of either the BP Group or any other company.

Except where otherwise expressly indicated, this Presentation speaks as of the date hereof. Neither the delivery of this Presentation nor the conduct of a transaction with the you or your company shall, under any circumstances, create any implication that there has been no change with regard to the content of this Presentation or in the affairs of the BP Group (including, without limitation, BPAPC) since the date hereof. In furnishing this Presentation, no member of the BP Group undertakes any obligation to update any of the information contained herein or to correct any inaccuracies which may become apparent.

Statements made on or contained in this Presentation, particularly those regarding capital employed, capital expenditure, cash flows, costs, savings, debt, demand, disposals, dividends, earnings, efficiency, gearing, growth, improvements, investments, margins, performance, prices, production, productivity, profits, reserves, returns, sales, strategy, synergies, tax rates, trends, value, volumes, the effects of BP merger and acquisition activity, are or may be forward looking statements. Such statements reflect the views of BP Group as of the date made with respect to future events and are subject to risks and uncertainties. Actual results may differ from those expressed in such statements, depending on a variety of factors including future levels of industry product supply; demand and pricing; political stability and economic growth; development and use of new technology; actions of competitors; and natural disasters, wars and acts of terrorism. Additional information, including information on factors that could cause actual results to differ materially from those in the forward-looking statements are contained in BP's latest published Annual Report and Accounts, in the BP Group's latest published Annual Report on Form 20F filed with the US Securities and Exchange Commission and other documents filed by BP from time to time with the US Securities and Exchange Commission. The BP Group disclaims any intention or obligation to update forward looking statements and provides no representations, warranties or other assurances forward-looking statements in this Presentation will be realized.



## Agenda



- BPX Energy Overview
- Acquisition of BHP Onshore Shale Business
- Post-BHP Divestments
    1. SWOOP
    2. East Texas (Woodlawn, Glenwood, Oak Hill fields)
    3. San Juan
    4. Wamsutter
    5. Anadarko
    6. Arkoma
    7. Diversified Minerals/ORRI Package
- Conclusion & Q&A



# BPX Energy core values, mission, and strategy







# BPX Energy Onshore Journey

## BPX Energy transformation to an onshore shale independent



| 2014 | 2015 | 2016 | 2017 | 2018 |

**David Lawler hired as CEO**
- Understands the landscape
- Deep dive portfolio evaluation

**Newly formed organization aligned**
New leadership team empowered to run the business like an independent

**Delivering material D&C and operating cost reductions** while simultaneously increasing EURs in many plays

**Headquarters moved to Denver Colorado**

**Closed on BP's transformative acquisition of BHP's Onshore US Shale Business**

**Rebranded as BPX Energy**

**Announced divestment of several legacy fields**

**Announcement to form separate business**
"The move is expected to improve competitiveness, helping US L48 onshore business remain at the forefront of innovation and development of technologies for unconventional resources"

Unit production costs $/bbl — 31%

Headcount '000s — 52%

Gross D costs $/bbl — 35%

bpx energy

# bpx energy



Acquisition of BHP Onshore Shale Business



# Acquisition of BHP Onshore Shale Entity
# New liquids-focused plays materially re-position business

**BPX Energy**
Post-Deal

Current production
**500**mboed
(27% liquids)

Resources
**12.7**bn boe
(35% liquids)

Acres
**6.3**m

Drilling locations
**11,600**
(37% liquids)

*(1) Calculated at $2.75 Henry Hub*



Wamsutter
San Juan
Woodford
Anadarko
Haynesville
Permian Delaware
Eagle Ford

● BPX Energy
● BHP US Onshore assets

**Combined drilling inventory**



● BPX Energy
● BHP US Onshore assets

|  | BPX Energy before acquisition (2018) | BPX Energy post-integration (2021) |
|---|---|---|
| **Operated wells** | 9,400 | **3,500** |
| **Basins** | 6 | **3** |
| **Capital budget** | ~$950m | **~$2-2.5bn** |
| **Production[1]** | 315mboed | **~500mboed** |
| **Oil % of production mix** | ~5% | **~25%** |





# Acquired asset – Permian Delaware

## Key highlights

Current production
**41**mboed
(71% liquids)

Gross drilling locations
**3,390**

Acreage
**83**k

After-tax IRRs[1]
**28-50**%



- Material position in heart of Delaware's over-pressured and liquids-rich window

- Stacked benches (Bone Springs, Wolfcamp A, B, C/D) offer deep drilling inventory – over 240 rig years

- Significant potential for capital efficiency improvement with multilateral drilling

- BPX Energy team experienced in infrastructure development and liquids management

*(1) Weighted average after-tax IRR for new wells, calculated at $2.75 Henry Hub / $ 55 WTI*



# Acquired asset – Liquids-rich Eagle Ford



## Key highlights

Current production
**87** mboed
(71% liquids)

Gross drilling locations
**1,402**

Acreage
**201**k

After-tax IRRs[1]
**39-95**%



- Core acreage in both the liquids-rich Karnes Trough and Eagle Ford wet gas window

- Builds on BPX Energy's experience in the Eagle Ford

- Opportunity to develop with multilaterals in Eagle Ford benches and Austin Chalk

- Can reduce cost with Intelligent Operations model for base production and midstream

*(1) Weighted average after-tax IRR for new wells, calculated at $2.75 Henry Hub / $ 55 WTI*



# Acquired asset – Haynesville



## Key highlights

Current production
## 61mboed
## (100% gas)

Gross drilling locations
## 727

Acreage
## 194k

After-tax IRRs[1]
## 16-27%

*(1) Weighted average after-tax IRR for new wells, calculated at $2.75 Henry Hub / $55 WTI*



- Doubles BPX Energy's production in the Haynesville, and more than triples acreage position

- Builds on BPX Energy's material expansion of the Haynesville  – the most revenue generative gas play in the US

- Opportunity to transfer BPX Energy completion technology

- Leverages economies of scale with existing operations



# bpx energy



Post-BHP Divestments

# Divestment Summary

- BP is offering several of its US onshore assets for sale in multiple packages comprising core positions in the San Juan, Wamsutter, Anadarko, Arkoma, legacy East Texas and its SWOOP positions as well as diversified non-operated royalty and working interests across BPX Energy

- Highlights:

  - **SWOOP.** New, highly economic, de-risked, contiguous Shallow Woodford Oklahoma Oil Play (SWOOP), near the SCOOP and STACK plays, with strong well results and extensive running room

  - **East Texas.** Three operated East Texas fields (Glenwood, Woodlawn, Oak Hill) comprising ~45k largely contiguous acres, in a stacked pay basin with development and recompletion opportunities in the Cotton Valley, Haynesville, and several other horizons

  - **San Juan.** Leading position in the San Juan basin. Strong cash flow from low-decline production base. Additional upside growth opportunities in the Mancos and CBM redevelopment

  - **Wamsutter.** Premier position in the Northern Greater Green River basin. Existing cash flow from liquids-rich low decline base production complements horizontal redevelopment of Lewis and Almond

  - **Arkoma.** Two large core gas positions with extensive undeveloped horizontal potential in the Woodford Shale in the West and strong legacy cash flow and production in the East

