IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE JUNEAU GROUP LLC, | § | |
|     *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:24-cv-02856 |
| | § | |
| VENDERA MANAGEMENT HOLDINGS, | § | |
| LLC d/b/a VENDERA RESOURCES, | § | |
|     *Defendant*. | § | |

**PLAINTIFF THE JUNEAU GROUP LLC'S FIRST AMENDED COMPLAINT**

Plaintiff The Juneau Group LLC ("Juneau Group") files this First Amended Complaint against Defendant Vendera Management Holdings, LLC d/b/a Vendera Resources ("Vendera Resources"), VR4-Moria, LP, ("VR4-Moria," and together with Vendera Resources, "Vendera"), and BOKF, National Association d/b/a Bank of Texas ("Bank of Oklahoma," and together with Vendera, "Defendants"), and would show the Court as follows:

### I.  PARTIES

1.  Plaintiff, The Juneau Group LLC, is a foreign limited liability company previously registered to do business in the state of Texas with its principal address in Houston, Harris County, Texas 77005. Juneau is a citizen of Louisiana for purposes of diversity jurisdiction.

2.  Defendant Vendera Management Holdings, LLC d/b/a Vendera Resources (CRD #175116) is an SEC-registered investment advisor, with its principal office and place of business at 5949 Sherry Lane, Suite 1600, Dallas, Texas 75225. Vendera filed a Notice of Removal (Dkt. 1) on July 31, 2024, answered on August 15, 2024, and has appeared for all purposes herein. On information and belief, Vendera is a citizen of Texas for purposes of diversity jurisdiction.

3.  Defendant VR4-Moria, LP is a Texas limited partnership with an office at 2626 Cole Ave., Suite 750, Dallas, Texas 75204. On information and belief, VR4-Moria, LP is an

indirect, wholly owned subsidiary of Vendera Resources. VR4-Moria may be served with process through its registered agent, Vendera Management Holdings, LLC at 5949 Sherry Lane, STE 1600 Dallas, TX 75225 USA.

4. Defendant, BOKF, is a national bank chartered by the Office of the Comptroller of the Currency. BOKF's principal place of business is in Tulsa, Oklahoma. BOKF is a citizen of Oklahoma for purposes of diversity jurisdiction. BOKF may be served with process through its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

## II. JURISDICTION & VENUE

5. The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because Juneau and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

6. Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, in that Juneau prepared confidential information subject of this lawsuit from Harris County, Texas, and provided Bank of Oklahoma access to that information from Harris County, Texas. Moreover, BP (defined below) solicited bids for the O&G Assets (defined below) and sold them from Harris County, Texas.

## III. FACTS

7. Jacob Juneau ("Juneau") is an energy and technology executive with extensive experience in the upstream oil and gas landscape. Mr. Juneau holds a degree in Petroleum Engineering from Louisiana State University and an MS in Energy Economics from Rice University.

8. Juneau is the sole owner of the Juneau Group, which as a consultant or in partnership with others, has evaluated, valued, participated in or financed significant energy-focused transactions since 2018.

9. BP America Production Company and its affiliates ("BP") announced it intended to divest substantial portions of its onshore drilling assets in a program labeled "Project Thrones," commencing in 2019.

10. Project Thrones was broken into six categories of "core assets" and a seventh grouping of miscellaneous assets spread around the "Lower 48" basins. While the six core categories of assets were well-defined in Project Thrones, the miscellaneous seventh category was barely defined in the marketing materials, as it only even identified 78 acres of the ultimate 1.32 million net acres that were included in this opportunity. The virtual data room for the seventh category was not even set up until much later, sometime after February 2021.

11. Project Thrones was led by BP's SVP of Business Development and Exploration, Mohit Singh ("Singh") and by its Director of Mergers and Acquisitions, John Kaffenes.

12. Juneau secured a lunch meeting with Singh in February 2020 to discuss Juneau's company and interest in working with BP to acquire the assets in the seventh category of Project Thrones. It was at this meeting that Juneau met with James "Tony" Webb, who would be the sole landman assigned to manage Project Thrones' seventh category of assets. Juneau had specific interest in the non-operated lease and royalty interests that were included in this seventh category, as he had identified this grouping of assets as potentially substantially undervalued and a perfect fit for a small investment group to purchase considering they did not require any operations to maintain the income streams associated with these assets. Ultimately, these assets, which were spread across 30 states, came to be known as the "Moria Assets."