  - **Anadarko.** Massive operated position in the core of Western Anadarko basin with stacked pay upside, high margins, material base production and Operating Cash Flow (OCF)

  - **Legacy Non-op Mineral and HBP Leasehold Assets** in multiple basins offering a variety of royalty, overriding royalty and working interest opportunities



*Note - Unless otherwise stated, all production and acreage figures are net to BP. Production figures 2018LE. OCF is annualized based on 2018 YTD Actuals through October*





# Divestment Process Timeline



**Contact:**

**MOHIT SINGH**

SVP – BD and Exploration, BPX Energy

737 North Eldridge Parkway

Houston, Texas 77079

**(281) 810-2119** (office)

**(281) 221-8177** (mobile)

Email: **mohit.singh@bpx.com**

- VDRs are expected to open from January 2019
- Upon execution and return of the Confidentiality Agreement, bidders will receive customary due diligence and support materials, including:
  - Reserve report from NSAI, Inc
  - 3P & resource ARIES database with development plans and costs
  - Environmental information including Phase 1 environmental study reports
  - Financial information including 24 months of LOSs
  - Asset information including master well list and acreage shape files
  - Dataroom presentation / Confidential Information Memorandum
- BP is intending to provide a staple financing package and hedging/marketing services to interested parties



# SWOOP

- New, highly economic, de-risked, contiguous shallow oil play
  - Unconventional Woodford play near SCOOP and STACK
  - ~35k net acres in McClain & Cleveland Counties, OK
  - Current production of ~4 net Mboe/d
  - Acreage is 60% Held by Production (HBP) as of Nov 1, 2018
  - High operated working interest of over 80%

- Strong well results have delineated play across acreage
  - No.1 Parker: IP30: 680 boe/d (88% oil)
  - No.2 Boechat: IP30: 930 boe/d (87% oil)
  - No.3 Brown: IP30: 918 boe/d (84% oil)
  - No.4 Norton: IP30: 1,005 boe/d (88% oil)
  - No.5 Brandt IP30: 915 boe/d (77% oil)

- Highly attractive F&D costs and operating margins
  - Woodford at only 7.5kft TVD drives ~$8m D&C cost (10k ft lateral)
  - Rich gas stream of 1,450+ BTU
  - Crude oil quality, 40-48 API gravity oil
  - Crude quality and location drive attractive differential of ~$1.10/bbl
  - Low lifting costs due to location and available services

- Extensive running room in current Woodford play (many drill ready) and upside in Hunton and other horizons
  - Over 15 rig years of drilling inventory in Woodford alone

*\* OCF2018 LE is annualized based on 2018 YTD through October*


Frac on the Boechat well





**SWOOP Net Production**

average monthly growth rate = 27%

| ASSET | Production Mboe/d | %Gas | %NGL | %Oil | Net Acres(k) | OCF 2018 LE ($m)* | Operated WellCount | Non-Op WellCount |
|-------|-------------------|------|------|------|--------------|-------------------|--------------------|------------------|
| SWOOP | 4 | 10% | 15% | 75% | 35 | 37 | 19 | 0 |



# East Texas

- Contiguous operated legacy fields
  - ~45k net acres total for all three fields
  - High average working interest of over 85%
  - 100% HBP to develop at own pace

- Material Cotton Valley and Haynesville undeveloped potential
  - Activity in area increasing with extended laterals and larger fracs
  - Over 50 horizontal upside locations identified to-date (50% Cotton Valley and 50% Haynesville)
  - Proven Haynesville at shallower depths than in the Shelby Trough
  - Active offset operators: Covey Park, RockCliff, Sabine, Sheridan, XTO, CCI, Valence, Tanos, and others
  - Attractive midstream terms and legacy pipeline close to Henry Hub contribute to attractive upside economics (Basin Diff ~ $0.20/mcf)

- Extensive behind pipe and cost reduction options
  - Stacked pay basin with Haynesville, Cotton Valley, Travis Peak, Pettet, James Lime, and others behind pipe for recompletions
  - Potential for further lifting cost reduction with small independent operating model

- Experienced & capable staff with significant knowledge of assets

*\* OCF2018 LE is annualized based on 2018 YTD through October*



F12 Drill site in East Texas



**East Texas Net Production**



| ASSET | Production Mboe/d | %Gas | %NGL | %Oil | Net Acres(k) | OCF 2018 LE ($m)* | Operated Well Count | Non-Op Well Count |
|-------|------------------|------|------|------|--------------|-------------------|---------------------|-------------------|
| East Texas | 6 | 75% | 20% | 5% | 45 | 35 | 471 | 121 |



**bp**

# San Juan

- Leading position in the San Juan Basin
  - Approximately 570k net acres in San Juan and Rio Arriba counties, NM and La Plata and Archuleta counties, CO
  - Stacked pay basin with ~9,500 wellbores and ~11,900 completions** (40% operated)
  - Average WI of ~71% for operated wells. Overall BP WI in the entire field is ~35%
  - 100% ownership in Florida River Midstream System
  - 50% ownership in Hilcorp-operated San Juan gas processing plant with surplus gas processing capacity

- Solid cash flow and low base decline (~5% over past 5 years) production profile
  - 2018 Latest Estimate (LE) OCF of $239m*
  - 2018 LE total BP net production of ~102 Mboe/d (94% gas)

- Additional low-risk growth opportunities
  - Predominantly HBP status affords buyer flexibility
  - Proven upside in CBM and dry gas Mancos
  - Potential Mesaverde downspacing

- Experienced & capable staff with significant knowledge of the basin

  *OCF 2018 LE is annualized based on 2018 YTD through October
  **Excludes wells where BP only has an ORI/RI*





### San Juan Net Production



Aztec drilling rig in Arboles, Colorado

| ASSET | Production Mboe/d | %Gas | %NGL | %Oil | Net Acres(k) | OCF 2018 LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| North (CO) | 64 | 100% | 0% | 0% | 277 | 136 | ~1,400 | ~500 |
| South (NM) | 38 | 81% | 18% | 1% | 290 | 103 | ~2,600 | ~5,000 |
| Total San Juan | 102 | 94% | 6% | 0% | 567 | 239 | 4,000 | 5,500 |



**bpx energy**

# Wamsutter

- Premier position in the Northern Greater Green River Basin
  - Approximately 500k net acres in Sweetwater and Carbon Counties WY
  - Stacked pay basin with interests in ~2,500 wellbores (99% vertical)
  - High average WI in operated wells (~79%)
  - HBP leases with low royalty burdens (average 15%)
- Opportunity to enter during early stages of basin horizontal redevelopment
  - Outstanding well results since inception of horizontal program in 2015
  - BP first to drill successful single section horizontal, extended reach horizontal and co-planar multilateral in the basin
  - Fox Hills/Lewis horizontal IP30's consistently exceeding 2 Mboe/d (over 40% Liquids)
  - Offset operators demonstrating excellent well results on adjacent acreage
- Solid cash flow from liquids – rich low decline base funds development
  - 2018 LE OCF of ~$187m
- Thousands of identified horizontal locations
  - Multiple distinct reservoir targets ranging from dry gas to rich condensate allows buyer to adjust drilling with commodity prices
  - Existing idle wet gas processing and residue export capacity
- Experienced & capable staff with significant knowledge of the basin