13. In this business, Juneau had long ago learned the critical value of information when making a deal, and he listened carefully to what was discussed at this initial lunch, and in the fifteen months following that he spent working directly with Mr. Webb to acquire the Moria Assets.

14. Juneau learned that the Moria Assets did not have reserve reports, and BP's team tasked with overseeing the Moria Assets was understaffed – meaning this deficiency would not likely be corrected. This alone created an enormous opportunity as it removed many institutional buyers from the bidding, and it opened the door to acquiring these assets for far below their actual value, so long as the buyer was willing to take the risk.

15. In addition, over the next fifteen months, Juneau and BP had multiple, regular interactions from which Juneau learned detailed information about the assets that was not publicly available. Just as importantly, Juneau was kept up to date on political changes inside BP that could alter its divestment preferences, including its internal concern related to potential environmental liabilities regarding these assets, that BP was undergoing specific accounting stresses, and that BP desired a debt-dilutive transaction structure. Finally, Juneau learned that he was the *only* potential bidder for the Moria Assets, which allowed him to be more creative in the structure and proposal that BP would likely accept.

16. Based on all this information and more, Juneau determined that the Moria Assets were likely undervalued and overlooked inside of the overall divestment plan. Juneau designed an acquisition strategy and bid amount/structure tailored to BP's priorities, the Moria Assets' particularities, and the Juneau Group's capabilities and needs (the "Juneau Bid Strategy"). Juneau kept the Juneau Bid Strategy confidential, and he continued to refine that strategy throughout the process as more information was obtained.

17. BP granted Juneau confidential access to BP's virtual data room containing extensive financial information. In the summer of 2021, Juneau submitted a letter of intent bid to BP and, after that, BP and Juneau began negotiating a purchase and sale agreement for the Moria Assets.

18. While Juneau and BP were working out the details on the Moria Assets, Juneau began looking for financing that might come at a lower cost than his traditional sources. Juneau approached Bank of Oklahoma as they were known to have an appetite for these types of transactions. The two Bank of Oklahoma representatives with whom Juneau communicated regarding the Moria Assets were Taylor Morris and Jeffrey Hawes.

19. To that end, Juneau entered into a June 20, 2021 confidentiality agreement ("BOKF Confidentiality Agreement") with Bank of Oklahoma so that the Juneau Group could share the Juneau Bid Strategy with Bank of Oklahoma, and have assurance BOKF would not use that information for its own (or its clients' own) purposes.

20. Under the BOKF Confidentiality Agreement, Bank of Oklahoma was allowed to use the information shared by Juneau, whether provided before or after the execution date, "solely for the purpose of evaluating or implementing possible financing between [Juneau] and [Bank of Oklahoma]." Bank of Oklahoma was only allowed to share the information with its representatives if the representatives agreed to be bound by the BOKF Confidentiality Agreement, and under paragraph 3, Bank of Oklahoma agreed to be responsible for any breach of the BOKF Confidentiality Agreement by its representatives.

21. Very soon after Juneau brought this opportunity to Bank of Oklahoma and shared the critically sensitive Juneau Bid Strategy that he had been developing on this deal for over a year, including an evaluation of the Moria Assets and his bid structure's strengths and vulnerabilities,

Bank of Oklahoma stopped communicating with Juneau regarding the Moria Assets acquisition and refused to finance the acquisition.

22. Two months later, BP informed Juneau that there was another bidder for the Moria Assets and that BP was moving forward with that bidder's offer instead of Juneau's. The other bidder eventually closed on the Moria Assets, and Juneau Group lost the acquisition on which it was ready and willing to close.

23. What Juneau did not know at the time was that the other bidder was Vendera Resources ("Vendera"), which was a major client of Bank of Oklahoma. In fact, one of the direct contacts that Juneau had with Bank of Oklahoma after the signing of the NDA was Jeffrey Hawes ("Hawes"), who would later leave Bank of Oklahoma to become Vendera's CFO. Hawes was the Bank of Oklahoma Director of Financial Securities with whom Juneau directly interacted with regarding financing the deal.

24. Shockingly, Juneau has recently uncovered evidence that it was Bank of Oklahoma that financed Vendera's bid after denying Juneau financing for the same assets. In fact, when confronted with his actions by Juneau, Hawes all but admitted that he sent this information to Vendera and that he anticipated that litigation would follow.