**Wamsutter Net Production**

*\* OCF 2018 LE is annualized based on 2018YTD through October*





Silhouette of drilling rig in Wyoming

| ASSET | Production Mboe/d | %Gas | %NGL | %Oil | Net Acres(k) | OCF 2018LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| Wamsutter | 38 | 69% | 21% | 10% | 500 | 187 | ~2,150 | ~350 |



# Anadarko

- Massive operated position in the core of the Western Anadarko basin
  - Over 500k net acre position in 13 counties in TX and OK
  - Contiguous, high operated working interests, and high net revenue interests in long held legacy position
  - Three separate sub-packages will be offered to better align with play boundaries (BP has a preference for a single buyer)
  - Over 98% HBP allows time to develop at buyer's pace
- Material production and cash flow underpin asset for years to come
  - ~19 Mboe/d net production (~38% liquids of which 7% is oil)
  - 2018 LE OCF of ~$91m
  - Further operating cost reduction opportunities identified
- Stacked pay provides numerous opportunities
  - With BP's development focus on other basins, numerous upside opportunities are still available to a new owner
  - Offset operators developing Oswego, Atoka, Cleveland, Granite Wash, Marmaton and others
  - New completion designs and extended laterals accelerating existing plays while new plays have been identified
  - Both oil- and gas-weighted plays provide product diversification
- Experienced & capable staff with significant knowledge of the basin
  *\* OCF 2018 LE is annualized based on 2018 YTD through October*





**Anadarko Net Production**



Storage tank and a pumping jack at Anadarko operation site

| ASSET | Production Mboe/d | %Gas | %NGL | %Oil | Net Acres(k) | OCF 2018 LE ($m)* | Operated Well Count | Non-Op Well Count |
|---|---|---|---|---|---|---|---|---|
| Cleveland/ Marmaton (P1) | 7 | 61% | 29% | 10% | 286 | 36 | 1,274 | 412 |
| Granite Wash (P2) | 8 | 56% | 37% | 7% | 147 | 40 | 592 | 572 |
| Western OK (P3) | 4 | 76% | 20% | 4% | 78 | 14 | 285 | 487 |
| Total Anadarko | 19 | 62% | 31% | 7% | 511 | 91 | 2,151 | 1,471 |



# Arkoma

- Two large core gas positions with extensive undeveloped potential
  - ~440k net acres (Arkoma West ~140k of total)
  - Arkoma West - a core of the core unconventional Woodford horizontal play with attractive IRRs and material running room
  - Arkoma East a largely conventional dry gas position in the Atoka, Spiro, Brazil, and Harthshorne Coal formations
  - High operated WI with average over 80% for both packages

- Highly economic Woodford horizontal development opportunity
  - Enhancements in completion design and longer laterals have improved returns and energized development in the area
  - BP's recent Resh Unit wells have IRRs greater than 35% at 12/5/18 Strip price
  - Frederick 26-7H has extended the play to the North and East
  - Strong offset operator activity in the area by Newfield, Bravo, Trinity, Canyon Creek, Calyx, Corterra, Antioch, and others
  - Emerging horizontal plays in Mayes and Caney horizons

- Substantial base production and operating cash flow
  - 2018 LE OCF of ~$103m with shallow base production declines (13%)
  - Smaller independent operating model could unlock LOE savings

- Experienced & capable staff with significant knowledge of the basin




*OCF 2018 LE is annualized based on 2018 YTD through October*


Arkoma Resh 3 well pad

## Arkoma Net Production



| ASSET | Production Mboe/d | %Gas | %NGL | %Oil | Net Acres(k) | OCF 2018LE ($m)* | Operated WellCount | Non-Op WellCount |
|---|---|---|---|---|---|---|---|---|
| Arkoma West (P1) | 21 | 99% | 1% | 0% | 140 | 64 | 153 | 463 |
| Arkoma East (P2) | 13 | 100% | 0% | 0% | 300 | 39 | 735 | 486 |
| Total Arkoma | 34 | 100% | 0% | 0% | 440 | 103 | 888 | 949 |



# Diversified Non-Op Royalty and  Working Interest Opportunities

- Interests in legacy mineral and leaseholds in non-operated assets in multiple BPX Energy basins
  - Assets in 6 unconventional trends:
    1 Powder River   2 Williston
    3 Eagle Ford   4 Haynesville
    5 Stack/Scoop   6 Denver-Julesburg
  - Conventional assets in multiple states from Alabama to Utah
  - ~2/3 HBP Leasehold, 1/3 Minerals
  - Current OCF primarily Royalty/ORR
  - Some WI holdings in Williston basin
  - Proximity to existing production/infrastructure

- Initial Packages will be Powder River Basin (PRB) and Williston Basin
  - PRB primarily retained undeveloped deep rights
  - Williston ~250 ORR and 3-5% WI wells
  - Expect marketing 1Q2019
  - Additional packages planned for remainder of 2019



| ASSET | OCF 2018 LE ($m)* | Net Acres (k) |
|---|---|---|
| Powder River Basin | 0.5 | 51 |
| Williston Basin | 2.4 | 27 |
| Remainder | 14.7 | 1,242 |
| Total Non Op Roy/WI | 17.6 | 1,320 |

*OCF 2018 LE is annualized based on 2018 YTD through October*





# In Conclusion

- **BP has transformed its US onshore business over the course of 5 years**

- **It is now a separate entity rebranded as BPX Energy**

- **Acquisition of the BHP Onshore Shale Business has added numerous high return and liquids focused assets**

- **Divestment of several material heritage assets will occur over 2019-2020**

- **BPX has greatly expanded its Haynesville position and is more excited than ever about the play and its future**

- **BPX Energy is well on its way in building a premier independent onshore business**



# EXHIBIT **17**



BUSINESS/ECONOMICS

# What Happened to all the E&P Deal-Making?

One of last year's big stories in the industry was consolidation among several of the larger upstream operators. But deal activity has fallen off in recent months. Will things remain this quiet during the somewhat uncertain year ahead?

**February 4, 2019  By Matt Zborowski**
**Journal of Petroleum Technology**





*Getty Images*

One of last year's big stories in the industry was consolidation among several of the larger upstream operators.



Price stability is crucial for nurturing an active acquisition & divestiture (A&D) environment. After all, deals rely on the seller and buyer agreeing on the value of an asset. When prices take a sudden, unexpected dive as they did last fall, deal activity tends to slow.

"If the single biggest variable is oil and gas prices and that variable is jumping around, it's going to make it pretty hard to come up with a common number to do a deal," explained Geoff Roberts, managing director and head of US A&D at BMO Capital Markets, during the SPE Gulf Coast Section's recent A&D Symposium.

Looking at longer-term numbers from BMO, recent activity of around 60 deals/quarter pales in comparison with the 450 deals/quarter that took place in late-2016 and early-2017 as prices were moderating after the crash. That means for companies and investors currently looking to scoop up assets, there are far fewer assets to be had.

However, "I think we're going to see some improvement—so there's hope on the horizon," Roberts said.

For the deals that have been getting done, he's observed a few trends. Activity has revolved around assets that are oil-weighted and in well-defined core areas. There's been small- and mid-cap consolidation as those firms try to remain competitive, and acreage trades have picked up as lateral lengths have increased.