25. Based on this sequence of events, including the timing, the fact that Bank of Oklahoma financed Vendera's bid after denying Juneau financing for the same deal, and the fact that Hawes had a close relationship with Vendera (demonstrated by him leaving Bank of Oklahoma to work for Vendera), and Hawes' admissions to Juneau, Hawes and/or other Bank of Oklahoma representatives must have informed Vendera of all or part of the Juneau Bid Strategy, which Vendera used to evaluate the Moria Assets and structure a bid that would beat Juneau's bid. Hawes and/or other Bank of Oklahoma representatives thus breached the BOKF Confidentiality

Agreement by sharing the Juneau Bid Strategy with Vendera. Under paragraph 3 of that agreement, Bank of Oklahoma is liable for that breach.

26.　That breach of the BOKF Confidentiality Agreement caused Juneau substantial damages. The Moria Assets at the time of the breach were worth tens of millions over the actual purchase price. They are likely worth much more now. Juneau was ready, willing, and able to close on the deal, but Vendera, Hawes, and Bank of Oklahoma stole the Juneau Bid Strategy from him and gave it to Vendera, who then stole the opportunity.

27.　Prior to closing the deal, Vendera Resources created an entity called VR4-Moria, LP, which acquired the Moria Assets and received the financing from Bank of Oklahoma, making it an active participant in and beneficiary of the breaches of the NDA and misappropriation of Juneau's trade secrets.

### IV.　COUNT 1: BREACH OF CONTRACT

28.　Juneau Group incorporates herein by reference the allegations set forth in the preceding paragraphs.

29.　The BOKF Confidentiality Agreement was valid and enforceable and provided that Bank of Oklahoma would use information shared by Juneau "solely for the purpose of evaluating or implementing possible financing between [Juneau] and [Bank of Oklahoma]." It also provided that Bank of Oklahoma was only allowed to share the information with its representatives if the representatives agreed to be bound by the BOKF Confidentiality Agreement, and Bank of Oklahoma agreed to be responsible for any breach of the BOKF Confidentiality Agreement by its representatives.

30.　The BOKF Confidentiality Agreement provided that Juneau would provide certain information to Bank of Oklahoma regarding operational and financial affairs and that Bank of Oklahoma would not use that information to compete with Juneau.

31. Juneau Group was a party to the BOKF Confidentiality Agreement.

32. Juneau Group fully performed its obligations by furnishing the Juneau Bid Strategy to Bank of Oklahoma subject to the BOKF Confidentiality Agreement.

33. Hawes and/or other Bank of Oklahoma representatives materially breached the BOKF Confidentiality Agreement by providing part or all of the Juneau Bid Strategy to Vendera so that Vendera could acquire the Moria Assets.

34. Their breach of the BOKF Confidentiality Agreement caused injury to Juneau Group, which resulted in the following damages: Actual loss of the value of the Moria Assets, lost enterprise value of the Juneau Group, and the mineral royalties and other income received from the Moria Assets since the acquisition from all Defendants; unjust enrichment from the Bank of Oklahoma only, consisting of the amount of interest it made from financing the deal with Vendera.

35. Bank of Oklahoma is liable for Hawes and/or other Bank of Oklahoma representatives' breach of the BOKF Confidentiality Agreement under Paragraph 3 of the BOKF Confidentiality Agreement because they were representatives of Bank of Oklahoma and breached after Juneau Group and the Bank of Oklahoma entered the BOKF Confidentiality Agreement.

36. <u>Attorney's Fees.</u> Juneau Group is entitled to recover its reasonable attorneys' fees and costs pursuant to the Texas Civil Practice and Remedies Code § 38.001(b)(8). Juneau Group has retained the undersigned attorneys and agreed to pay their reasonable and necessary attorneys' fees.

### V.     COUNT 2: TRADE SECRET MISAPPROPRIATION

37. Juneau Group incorporates herein by reference the allegations set forth in the preceding paragraphs.

38. Juneau Group was in the business of acquisitions and divestitures with a focus on producing properties within the oil and gas sector. Juneau Group had the right to enforce a trade

secret because Juneau Group was party to confidential information consisting of the Juneau Bid Strategy.

39. Juneau Group made a reasonable effort to keep the Juneau Bid Strategy a secret by entering into the BOKF Confidentiality Agreement with Bank of Oklahoma before sharing the information with Bank of Oklahoma.

40. The Juneau Bid Strategy had potential economic value because it was generally unknown to and not readily ascertainable through proper means by third parties, since Juneau kept its proprietary acquisition strategy confidential.