Roberts expects to see a continuation throughout 2019 of operators "cleaning up" their portfolios. "If you look at the number of deals that have come out in this last 4 or 5 months, 95% of them are lower end, clean up assets." Meanwhile, there's just been a few "sizeable" deals valued at more than $100 million "that could serve as a core or substantial add on," he said.

A "dominant theme" for the year will be BP's plan to shed some of its excesses after its $10.5-billion purchase of BHP's US onshore assets. In an effort to clean up its balance sheet, it's now offering several packages for sale collectively called "Project Thrones." Those packages are Swoop, East Texas, San Juan, Wamsutter, Arkoma, and Anadarko. But, "They're not looking for one large corporate buyer—they're looking for strategic buyers," Roberts said.

## Are the Public Markets Dead?

The widely-held belief that the "public markets are dead" is "pretty much true," Roberts said, noting that the upstream space went 21 days without a high-yield issue last year. That hasn't happened in more than 30



"The old growth-at-any-cost model is absolutely dead," he said. "Right now we've been in negative cash flow for years, and after a while the public markets just had enough." Roberts quoted John Walker, EnerVest chief executive officer, who once said the upstream industry is adept at "destroying capital." But companies have been working to turn the corner on free cash flow generation, and the markets have reacted favorably to recent earnings reports from the majors, ConocoPhillips, and Hess.

Further improvements will come as the engineers become even more proficient in drilling laterals, fracturing, and spacing, Roberts said.

"We've really got to get away from 300, 400 ft spacing," he said. "We've got to spread it out a little bit. There's been a ton of work on parent-child spacing. The good news is it was in time to save most of us from drilling too many wells. The recovery factors are going up, and the costs are going down. And that'll keep happening."

For now, investors want moderate growth, which "is tough" with crude prices in the mid-$50s/bbl, he said. "We really need 60-65 bucks for this industry to show a modest and moderate growth rate."

Roberts noted that bigger is better when it comes to weathering the stock market storm. Over the past year, small cap firms lost 45% of their stock value while large caps lost 22% and majors lost 15%.

## Private Equity "Paradigm Shift"

In the private equity (PE) arena, there's a new focus that some are calling "a paradigm shift," Roberts said.

There are some 500 PE-backed companies, of which 150 are in the Permian Basin alone. "There's a ton of money sitting on the sidelines," he said. "But look at the competitive landscape. Look at the volatility and prices. The difficulty of finding deals." Those seeking PE money may "have to find another model."

The days of the "lease and flip" are "absolutely over," he said. No longer can PE firms make a purchase and later sell the acreage for a loss or even small profit.

Time horizons are getting longer. "This is probably the fundamental change in what private equity backers are looking for," Roberts said. "They're no longer expecting you to be in and out in 3 to 5 years." Some are content with holding onto assets for 6–7 years, and some may even consider not exiting at all. It all depends on whether those PE-backed operators stay profitable.



just holding on to it."

While Yorktown is a "slightly different breed," Roberts said, other PE firms are starting to think that way too. "They could build a real company and just keep it. I mean, what a concept."

**TOPICS**    BUSINESS/ECONOMICS

**TAGS**    BP,  private equity,  consolidation,  acquisitions and divestitures,  mergers and acquisitions

## Matt Zborowski

See More Stories by Matt Zborowski

---

## RELATED CONTENT



BUSINESS/ECONOMICS

**Shell and ExxonMobil Unload North Sea Gas Fields to UK Independent**

July 31, 2024 • Trent Jacobs • Journal of Petroleum Technology



UNCONVENTIONAL/COMPLEX RESERVOIRS

**Nearly $90 Billion in Shale M&A This Year Underscores Shrinking Opportunity Set**

July 30, 2024 • Trent Jacobs • Journal of Petroleum Technology



ASSET/PORTFOLIO MANAGEMENT

**H&P Bets on Middle East With $1.97-Billion KCA Deutag Deal**

July 25, 2024 • Jennifer Pallanich • Journal of Petroleum Technology



BUSINESS/ECONOMICS

**LLOG Strengthens US Gulf Presence After Buying Dozens of Deepwater Blocks**

July 18, 2024 • Trent Jacobs • Journal of Petroleum Technology

# EXHIBIT **18**

# Oil and Gas Investor

MARCH 2019



Marcellus and Utica private buyers see investments bloom.

HART ENERGY

MARKET INSIGHTS

# A&D'S LONG AND TWISTED ROAD

The middle class of E&P companies is shrinking as consolidators target companies valued between $3- and $10 billion, leaving dozens of lesser-valued companies to sweat as access to public equity markets remains blocked and oil prices recede.

ARTICLE BY
DARREN BARBEE



FILE PHOTO

For the past two years, the oil and gas universe has been collapsing in on itself.

This is what life is like in the resulting public-market black hole: in January 2017, the publicly valued E&Ps totaled $562 billion. Two years later, values have been crushed down to $434 million, said Craig Lande, managing director of RBC Richardson Barr.

The strength of the A&D market was also partly a mirage, more akin to the down year of 2015 than it seemed. As RBC counts deals—at least $20 million qualifies—from 2010 to 2017 transactions averaged about $50- to $60 billion. RBC's tally of deals for the 2018 market was $44 billion.

Addressing the IPAA's Private Capital Conference audience on Jan. 24 in Houston, Lande said: "I think a lot of you will say, 'Well, it seems like the A&D market has been fairly soft, not a lot of things happened last year, so it's odd to say $44 billion.' I agree."

Partly, the 2018 deal total was inflated by the "anomaly" of BP Plc's deal to buy most of BHP Billiton's U.S. shale assets for $10.5 billion, he said.

"Not a lot of people got to play those" outsized transactions, Lande said. "You take that away and you're really talking more of a $33- to $34 billion market" for the year. That compares more to 2015, when the A&D market was really in bad shape and only $23 billion in deals were transacted.

There's quite a bit of silver in all of the gray. Chief among the good news is all of this has happened before, Lande said. It was a theme he repeatedly returned to that, he said, has either been forgotten or not yet learned: oil and gas is a cyclical business.

"Consolidation is going to happen, one way or the other, and I think everyone would agree it should in this kind of environment," Lande said.

Yet, since at least 2010, the oil and gas industry has been fixated but frozen on mergers. In 2018, M&A finally had its breakthrough.

But as deals were made and market values shrank, so did the middle class of E&Ps with market caps between $3 billion and $10 billion. That does not bode well for the majority of companies in our industry with a mix of

*"The capital markets really have a huge effect on A&D," said Craig Lande, managing director of RBC Richardson Barr.*

disparate assets, poor acreage, high leverage or inadequate cash flow.

"You're going to see consolidation two ways," Lande said. "You're going to see the bigger guys pick off that sort of 'meaty middle,' the $3- to $10 billion companies and, unfortunately, you'll most likely see some of the smaller guys ultimately head toward bankruptcy" if market conditions don't change.

In January 2017, the number of companies in the $3- to $10 billion middle ground totaled 26. Now there are just 11 in that market-cap range.

"Those companies didn't get bigger," Lande said. "They got smaller or went away."