41. Hawes, Bank of Oklahoma, and Vendera misappropriated Juneau Group's trade secret (the Juneau Bid Strategy) by acquiring it and having actual and constructive knowledge that the trade secret was acquired by improper means (Vendera) and by using it improperly (Vendera and Bank of Oklahoma). Specifically, Hawes and Bank of Oklahoma were subject to the BOKF Confidentiality Agreement, and Vendera had actual or constructive knowledge of it through its relationship with Hawes and Bank of Oklahoma.

42. Hawes, Bank of Oklahoma, and Vendera also misappropriated the Juneau Bid Strategy by using it without Juneau Group's consent. On the contrary, Juneau Group protected the Juneau Bid Strategy through the BOKF Confidentiality Agreement from rival investors such as Vendera.

43. Hawes, Bank of Oklahoma, and Vendera's misappropriation of the Juneau Bid Strategy caused injury to Juneau Group, which resulted in the following damages: Actual loss of the value of the Moria Assets, lost enterprise value of the Juneau Group, and the mineral royalties and other income received from the Moria Assets since the acquisition from all Defendants; unjust

enrichment from the Bank of Oklahoma only, consisting of the amount of interest it made from financing the deal with Vendera.

44.     <u>Exemplary damages.</u> Juneau Group's injury resulted from Bank of Oklahoma, Hawes, and Vendera's willful and malicious misappropriation of Juneau's trade secret, which entitles Juneau Group to exemplary damages under Texas Civil Practice & Remedies Code section 134A.004(b).

45.     <u>Attorney fees.</u> Juneau Group is entitled to reasonable attorney fees under Texas Civil Practice & Remedies Code section 134A.005 because Defendants willfully and maliciously misappropriated Juneau Group's trade secret.

46.     Bank of Oklahoma is liable for Defendants' misappropriation of Juneau Group's trade-secret because the misappropriation involved a breach of the BOKF Confidentiality Agreement, and Bank of Texas is responsible for any of its representatives' breaches of the agreement under Paragraph 3 of the BOKF Confidentiality Agreement.

## VI.     CONDITIONS PRECEDENT

47.     All conditions precedent to Juneau Group's claims for relief have been performed or have occurred.

## VII.     JURY DEMAND

48.     Juneau Group asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## VIII.  PRAYER

Wherefore, Plaintiff The Juneau Group LLC requests judgment against Defendants BOKF, National Association d/b/a Bank of Texas, Vendera Management Holdings, LLC d/b/a Vendera Resources, and VR4-Moria, LP for all following amounts as determined by the Court or the jury:

- Actual damages;
- Compensatory damages;
- Exemplary damages;
- Court costs and other compensable litigation costs;
- Attorney's fees pursuant to Texas Civil Practice and Remedies Code §§ 38.001 and 134A.005; and
- Pre- and post-judgment interest.

Plaintiff The Juneau Group LLC requests all further relief, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

*/s/ Ethan G. Gibson*
Ethan G. Gibson
State Bar No. 24073131
S.D. Tex. ID: 1145802
ethan@gibson-pc.com
GIBSON P.C.
4 Houston, Center
1221 Lamar St., Suite 1001
Houston, Texas 77010
Telephone: 713.897.8008
Facsimile: 713.897.8007

ATTORNEY-IN-CHARGE FOR PLAINTIFF
THE JUNEAU GROUP LLC

OF COUNSEL:
Jost M. Lunstroth
State Bar No. 24094807
S.D. Tex. ID: 3579146
jlunstroth@gibson-pc.com
GIBSON P.C.
4 Houston, Center
1221 Lamar St., Suite 1001
Houston, Texas 77010
Telephone: 713.897.8008
Facsimile: 713.897.8007

Hessam Parzivand
State Bar No. 24071157
S.D. Tex. ID: 1129776
hp@parzfirm.com
THE PARZIVAND LAW FIRM, PLLC
10701 Corporate Dr., Suite 185
Stafford, Texas 77477
Telephone: 713.533.8171
Facsimile: 713.533.8193

## CERTIFICATE OF SERVICE

The undersigned counsel certifies service of a true and correct copy of the foregoing document will be accomplished through the Notice of Electronic Filing generated by the Court's Electronic Filing System on September 5, 2024, as follows:

Thomas G. Ciarlone, Jr.
tciarlone@krcl.com
Demetri J. Economou
deconomou@krcl.com
Sage Plaza
5151 San Felipe, Suite 800
Houston, Texas 77056

COUNSEL FOR DEFENDANT VENDERA MANAGEMENT HOLDINGS, LLC D/B/A VENDERA RESOURCES

/s/ Ethan G. Gibson
Ethan G. Gibson