The middle ground E&Ps, it turns out, are important, he said. The middle is where companies have been giving way to the push and pull of the markets and, ultimately, consolidation. It's from there that the mergers of Concho Resources with RSP Permian and Diamondback Energy Inc. with Energen Corp. emerged.

"Now scale is everything," Lande said. "Bigger is better. You saw Concho buy RSP for about $9 billion and Diamondback Energy [buy Energen] for [about] $9 billion. Those [deals] moved the needle for those companies. There's only a few of those that remain right now that move the needle for the bigger companies."

The small number of companies still in the E&P middle ground will have targets on their backs or sights on each other as consolidation continues. Companies such as WPX Energy Inc. and Parsley Energy Inc., both with market caps of roughly $5.5 billion, are in the range of what Lande called a "meaningful" size—meaning they, too, can shift a company's dynamics.

"This is the sector, this area of $3- to $10 billion, in my mind, where they are going to consolidate [with] each other or the guys above them," Lande said.

Occasionally, smaller companies with appealing acreage, particularly in the Permian Basin, will "probably be picked off," Lande said. One such deal: Cimarex Energy Co.'s proposed acquisition of Resolute Energy Corp. for $1.6 billion, including $710 million in long-term debt. Resolute, with a market cap of about $750 million, holds about 21,000 net

> "Consolidation is going to happen, one way or the other, and I think everyone would agree it should in this kind of environment."
>
> —Craig Lande, RBC Richardson Barr

acres in Reeves County, Texas, in the Delaware Basin.

It's no coincidence mergers follow a period in which the oil and gas industry has come to terms with a market voicing its discontent with activists, outright hostility or withdrawal.

For most of 2016, the markets opened up.

"Publics were getting rewarded for paying $40,000 [plus] per acre for Permian resources, and that was great for my business," Lande said.

After funding the industrywide spending spree from 2010 to 2017 and financing an outspend of capital of about $200 billion during those years, the market has effectively been shouting down deals. Concho and Diamondback, among other

### Monthly A&D Asset Supply



$ in Billions

Source: RBC Richardson Barr

## TERRAIN ADVANTAGE

**C**raig Lande, managing director of RBC Richardson Barr, notes several factors that make buying from public companies both a conundrum and opportunity:

**Serendipity.** "You're going to have all these zones that probably are underexploited or have never been exploited at all, that you don't have to necessarily mess with now," he said. "But a few years down the road they may look really interesting when prices recover."

**Cost savings.** Cutting lease operating expenses and overhead is essential. For anyone that can't buy an asset from a large company and streamline expenses, "you probably don't need to be in the private-equity world."

**Cash flow.** Anything you buy most likely spits out a lot of cash flow from day one," Lande said.

**Valuation.** Undeveloped acreage is less and less a part of

the buying equation in transactions, with deals falling more closely in line with proved-developed-producing values.

While quickly flipping assets for a high return is unlikely, "down the road you've basically got all this upside, whatever comes of it, for free," Lande said. "I think there's just a ton of pros. Again, it's really calibrating ourselves that you can't flip acreage anymore and getting back what we used to do. There's a lot of money to be made; you've just got to hang on longer."

And that, Lande said, is the way it used to be before the shale boom years drove A&D.

"Again, our business, oddly enough, is cyclical," he said. "I don't care if you're 25 years old and you're coming in to the business or you've been doing this for a long time. You know it is. If you don't, you should know it is."

**Percent of Private Equity Buyers By Year**



(1) Excludes BP/BHP deal.

**Private Equity Asset Demand Since 2016 ($B)**



Source: RBC Richardson Barr

In 2016, about 34% of sellers were public companies. In 2018, nearly 70% of the asset flow came from publics. Going back to 2014, "M&A has been a wonderful thing for A&D. It promotes A&D."

Whiting Petroleum Corp.'s $3.8-billion purchase of Kodiak Oil & Gas spawned four or five deals, Lande said. Other mergers, such as EQT Corp. and Rice Energy Inc., and Noble Energy Inc.'s purchase of Clayton Williams Energy Inc. and Rosetta Resources Inc. also set off related, noncore sales.

Since purchasing BHP's assets, BP plans to divest $5- to $6 billion worth of assets during the next two years. BP's noncore assets include the Wamsutter gas field in Wyoming, the San Juan Basin in New Mexico and the Arkoma Basin in Oklahoma.

RBC is handling Diamondback's divestiture of Central Basin Platform assets acquired with Energen, Lande said.

Encana USA Corp.'s pending $7.7-billion merger with Newfield Exploration Co., in theory, could produce divestitures in the Bakken, Arkoma, Uinta and perhaps the Eagle Ford.

"You would expect some divestitures to come out of that," Lande said.

Musing on the Encana deal, Lande noted that after an industry trend toward pure play companies, Encana is now diversifying. "We'll see if we can go back to diversity," he said. "Oddly enough, our industry is cyclical, if you hadn't realized it yet."

Private equity will be likely buyers, which continues to look for exits but still has more money than anyone with an estimated $95 billion in dry powder, Lande said.

"There's a lot of money. That's not the problem. It's obviously the tepidness right now to pull the trigger on deals," he said.

Private equity's targets have largely been outside of the Permian Basin. "It's places like the Bakken that really had been left for dead by the publics," he said. "Or the Eagle Ford, which was once considered the best rock, pound for pound. It probably still is in a lot of respects."

The Permian simply overshadows it, Lande said.

The days of buying acreage and flipping it within a year, sometimes without having to put a rig to work, are likely over.

"If you had an asset in an attractive resource play for over 18 months and hadn't sold it yet, then you were probably doing something wrong. That's how frothy of a market we were in for so many years with the shale revolution. However, times have changed and now we're back to where we used to be before the advent of resource plays—longer-term holds and cash flow and PDP."

Patient money is now required.

Lande noted that private equity has scooped up about $16 billion in conventional assets, including $12 billion in gas.

"These are the opportunities that have presented themselves the past few years," he said. Buyers that wait for a home run deal with excellent acreage in the core of the core are likely to have little to swing at. □

consolidators, saw their stock prices suffer after announcing their deals.

The market effectively "stopped and said, 'No more equity for acquisitions—actually show us the stuff that you bought works,'" Lande said.

E&Ps are now expected to execute and show capital discipline. That shift in public market sentiment has driven public companies to become the dominant sellers in the market. For CEOs, it's a pain.

"They love buying. They don't like executing," he said. "It's a thankless job and, in this environment, investors expect perfection and, as you can see, a lot of people have been penalized for not being 'perfect.'"

Some months, A&D deals were as much as $10 billion. As the capital markets retreated there was first a flattening and then a nose dive.

"The capital markets really have a huge effect on A&D," he said.

By December, Lande counted four deals of more than $100 million, "and in my shoes, that's not good," he said.

Through most of January nearly no A&D— "a giant bagel"—occurred, he said. The good news: there are more opportunities to come and more assets will likely be on the market, he said.

M&A, as Lande sees it, begets A&D. Historically, companies that make big mergers typically sell off noncore assets.

# EXHIBIT **19**



APRIL 2019



Colorado sets a chilly bellwether as producers there seek a social license to operate.

*A&D Watch*

# BP's BPX Energy Pursues U.S. Shale Mission

**IT'S NOT UNCOMMON** for British supermajor **BP Plc** to publicly share information on its operations; however, its Lower 48 business—the recently christened **BPX Energy**—rarely makes such moves.

That changed when Mohit Singh, senior vice president of business development and exploration for BPX Energy, took the stage at Hart Energy's DUG Haynesville conference on Feb. 20. He spoke about how BP is transforming its U.S. onshore business, following its $10.5 billion acquisition of **BHP Billiton**'s Delaware Basin, Eagle Ford and Haynesville assets in 2018.

"For me to come out [on stage] was a little bit of a coming out party in some sense," Singh said. "One of the things we want to do going forward is be a little bit more visible externally so we can get our message out."

Starting March 1, the company was to take over operations from BHP on its quest to build a "premier independent onshore company focused on delivering free cash flow on a consistent basis," Singh said.

The acquisition, which closed in October 2018, marked a pivotal moment for BP, which already had U.S. onshore assets that include the Midcontinent's SWOOP, Anadarko and Arkoma as well as East Texas, San Juan and Wamsutter assets. The assets are among the $5- to $6 billion worth of property BP plans to divest during the next two years to pay for its acquisition of BHP's U.S. shale assets.

Referring to BPX's legacy portfolio, Singh said the company had several good opportunities prior to the acquisition, "but BHP clearly upgrades us. … We're talking about decades and decades of high-quality drilling inventory that will deliver phenomenal rates of return."

The deal includes assets in the Permian's Delaware Basin, adding about 41,000 barrels of oil equivalent per day (boe/d) in production with 3,390 gross drilling locations on an 83,000-acre position.

"We are seeing up to 240 rig years of drilling inventory just because of the stacked pay zones," Singh said, particularly in the Bone Spring and Wolfcamp A, B and C/D. The company put the after-tax internal rate of returns for the assets at between 28% and 50%.

The deal also gives BPX an opportunity to develop multilaterals in Eagle Ford benches and Austin Chalk. The acquired assets in the liquids-rich Eagle Ford included core acreage in the Karnes Trough and the shale play's wet gas window, Singh said. Current production is about 87,000 boe/d (71% liquids), and there are 1,402 gross drilling locations on the 201,000-acre position.

**BPX Combined Assets**



Source: BPX Energy

In the Haynesville, BPX tripled its footprint and doubled its production with the BHP deal. Singh said BPX is running six rigs in the Haynesville in East Texas this year and has plans to eventually start on the Louisiana side.

Once BP completes divestitures, which are being offered in seven packages, Singh said BPX will only operate in the Delaware, Eagle Ford and Haynesville.

"That's where all of the capital will go. Traditionally, we've spent about $1 billion of capital in this business every year," Singh said. "Going forward, that number will be $2- to $2.5 billion. It's significant investment by BP into the onshore business."

Meanwhile, marketing has already begun for assets being sold by BP.

"Suffice it to say the last 18 months at BP have been very, very hectic but a good kind of hectic," Singh said.

The Shallow Woodford Oklahoma Oil Play (SWOOP) near the Scoop and Stack plays and East Texas packages are already being marketed. The others, Singh said, are set to come out between the end of February and early March.

The biggest of the bunch are the San Juan Basin assets, which accounts for half of the nearly 200,000 boe/d of production being sold. Singh described San Juan as a "phenomenally robust play in terms of coal." Most of the production comes from coal seams in San Juan, he said, calling it world-class quality coal.

Here, BPX has drilled horizontal semi-laterals, dual laterals, tri laterals and quad laterals, which Singh described as horizontals coming from

## BPX's Divestment Packages

| | Mboe/d | OCF | % Gas | % NGL | % Oil | Wellbores (Wt%) | | Acres |
|---|---|---|---|---|---|---|---|---|
| Shallow Woodford Oklahoma Oil Play (SWOOP) | 4 | $37MM | 10 | 15 | 75 | 19 | (0%) | 35k |
| East Texas | 6 | $35MM | 75 | 20 | 5 | 600 | (77%) | 45k |
| San Juan | 102 | $239MM | 94 | 6 | 0 | 9,500 | (99%) | 567k |
| Wamsutter | 38 | $187MM | 69 | 21 | 10 | 2,500 | (99%) | 500k |
| Anadarko | 19 | $91MM | 62 | 31 | 7 | 3,600 | (73%) | 511k |
| Arkoma | 34 | $103MM | 100 | 0 | 0 | 1,800 | (67%) | 440k |
| Legacy Non-Op Minerals/Leasehold - Multiple Basins | | $18MM | | | | | | 1,320k |



Note: Unless otherwise stated, all production and acreage figures are net to BP Production figures 2018LE. OCF is annualized based on 2018 YTD Actuals through October.
Source: BPX Energy

*Oil and Gas Investor • April 2019*

one vertical on a pad. Such drilling methods have enabled BPX to reduce well costs, he added. Plus, "given the quality of the coal is so prolific, these wells come on and they stay flat for a year plus, which is incredible."

BPX produced about 100,000 boe/d from the San Juan Basin in 2018. Most of it was gas.

However, some oily acreage is also available, including in the SWOOP where BPX said well results have been strong.

"We were running four rigs prior to BHP happening. We were very, very bullish on this play," Singh said before highlighting IPs of nearly 90% oil. "Hopefully, it will end in the hands of someone who's going to get after it."

Other assets available include:
- Glenwood, Woodlawn and Oak Hill fields in East Texas, which comprise about 45,000 mostly contiguous acres. BPX says there are development and recompletion opportunities in the Cotton Valley, Haynesville and other horizons;
- Wamsutter in the northern Greater Green River Basin, where the company said "existing cash flow from liquids-rich low decline base production complements horizontal redevelopment of Lewis and Almond";
- Two large core gas positions in the Arkoma, where there is undeveloped horizontal potential in the Woodford Shale; and
- Anadarko Basin, a more than 500,000-acre position that Singh said might be divided into three packages.

BP is also divesting interest in legacy mineral and leaseholds in nonoperated assets in several basins, including the Powder River, Williston, Eagle Ford, Haynesville, Stack/Scoop and Denver-Julesburg.

Post-integration in 2021, BPX Energy expects to have 3,500 wells, down from 9,400 in 2018, and operate in three basins, down from six.

But the capital budget is expected to more than double as the company focuses heavily on the Delaware, Eagle Ford and Haynesville to bring combined production to about 500,000 boe/d, up from 315,000 boe/d in 2018. Oil is expected to make up about 25% of BPX's production mix, compared to 5% in 2018, as the company remains bullish on gas.

The acquisition of BHP's U.S. shale assets has been transformational, Singh said.

"It's given us very high rates of return and a depth of repeatable drilling inventory that is very, very exciting. … We are well on our way to building a premiere onshore business," he said.

*—Velda Addison*

# TRANSACTION HIGHLIGHTS

## UTICA

■ **Pin Oak Energy Partners LLC** said it closed an acquisition of nearly 70,000 net acres in the Northern Trend of the Utica/Point Pleasant play in Ohio and Pennsylvania.

The company said it closed a series of transactions in early February 2018 with multiple, undisclosed sellers. The transactions include the acquisition for the Utica and Point Pleasant assets, which are nearly 90% HBP. In addition to other areas, the transactions include leasehold acreage in Mahoning and Trumbull counties, Ohio, and Mercer County, Pa., all of which are part of Pin Oak Energy's northern Utica/Point Pleasant position.

Leasehold acreage in eastern Guernsey County, Ohio, was also included, which adds to Pin Oak's southern Ohio Utica/Point Pleasant activities. Also included were associated pipeline rights-of-way in and around Pin Oak's expanding acreage position. The company also acquired processing facilities and multiple taps into interstate pipelines across Pin Oak's northern Pennsylvania position.

## BAKKEN

■ **Hess Midstream Partners LP** continues to build out its infrastructure footprint in the Bakken Shale play with a $60 million bolt-on acquisition on Feb. 26. The Houston-based company, an affiliate of oil and gas producer **Hess Corp.**, said it had entered an agreement to purchase the Tioga Gathering System from **Summit Midstream Partners LP**.

The crude oil and gas gathering assets include roughly 73 miles of crude pipelines and 79 miles of gas pipelines. Meanwhile, the water assets consist of 75 miles of produced water gathering pipelines. Hess Midstream said it expects that HIP will offer it a right-of-first offer to acquire the water assets in the event HIP decides to sell the assets in the future, according to the company press release.

## DELAWARE BASIN

■ **Cimarex Energy Co.** closed its acquisition of **Resolute Energy Corp.**'s Delaware Basin position in a cash-and-stock transaction worth about $1.6 billion, including assumption of $710 million in debt.

The deal, announced Nov. 19, adds about 21,100 net acres in Reeves County, Texas, where Resolute held an average 79% working interest.

Resolute's average third-quarter 2018 production was 34,752 boe/d.

## MIDCONTINENT

■ **Encana Corp.** said Feb. 13 it completed its $7.7-billion acquisition of U.S. shale producer **Newfield Exploration Co.** and will proceed with a previously announced $1.25 billion share buyback program.

Encana acquired all outstanding shares of Newfield common stock in an all-stock transaction valued at roughly $5.5 billion. In addition, the Calgary, Alberta-based company also assumed $2.2 billion of Newfield net debt.

For Encana, the acquisition of Newfield, which analysts called Encana's "boldest move yet," will expand the company's "core four" portfolio to include a key position in the oil-rich Stack and Scoop plays of the Anadarko Basin.

"This acquisition creates North America's premier resource company with large-scale positions in the core of the Permian, Anadarko and Montney," Doug Suttles, Encana's president and CEO, said in a news release.

In November, Encana said it expected liquids production following the close of its combination with Newfield to contribute more than 50% of total company production, driving continued margin expansion and returns. Additionally, the company also anticipates the combination to result in $250 million of annual synergies through greater scale, cube development and overhead savings.

## APPALACHIA

■ **Eclipse Resources Corp.** and **Blue Ridge Mountain Resources Inc.** completed a merger Feb. 28 and emerged as a new Appalachian Basin producer, **Montage Resources Corp.,** with 227,000 net effective undeveloped acres in the Utica and Marcellus shales.

In late August 2018, Eclipse and Blue Ridge Mountain agreed to merge in an all-stock transaction. Blue Ridge stockholders received 4.4259 shares of Eclipse common stock for each share of Blue Ridge stock. The transaction was then valued at about $345 million.

The resulting combination, holds acreage in southeast Ohio, West Virginia and North Central Pennsylvania.

Montage began trading on the New York Stock Exchange under the ticker "MR" with a 15-to-1 stock reverse split effective March 1.

# EXHIBIT **20**

| | |
|---|---|
| **From:** | Collin Lensing <clensing@venderaresources.com> |
| **Sent:** | Thursday, August 8, 2024 9:27 AM |
| **To:** | Demetri Economou |
| **Subject:** | FW: Intro - Legacy Non-Op Minerals/Leasehold package |
| **Attachments:** | NAPE 2020 BPX Mineral - RI - ORRI Divestment NAPE Handout.2-4-20.pdf |

Attorney-Client Privileged

**From:** James Webb <James.Webb@bpx.com>
**Sent:** Wednesday, September 30, 2020 14:16
**To:** A. Wood Brookshire <abrookshire@venderaresources.com>
**Subject:** RE: Intro - Legacy Non-Op Minerals/Leasehold package

Wood,

Thank you for your interest. Yes, we have been working to bring several non-core assets to market. Some more advanced than others. At this time those are on pause due to the market flux (Corona) and the reorg ongoing (BP recent announcement). At this time we are targeting starting up again in 1Q21.

I have attached a teaser we gave out at NAPE in Feb that may help you in understanding the assets.

The 3 solid gray areas are our core areas and will be retained.
The gray crossed hatch areas were sold in 2020. Mostly legacy assets heavily operated .
The clear cross hatched is our Wamsutter field and is in the process of being sold
The red outlined area in SETX is our prime mineral asset. ~800k ac, Lands leased out to other operators so almost exclusively royalty income and bonus. A handful of small WI/RI properties where we did a farmout with a WI backin in the past.
The red outline in ND/MT is a bakken package that is mostly ORRI's but some small nonop WI as well as undeveloped lands.
All the other yellow (leasehold) and red (minerals) lands are either undeveloped or have cash flows the large majority of which are from either royalties or ORRI. A few small nonop WI properties, mostly clustered in a few counties. Please note that the red minerals in western Montana have now been taken off our divestment list.

Thank you again for your interest and I will add you to our contact list when we revive our sale processes.


**James A. (Tony) Webb**
Business Development Project Manager
BP America Production Company
BPX Energy Inc.

15377 Memorial Dr.
Houston, TX 77079
281-732-2960
James.Webb@BPX.com
*This email and any attachments are intended only for the addressee(s) listed above and  may contain confidential, proprietary, and/or privileged information. If you are not an intended recipient, please immediately advise the sender by return email, delete this email and any attachments, and destroy any copies of same.  Any unauthorized review, use, copying, disclosure or distribution of this email and any attachments is prohibited.*

---

**From:** A. Wood Brookshire <abrookshire@venderaresources.com>
**Sent:** Wednesday, September 30, 2020 1:45 PM
**To:** James Webb <James.Webb@bpx.com>
**Subject:** Intro - Legacy Non-Op Minerals/Leasehold package

Tony – I hope you are doing well. A friend of mine sent me your contact info and mentioned that you are gearing up to sell the Legacy Non-Op Minerals/Leashold package for BP. We are a non-op/mineral buying group that is backed by a state pension fund, college endowments and foundations. We just finished raising our fourth fund and are looking to acquire properties similar to what BP is selling. Would you mind putting me on your distribution list when you officially start marketing the asset?

Thanks and please let me know if I can answer any questions about my company.

Best,
Wood



**A. Wood Brookshire** | CEO
**a:** Vendera Resources | 2626 Cole Avn., Suite 750 | Dallas, TX 75204
**e:** abrookshire@venderaresources.com | **w:** www.venderaresources.com
**p:** 469.248.3070 **c:** 903.520.7065

# EXHIBIT **21**

# Diversified Non-Op Royalty and Working Interest Opportunities

- Interests in legacy mineral and leasehold positions in non-operated assets across L48
- Williston Basin and SE Texas Minerals will be marketed in 2020

- Contact Information

James (Tony) Webb   james.webb@bpx.com
Malcolm Coleman     malcolm.coleman@bp.com
Cheney Dale         cheney.dale@BP.com



● BP Leasehold
● BP Minerals
▦ BPX Core Areas
▩ BP Divested Areas





# Legal Acknowledgement & Disclaimer

This marketing document is being furnished to procure interest in submitting proposals to acquire certain oil and gas assets of BP America Production Company (together with its affiliated companies, collectively, "BP"). By accepting it the recipient agrees to use and maintain the information contained herein consistently with the acknowledgements, agreements and disclaimers contained herein. IF THE RECIPIENT DETERMINES THAT IT CANNOT (OR IS UNWILLING TO) COMPLY WITH THESE CONDITIONS, THE RECIPIENT SHOULD IMMEDIATELY CEASE THE REVIEW AND RETURN THIS DOCUMENT TO BP.

All communications and inquiries relating to this potential sale should be addressed only to the designated individuals whose names are set forth herein. The recipient should not under any circumstances contact management representatives or any other employee or representative of BP with respect to this potential sale or any information contained herein.

Neither BP nor any of its officers, employees, agents or advisors accepts any responsibility for, or makes any representation or warranty, express or implied, as to, the accuracy, completeness, relevance, sufficiency or materiality of the information contained in, or any omissions from, this document (including any representation or warranty as to the achievement or reasonableness of any forward looking statements referred to herein or any of the assumptions underlying such statements), or accepts any responsibility for updating this document or correcting any inaccuracies herein. This document (a) does not constitute an offer or invitation to purchase any BP assets and (b) is not and does not purport to be comprehensive or to contain all information that a potential bidder may consider necessary or desirable as interested parties must conduct their own investigation and analysis of the potential opportunity. THE RECIPIENTS OF THIS DOCUMENT MUST INFORM THEMSELVES ABOUT AND OBSERVE ALL APPLICABLE LEGAL AND/OR REGULATORY REQUIREMENTS, NCLUDING, BUT NOT LIMITED TO, THOSE UNDER ANTI-TRUST OR SECURITIES LAWS AND REGULATIONS.

BP reserves the right, in its sole discretion, to negotiate with one or more parties at any time and at the same time and to enter into a written definitive agreement related to the potential opportunity without prior notice to any party. BP also reserves the right, for any or no reason, at any time and in any respect, to cancel this sale (in whole or in part) or to terminate discussions with any party or to negotiate in BP's sole discretion with any party with respect to a potential transaction. BP has no obligation to accept any offer, regardless of whether or not such offer represents the highest consideration proposed by any party. BP also reserves the right to modify, at any time, any procedures related to this potential opportunity without assigning reason thereto. BP will have no liability to any potential bidder or any other person as a consequence of the foregoing actions.

THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS NOT INTENDED TO BE AND SHOULD NOT BE CONSTRUED AS AN OFFER THAT MAY BE ACCEPTED BY THE RECIPIENT OF THIS DOCUMENT. Unless and until a definitive written agreement is executed and delivered by authorized representatives of BP and the recipient (if at all), BP shall not be under any obligation whatsoever (legal, equitable or otherwise) with respect to the assets described herein, including to enter into or to conclude a potential transaction regarding the same, whether by virtue of this document or otherwise. Written and oral communications, except to the extent expressly included in such executed definitive written agreement (if any), shall not be relied on by the recipient or any other party as the basis for taking any action, foregoing any opportunity or incurring any costs, nor shall they create any obligations whatsoever on the part of BP.



# EXHIBIT **22**

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| THE JUNEAU GROUP LLC, | No. 4:24-cv-02856 |
| *Plaintiff*, | JURY DEMANDED |
| *v.* | |
| VENDERA MANAGEMENT HOLDINGS, LLC *d/b/a* VENDERA RESOURCES, | |
| *Defendant*. | |

## DECLARATION OF DEMETRI J. ECONOMOU

STATE OF TEXAS          §
COUNTY OF HARRIS      §

My name is Demetri J. Economou. I am counsel of record for Defendant Vendera Management Holdings, LLC *d/b/a* Vendera Resources and give this declaration in support of its Motion for Summary Judgment, specifically as to the capability of certain exhibits to be authenticated at trial.

**1.**      Exhibits 1–8 are documents filed in the United States Bankruptcy Court for the District of Delaware, No. 22-10951-CTG, *In re KServicing Wind Down Corp.* Each document bears header information consistent with having been filed with the

District Clerk. These documents are capable of authentication under Federal Rule of Evidence 902(4) (public records) or otherwise under the residual exception of Rule 807.

**2.**     Exhibits 9–12 are documents filed in the United States Bankruptcy Court for the District of Colorado, No. 20-12377-EEB, *In re Sklar Exploration Company, LLC*. Each document bears header information consistent with having been filed with the District Clerk. These documents may ultimately be authenticated under Federal Rule of Evidence 902(4) (public records) or otherwise under the residual exception of Rule 807.

**3.**     Exhibits 13–14 and 20–21 are e-mails and attachments collected from Vendera's e-mail records. These documents are authenticated by the Business Records Affidavit of Collin Lensing, submitted as Exhibit 23.

**4.**     Exhibits 15–19 are articles and attachments to articles. These documents are capable of authentication under Federal Rule of Evidence 902(6) (newspapers and periodicals), the residual exception of Rule 807, or otherwise upon the testimony of the authors thereof.

**5.**     Exhibits 22 is this declaration which meets the requirements of 28 U.S. Code § 1746. Exhibit 23 is a business records affidavit.

**6.**     I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: August 15, 2024.

**DEMETRI J. ECONOMOU**

# EXHIBIT **23**

# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| The Juneau Group LLC,<br><br>*Plaintiff,*<br><br>*v.*<br><br>Vendera Management Holdings, LLC *d/b/a* Vendera Resources,<br><br>*Defendant.* | No. 4:24-cv-02856<br><br>JURY DEMANDED |

## BUSINESS RECORDS DECLARATION

STATE OF TEXAS         §
COUNTY OF DALLAS       §

**1.**    My name is Collin Lensing. I am General Counsel for Defendant Vendera Management Holdings, LLC *d/b/a* Vendera Resources ("Vendera") and give this declaration in support of its Motion for Summary Judgment, specifically as to Business Records discussed herein.

**2.**    The "Business Records" are Exhibits 15–19 to Vendera's Motion for Summary Judgment, constituting e-mails and attachments collected from Vendera's e-mail records.

---

**3.**     I am the custodian of records for Vendera and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities. The Business Records are original records or exact duplicates of original records. The Business Records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth therein. It is the regular practice of Vendera to make these types of records at or near the time of each act, event, condition, opinion, or diagnosis set forth in the Business Records. The Business Records were made by, or from information transmitted by, persons with knowledge of the matters set forth therein. It is the regular practice of Vendera for these type of records to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them. The Business Records were kept in the course of regularly conducted business activity, and it is the regular practice of Vendera to keep these types of records in the course of regularly conducted business activity.

**4.**     I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: August 15, 2024.

_____
**COLLIN LENSING**

---

**BUSINESS RECORDS DECLARATION**

**– 2 –**