IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE JUNEAU GROUP LLC, | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 4:24-cv-02856 |
| | § | |
| VENDERA MANAGEMENT HOLDINGS, | § | Judge Charles Eskridge |
| LLC d/b/a VENDERA RESOURCES, | § | |
| VR4-MORIA, LP, and BOKF, | § | |
| NATIONAL ASSOCIATION | § | |
|  d/b/a BANK OF TEXAS | § | |
| *Defendants*. | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff The Juneau Group LLC ("Juneau") files this Second Amended Complaint against Defendants Vendera Management Holdings, LLC d/b/a Vendera Resources ("Vendera"), VR4-Moria, LP, ("VR4") (together "Vendera Defendants"), and BOKF, National Association d/b/a Bank of Texas ("BOKF"), (collectively "Defendants"), and would show the Court as follows:

### I.     PARTIES

1.     Plaintiff, The Juneau Group LLC, is a foreign limited liability company previously registered to do business in the state of Texas with its principal address in Houston, Harris County, Texas 77005. Jacob Juneau is the sole member of the LLC and is a citizen of Louisiana for purposes of diversity jurisdiction.

2.     Defendant Vendera Management Holdings, LLC d/b/a Vendera Resources (CRD #175116) is an SEC-registered investment advisor, with its principal office and place of business at 5949 Sherry Lane, Suite 1600, Dallas, Texas 75225. Vendera filed a Notice of Removal (Dkt. 1) on July 31, 2024, answered on August 15, 2024, and has appeared for all purposes. According to Vendera's notice of removal, Vendera is a citizen of Texas for purposes of diversity jurisdiction.

3.      Defendant VR4-Moria, LP is a Texas limited partnership with an office at 2626 Cole Ave., Suite 750, Dallas, Texas 75204. On information and belief, VR4-Moria, LP is an indirect, wholly owned subsidiary of Vendera Resources. On October 3, 2024, VR4 answered in this cause and has appeared for all purposes. On information and belief, VR4 is a citizen of Texas for purposes of diversity jurisdiction

4.      Defendant, BOKF, is a national bank chartered by the Office of the Comptroller of the Currency. BOKF's principal place of business is in Tulsa, Oklahoma. On October 2, 2024 BOKF answered in this cause and has appeared for all purposes. On information and belief, BOKF is a citizen of Oklahoma for purposes of diversity jurisdiction.

## II.      JURISDICTION AND VENUE

5.      The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because Juneau and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

6.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, in that Juneau prepared confidential information subject of this lawsuit from Harris County, Texas, and provided BOKF access to that information from Harris County, Texas. Moreover, BP (defined below) solicited bids for the Moria Assets (defined below) and sold them from Harris County, Texas.

## III.      NATURE OF THE CASE

7.      When the opportunity arises to acquire oil and gas assets, capital formation is paramount. Due to the large investments involved, capital funds traditionally come from only a few sources known within the oil and gas industry. These capital sources include national banks, regional banks, publicly traded energy companies, private equity institutions, and family offices,

which are privately held companies that handle investments for wealthy families, generally those with at least $50–100 million in investable assets.

8.      Besides having access to capital, in order to carry an oil and gas transaction across the finish line, a buyer must develop a bid proposal that the seller can and will accept. This requires the buyer to carefully map out and navigate a number of highly complex factors. For example, a buyer of oil and gas property must analyze the seller's information about the property, which is a highly specialized task requiring special knowledge and experience in the oil and gas industry. In addition, the seller's information about the property is typically voluminous and complex which requires buyers to expend much time and resources to interpret and distill. In addition, structuring a financing plan that will transform a bid into a purchase requires a buyer to navigate within the constraints of complex regulatory lending laws. Thus, developing a bid proposal requires more than picking a number. Indeed, an oil and gas buyer typically spends months if not years developing information about a particular oil and gas transaction to develop a bid proposal that a seller will accept and that can be financed by a lender or equity investor.

9.      Between 2020 and 2021, Juneau developed exactly that type of information so it could buy oil and gas assets from BP in a private and sealed bidding process. Juneau's information was stolen and used to benefit a competing bidder. This case is about the willful and malicious misappropriation of Juneau's information by the Defendants as part of their efforts to buy the assets for Vendera and to assure future business for BOKF through unfair practices, noncompetitive methods, submission of false information, and deceit.

## IV.    FACTS

10.     Jacob Juneau ("Jacob") is an energy and technology executive with extensive experience in the upstream oil and gas landscape. Jacob holds a degree in Petroleum Engineering

from Louisiana State University and a Master of Science in Energy Economics from Rice University.  Jacob grew up in the energy industry. From a young age, Jacob understood the importance of capital formation and developing a network of family office investors.  After acquiring his educational credentials and establishing working relationships with investment banks and high-wealth investors, Jacob began looking for investment opportunities in the energy sector.

11.    In 2018, Jacob formed The Juneau Group ("Juneau") which focused on acquiring minerals and non-operated leaseholds in oil and gas assets. Non-operated assets are ownership stakes in oil and gas properties in which the owner does not participate in the day-to-day operations but receives a share of the revenue. These interests come mainly in three forms: (a) royalty interest (RI); (b) non-operated overriding royalty interest (ORRI); and (c) non-operated working interest (WI). Together these transactions are known as acquisition and divestiture (A & D) of minerals in the upstream oil and gas landscape, which is a submarket in which Juneau became a familiar participant. Indeed, over the years, Juneau, received nearly a thousand investment proposals from energy sellers and representatives but rejected the majority, finding them unworthy of investment.

12.    However, in 2019, BP America Production Company and its affiliates ("BP") announced it intended to sell a portion of its onshore assets in six regions, as well as non-operated RI, ORRI, and WI and leasehold interests across the United States. Juneau was interested only in the non-operated RI, ORRI, and WI and leasehold interests and informed BP of its desire to acquire those assets, which became known as the "Moria Assets."

13.    In early 2020, Juneau and a group of investors met with BP to discuss the sale and purchase of the Moria Assets. Representing BP was Senior Vice President of Business Development and Exploration Mohit Singh and Project Manager Tony Webb.

14.    At this first meeting, Juneau learned details about the assets as well as BP's reasons for selling them.  Juneau also learned that there would be potential financing obstacles that could limit the number of potential buyers and thereby artificially depress bid offers. One such obstacle was that an oil and gas reserve report was unavailable, and BP did not intend to spend resources to commission one. This was problematic because the institutional investment community, including banks, typically require a reserve report to substantiate the value of the assets, which serve as collateral for the loan(s).  If no reserve report was available, institutional investors would be unwilling to finance the deal due to regulatory compliance issues.

15.    A second potential financing obstacle that emerged in 2020 that Juneau believed would lead to few and low bids was the uncertainty of the oil and gas market and a shift in the financial market. Juneau was aware that the market price of oil had collapsed, Environmental, Social, and Governance (ESG) investment incentives increased, equity capital available for oil and gas production/development was largely depleted, and equity firms were unable to raise new capital. This shift in the financial market left family offices, high-net-worth individuals, and other sources of "patient capital" as the primary sources of capital for oil and gas assets. These market conditions would make it difficult to secure institutional financing, and likely limited the pool of potential bidders capable of offering a proposal that BP was willing to accept.

16.    Based on this initial information, Juneau believed acquiring the Moria Assets was a once-in-a-lifetime opportunity. Juneau had access to capital through high-wealth individuals who were unrestrained by federal or state regulations and who Juneau believed had the money and the desire to invest in this kind of opportunity. Juneau again expressed its desire to buy the Moria Assets. Singh and Webb informed Juneau that *after* BP sold the other six divestiture packages, it

intended to open a virtual database room ("VDR") to initiate the bidding process for the Moria Assets and that BP would invite Juneau to participate.

17.     VDRs are used in the oil and gas industry to organize and store data for various deals and business initiatives. This data might include confidential business information, financial data, geological information, lease date(s), environmental audits, and other confidential information. Typically, the VDR information is protected from public disclosure and permission to enter the VDR must be obtained from its owner.

18.     While Juneau waited for BP to open the VDR, it focused on other potential transactions and continued to develop its capital investment contacts so that it would be prepared to meet the Moria opportunity when it came. One transaction with which Juneau was involved during this time was the Kansas Petroleum Unit Transaction ("Unit Transaction") during which Jacob met Jeffrey Hawes, BOKF's Director of Financial Securities.

19.     Between January 2021 and April 2021, Jacob and Hawes worked closely on the Unit Transaction. During that time, Jacob came to trust Hawes.

20.     In March 2021, BP initiated the sealed bidding process for the Moria Assets and invited Juneau to view the information in the VDR so Juneau could structure and submit its bid by May, 2021.  However, unlike most traditional oil and gas transactions, the information included in the Moria VDR was murky and disorganized. Typically, VDRs contain information about the individual assets, listing them by name, acreage, and location, and disclosing the net profit and loss for each asset. That data is then verified by the reserve report, which is typically also included in the VDR.

21.     Although BP identified about 1000 leases and wells by name, location, and acreage in the Moria VDR, BP did not disclose clear profit and loss data for all the assets. Instead, the

profit and loss data were aggregated into a subset of cost centers, which did not segregate the financial information by individual well. Moreover, some wells were not matched to a cost center at all. And the operating cash flow data was dependent in part on payments that were delayed, some of which were delayed as long as five years, without explaining the cause for the delays. Consequently, without a reserve report, the sheer volume of the leases and wells coupled with the tight bidding deadline, made it virtually impossible for a bidder to verify the net income or costs associated with each well, which in turn would pose a roadblock to traditional institutional financing, and made the data—on which typical transactions of this kind relied -- difficult to interpret.

22.     However, because Juneau had been focused on these particular types of assets for years, it determined it could assess value and obtain financing by emphasizing information related to the assessed value of each acre, rather than profit and loss reports. Juneau determined that it could convince a lender that the risk of loss was minimal because the transaction would pay for itself given that costs to establish a new leasehold in the existing and foreseeable market far exceeded the cost of acquiring existing leaseholds. Juneau reasoned that if BP's murky information hid risk, any risk was outweighed by the certainty of the value in the acreage/leasehold that could be peeled off by Juneau one by one, if required. In addition, Juneau believed the price of oil was trending upward and that the market would quickly recover following 2020's outlier year due to the pandemic. Based on this information, Juneau believed the assets were worth much more than even BP was estimating. Juneau therefore could justify offering a higher bid price that was sure to beat out the other bidders who were basing their bids on the traditional profit/loss method of valuation, which even BP could not verify using its own data. Even at the higher price point, Juneau believed the assets would be purchased at a fraction of what they were actually worth.

23.     In May 2021, using both the VDR data and the information Juneau learned at the 2020 meeting with Singh and Webb as well as his own interpretation of the data, Juneau submitted its confidential bid proposal to BP in the amount of $42,500,000.00 with an effective date of June 1, 2021 and closing date of April 1, 2022. Juneau proposed to pay 10% of purchase price upon the signing of the Purchase Sale Agreement (PSA) and the remaining amount at closing. Finally, the bid proposal included a 30-day exclusivity term so that Juneau could secure the funding for the down payment from an investment firm. Juneau was aware a signed PSA was typically required prior to securing such capital.

24.     According to Juneau, this bid proposal would appeal to BP because the bid price was higher than expected given their undervaluing of the assets, BP understood the problem the lack of the reserve report posed, and BP seemed eager to offload these assets quickly. Juneau also believed there would likely be few other takers due to: the absence of the reserve report, lack of access to institutional funding, and the low price of oil. In addition, a delayed closing date of April 1, 2022 would solve the problem associated with the absence of the reserve report. If BP agreed to transfer the assets on the effective date of June 1, 2021, then Juneau would be entitled to receive check stubs documenting royalty amounts from the leases until the closing date. The check stubs would serve as the documentation necessary to satisfy the institutional bank requirements and open up funding from the banks for the prospective closing.

25.     Juneau kept confidential its analysis of the BP data, its valuation of the Moria Assets, and its reason for delaying the closing. And Juneau did not disclose its bid price with anyone but BP. However, Juneau continued to refine its bid proposal throughout the bidding process by communicating directly with BP as more information was obtained.

26.     Shortly after Juneau submitted its bid, Jacob spoke with the BP Project Manager Webb who expressed concern with Juneau's ability to fund the purchase. During that call, Jacob was informed that BP would not agree to the exclusivity term. Without that term, it was unlikely Juneau's existing equity investor would agree to fund the downpayment, which prompted Jacob to raise the possibility of approaching lenders to finance the transaction and to "hedge." Webb seemed receptive to the idea.  Besides, equity providers typically negotiate an interest in the assets, whereas lenders do not. So in light of BP's resistance to the exclusivity term, Juneau decided to seek out a lender to both fund the transaction and to hedge.

27.     Hedging refers to a practice in the oil and gas industry of using financial instruments, such as "options" or "futures" to protect against price fluctuations. For example, an option contract could give the holder the right (not obligation) to buy or sell oil or gas at a specific price within a certain timeframe.

28.     After the first round of bidding ended, BP instructed Juneau to submit its best and final bid by June 2, 2021.  Juneau believed that it was the high bidder and therefore stood by its original bid and did not submit a subsequent bid. Juneau continued to seek financing that would address BP's concern about funding.

29.      To that end, on June 9, 2021, Jacob reached out to Hawes, who was a BOKF contact.  BOKF was a lender that Jacob believed would be interested in funding the transaction. Jacob explained to Hawes that Juneau was the high bidder in the final stages of a bidding process for the BP Moria Assets.  Jacob asked Hawes to introduce him to someone on BOKF's lending side so he could discuss financing and hedging the transaction. Hawes told Jacob BOKF would be interested in the transaction and introduced Jacob to Taylor, a Vice President on the lending side of BOKF.

30.     On June 17, 2021, Jacob spoke to Morris.  Jacob gave a short description of the transaction. Jacob explained Juneau was the high bidder in a sealed bidding process involving the acquisition of BP's Moria Assets and that he was interested in financing the transaction through BOKF.  Morris told Jacob that BOKF was interested but needed to hear more. Accordingly, before Jacob agreed to disclose more, he wanted BOKF to sign a confidentiality agreement, which Morris agreed to execute.

31.   On June 20, 2021, Juneau and BOKF executed a Confidentiality Agreement. The executed Agreement required BOKF to treat as confidential and not disclose "Evaluation Material" provide by Juneau, which was defined in the Agreement as "*any*. . . *information* Borrower or its representatives furnish to Lender, whether furnished before or after the date of this Agreement…" (Emphasis added).

32.     Under the Agreement, BOKF could use Juneau's information "solely for the purpose of evaluating or implementing possible financing" for Juneau's transaction. And BOKF agreed to be responsible for any breach of the Agreement by its representatives.

33.     On June 29, 2021, Jacob spoke with Morris again. During that call Jacob disclosed detailed confidential information about Juneau's bid proposal, including his analysis and valuation of the Moria Assets, the amount of Juneau's bid, the delayed closing idea, and Jacob's idea to hedge.  With respect to hedging, Morris explained BOKF was not interested in hedging the transaction because doing so would be too complicated. Jacob told Morris he had another investor in mind, Cargill, that could likely handle the hedging part of the deal, but still wanted BOKF to consider financing the transaction.  Morris promised to discuss financing the transaction with his team and would circle back to Jacob. Morris did not state that he was aware of the Moria sale

before his discussion with Jacob or that BOKF was in any way involved with financing the deal for another bidder.

34.     On June 29, 2021, without Juneau's knowledge or consent, BOKF employee Alex Trlica reached out to Wood Brookshire, founder and CEO of Vendera. Vendera, as it turned out, was Juneau's sole competing bidder for the Moria Assets. Mr. Trlica suggested to Mr. Brookshire that they should schedule a meeting so the two could "catch up."

35.     According to Vendera's written bid that was pending at the time of Mr. Trlica's communication, Vendera had offered $22,000,000.00 for the Moria Assets and promised the deal could "close with all cash" and would "not be dependent on securing financing to close the transaction." Vendera's initial bid also indicated closing would occur as "expeditiously as possible."

36.     On July 1, 2021, Jacob followed up with Morris at BOKF via email and asked whether BOKF had reached a decision about financing Juneau's transaction. Morris never responded. Indeed, BOKF stopped communicating with Juneau altogether and refused to finance Juneau's acquisition.

37.     On July 7, 2021, Jacob contacted Nick Curtis, a Cargill broker, to discuss the hedging strategy. Curtis signed a nondisclosure agreement that day. Jacob likewise explained the details of the Moria bidding process, his valuation of the Moria Assets, his bidding proposal, his delayed closing idea, and his hedging strategy. Curtis later refused to hedge the transaction without explanation.

38.     On September 3, 2021, after Juneau disclosed its confidential information to BOKF, Vendera submitted to BP a revised bid. Not only did Vendera raise its bid price, the revised bid reflected changes that would allow for BOKF to finance the transaction without disclosing that

the transaction was being financed. For example, instead of an immediate cash closing as provided in Vendera's original bid, Vendera's revised bid, like Juneau's bid, now included an effective date of September 1, 2021 so that BP "could verify the cash flows presented via check stubs." The revised bid also removed the promise to "expeditiously" close. Indeed, the closing did not occur until May 31, 2022, which is a delayed closing.

39.     And although the revised bid continued to falsely state that the closing would be a "cash" closing, in truth the entire transaction was financed by BOKF through shell companies using the Moria Assets themselves as collateral. This was deliberately done to create the false impression that Vendera's "cash" bid was more attractive than Juneau's "financed" bid, even though they were both "financed" bids. Moreover, the transaction was boosted by hedging through the same investors that Juneau had identified.

40.     In late August/early September 2021, after waiting and not hearing back from BOKF, Jacob incorrectly assumed that BOKF had been unconvinced by his analysis and evaluation of the Moria Assets and his proposed financing structure. So Juneau tapped his high-wealth investors for financing, who expressed confidence in Juneau's valuation analysis and believed his financing strategy was sound.

41.     On September 10, 2021, Juneau submitted two letters to BP demonstrating that these investors would fund the down payment and guarantee that the transaction would close within nine months as contemplated by the delayed closing term in Juneau's bid.

42.     By this time, however, BP informed Juneau that it had decided to move forward with another offer but did not disclose the identity of the bidder or the details of the bid or payment structure. Juneau, who at the time, believed the winning bid must have been larger than its own, asked to remain in the wings in case the bidder was unable to close due to inability to fund.

43.     When Vendera eventually closed on the Moria Assets on May 31, 2022 Juneau lost the acquisition after vying for it for over two years even though Juneau was willing and able to close the transaction.

44.     Due to the confidentiality of the terms of the purchase and sale agreement between BP and the winning bidder, Juneau did not learn the identity of the winning bidder or about the malfeasance by BOFK and Vendera until 2024.

45.     Juneau discovered in 2024 that Vendera hired Hawes as its CFO to manage the Moria Assets. This development led Juneau to believe Hawes had assisted Vendera in acquiring the assets by obtaining and using the confidential information Juneau shared with BOKF.

46.     In 2024, Juneau confirmed that Vendera was in fact the winning bidder. Juneau also learned through discovery that Vendera's revised and accepted bid mimicked Juneau's bid in material ways. Juneau also learned that BP selected Vendera's bid over his own because Vendera promised to close with "all cash." But Juneau discovered that Vendera's promise to close with cash was false when made because Vendera had no/insufficient cash on its books at the time. And in truth, Vendera did not close with cash, but financed the transaction through BOKF using Juneau's delayed closing idea and the hedging strategy that Juneau disclosed to BOKF in June 2021. Vendera also used the same hedging lenders that Juneau had proposed—BP and Cargill— to close the transaction.  This information was not discoverable without legal process.

47.     Indeed, BOKF failed to disclose to Juneau that it had discussed financing the same transaction with Vendera. If this information had been disclosed sooner, Juneau would not have disclosed confidential information to BOKF, and Vendera would not have been able to close.

48.     BOKF and/or its representatives breached the Confidentiality Agreement by using Juneau's confidential information for their own benefit to secure business, interest, and

commissions from Vendera, and by disclosing to Vendera Juneau's confidential information, without which Vendera could not have defeated Juneau's bid.

49.     Moreover, both BOKF and Vendera misappropriated Juneau's confidential information and submitted false information, which BP relied on, to interfere with Juneau's prospective contract with BP.

50.     Defendants' malfeasance, jointly and severally, caused Juneau substantial damages. The Moria Assets at the time of the breach were worth millions over the actual purchase price. They are worth much more now. Juneau was ready, willing, and able to close on the deal, but BOKF stole the confidential information from him and gave it to Vendera, who then stole the opportunity from Juneau by using Juneau's confidential information and submitting false information on which BP relied to reject Juneau's bid.

51.     Before closing the deal, Vendera created an entity called VR4-Moria, LP, which acquired the Moria Assets and received the financing from BOKF, making it an active participant in and beneficiary of the breaches of the NDA and misappropriation of Juneau's trade secrets.

## IV. COUNT 1: BREACH OF CONTRACT
### *(by BOKF)*

52.     Juneau incorporates herein by reference the allegations set forth in the preceding paragraphs.

53.     Juneau made a demand that BOKF enter into a confidentiality agreement before proceeding with discussions about financing the purchase of the Moria Assets.

54.     BOKF accepted the demand and, and on June 20, 2021, offered to be bound by its own form Confidentiality Agreement, which BOKF sent to Juneau for execution.

55.     Juneau accepted all material terms of BOKF's form Confidentiality Agreement.

56.    BOKF accepted the benefit of the Confidentiality Agreement by proceeding with discussions on financing the Moria Assets and acquiring Juneau's confidential information about the transaction.

57.    Accordingly, Juneau and BOKF were parties to the Confidentiality Agreement dated June 20, 2021.

58.    The Confidentiality Agreement governed BOKF's handling of Juneau's "confidential information" which was defined as "any" information Juneau shared with BOKF concerning the Moria transaction before and after the Agreement was signed.

59.    On June 17, 2021, June 20, 2021, and June 29, 2021, Juneau incrementally shared with BOKF the following confidential information:

- Juneau's efforts to buy the Moria Assets.

- The terms and structure of Juneau's proposed purchase, including the price.

- Juneau's direct communications with the seller before and during the bidding process and Juneau's place within a sealed bidding process.

- Juneau's method of valuation of the assets.

- Juneau's analysis of the seller's information.

- Juneau's assessment that the seller was undervaluing the assets.

60.    The Confidentiality Agreement prohibited BOKF from using Juneau's confidential information for any purpose *except* for "evaluating or implementing possible financing between [Juneau] and [BOKF]."

61.    The Agreement prohibited BOKF from sharing with third parties any information provided by Juneau.

62.    The Agreement made BOKF responsible for any breach of the Agreement by its representatives.

63.     The Agreement prohibited BOKF from using the information provided by Juneau to compete with Juneau.

64.     Juneau fully performed its obligations by furnishing Juneau's information to BOKF for the purpose of evaluating the Moria Assets transaction.

65.     On information and belief, BOKF and/or its representative(s) materially breached the Agreement by using part or all of Juneau's information to solicit business from Juneau's competitor, Vendera.

66.     On information and belief, BOKF and/or its representative(s) materially breached the Agreement by using part or all of Juneau's information to evaluate and finance the Moria Assets transaction for Juneau's competitor, Vendera.

67.     On information and belief, BOKF and/or its representative(s) materially breached the Agreement by sharing with Juneau's competitor, Vendera, Juneau's information so Vendera could acquire the Moria Assets, and in turn, deprive Juneau of those assets.

68.     Had BOKF complied with the Confidentiality Agreement, Juneau would have purchased the assets and enjoyed a significant profit it had identified through its due diligence, skill, and ability.   However as a direct and proximate cause of BOKF's breach of the Confidentiality Agreement, and as was foreseeable to BOKF—and indeed the purpose of BOKF's breach—Vendera purchased the property, and Juneau was stopped from doing so. Juneau thus suffered losses, including the loss of substantial profits, in an amount to be proven at trial.

69.     Juneau has retained the undersigned attorneys and agreed to pay their reasonable and necessary attorneys' fees. Juneau is entitled to recover its reasonable attorneys' fees and costs under the Texas Civil Practice and Remedies Code § 38.001(b)(8).

## V. COUNT 2: TRADE SECRET MISAPPROPRIATION
### (*by BOKF and Vendera*)

70.     Juneau incorporates herein by reference the allegations set forth in the preceding paragraphs.

71.     The information that Juneau provided to BOKF on June 17, 2021, June 20, 2021, and June 29, 2021, (and described in paragraphs 22, 23, 24, 26, 29, 30, 33, and 59) were "trade secrets" as that term is defined by Tex. Civ. Prac. & Rem Code § 134A.002(6) and 18 U.S.C. §1839(3). These trade secrets were not publicly available, they were gathered through significant efforts by Juneau and were used by BOKF and Vendera who obtained economic value from its use to obtain the Moria Assets. Moreover, by requiring BOKF and other potential financiers to sign a confidentiality agreement, Juneau took reasonable measures under the circumstances to keep the information secret.

72.     As Juneau's trade secrets were subject to a Confidentiality Agreement, BOKF and Vendera acquired Juneau's trade secrets under circumstances giving rise to a duty to both maintain the secrecy and to limit the use of the trade secrets.

73.     Jeffery Hawes, Taylor Morris, and Alex Trlica were all employees and/or representatives of BOKF. Wood Brookshire, the founder and CEO of Vendera, who was signing the bids that competed with Juneau accepted from BOKF and used Juneau's trade secrets. Accordingly, each of these Defendants knew or had reason to know that Juneau's trade secrets were acquired through a breach of a confidentially agreement.

74.     Accordingly, Defendants each misappropriated Juneau's trade secrets in conscious disregard to Juneau's rights.

75.     As a direct and proximate cause of Defendants' misappropriation of Juneau's trade secrets, Juneau suffered damages in an amount to be proven at trial. And Defendants have been

unjustly enriched in an amount to be proven at trial, for which Juneau seeks monetary relief, or alternatively, seeks the imposition of a reasonable royalty on income generated by the Moria Assets in exchange for the unauthorized use of Juneau's trade secrets in acquiring the assets.

76.     In addition, because Defendants willfully and maliciously misappropriated Juneau's trade secrets in conscious disregard of Juneau's rights, Juneau seeks both attorney's fees and exemplary damages in an amount not exceeding twice any award of damages.

## VI. COUNT 3:
## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT
### (*by BOKF and Vendera*)

77.     Juneau incorporates herein by reference the allegations set forth in the preceding paragraphs.

78.     After reaching the status of the high bid in a sealed oil and gas bidding process, Juneau immediately sought financing to ensure it could close the deal.  And following Juneau's conversation with Project Manager Webb that BP would not grant an exclusivity period after it signed the purchase and sale agreement, Juneau immediately sought financing through BOKF. On three occasions Juneau discussed the Moria deal with BOKF's representatives, who never stated they knew that BP was auctioning the assets, or that there was an opportunity for a lender to finance the deal, or that BOKF was discussing financing with a competitive bidder.

79.     However, because BOKF expressed an interest in pursuing the deal with Juneau, which was a representation on which Juneau relied, Juneau disclosed its confidential information to BOKF, including details about Juneau's analysis and evaluation of the assets, how to structure the deal to comply with regulatory obligations, and its strategy to delay closing and hedge the transaction.

80.     BOKF's representation that it was interested in pursuing the deal with Juneau was materially false when made because after Juneau disclosed its confidential information, BOKF ran to Vendera, Juneau's competition, and offered to finance the same deal secured by exactly the same assets. BOKF's representation that it was interested in a deal with Juneau was a pretense to learn the details of the deal so BOKF could use Juneau's information for its own benefit, and for the benefit of Vendera.

81.     Without Juneau's knowledge or consent, BOKF disclosed confidential information to Vendera, Juneau's competitor, as Vendera was negotiating the terms of its own purchase of the same assets.  With Juneau's confidential information, Vendera was able to make a more informed decision in purchasing the assets and securing its capital, which also allowed Vendera to gain insight into Juneau's competing deal structure and bid price.

82.     If BOKF had not fraudulently obtained Juneau's confidential information and then shared it with Vendera, and if Vendera had not accepted it, Juneau would have purchased the Moria Assets, and enjoyed the significant profit it had identified through due diligence, skill, and ability.

83.     It is reasonably probable that, but for the Defendants' tortious and unlawful misappropriation and misuse of Juneau's confidential information, which is more particularly described in the foregoing paragraphs, to gain a competitive edge in their pursuit of the assets, Juneau would have secured financing in time to purchase the assets.

84.     However, as a direct and proximate cause of Defendants' interference with Juneau's prospective purchase of the assets, Juneau has suffered losses in an amount to be proven at trial.

## VII. COUNT 4: FRAUDULENT CONCEALMENT
### (*by BOKF and Vendera*)

85.      Juneau incorporates herein by reference the allegations set forth in the preceding paragraphs.

86.      As alleged in paragraphs 78-81, before acquiring Juneau's confidential information about the Moria transaction for which Juneau sought financing, BOKF expressed interest in pursuing a deal with Juneau. After acquiring Juneau's confidential information, BOKF ran to Vendera, Juneau's competitor, to provide the financing for Vendera, and then ghosted Juneau.

87.      BOKF failed to disclose to Juneau that it had shared Juneau's confidential information with Juneau's competitor, Vendera, or that BOKF had used Juneau's information to structure Vendera's financing.

88.      BOKF also failed to timely inform Juneau it was not interested in financing the deal for Juneau. If it had, Juneau could have and would have pursued financing with a different lender sooner. Instead, without Juneau's knowledge, while Juneau waited for Morris to get back to him, BOKF was feverishly working with Vendera behind Juneau's back to structure and provide the financing so that Vendera could submit its revised bid before BP could accept Juneau's offer.

89.      At some point, BOKF was made aware that its existing client, Vendera, was competing with Juneau for the same assets. Upon learning of this conflict, BOKF had a duty to disclose to Juneau that it was providing financing for Vendera and that it was using Juneau's finance strategy to structure the deal to compete with Juneau, but BOKF intentionally withheld this information and remained silent to Juneau's detriment, with knowledge that remaining silent would hurt Juneau's chances and help Vendera's.

90.      If BOKF had disclosed it was financing Vendera's bid and using Juneau's financing strategy to close Vendera's transaction, Juneau could have acted to protect its interests by refusing

to disclose its confidential information or by securing financing from another lender sooner. However, due to the secrecy of the bidding process and the confidentiality of the lending documents, Defendants could and did conceal their malfeasance, and Juneau was unable to discover the wrongful acts by the Defendants until 2024, shortly before Juneau filed suit.

## VIII. COUNT 5: COMMON LAW FRAUD
### (*by BOKF and Vendera*)

91.     Juneau incorporates herein by reference the allegations set forth in the preceding paragraphs.

92.     As alleged in paragraphs 78-81, before acquiring Juneau's confidential information about the Moria transaction for which Juneau sought financing, BOKF expressed interest in pursuing a deal with Juneau.

93.     Upon learning on June 17, 2021 and June 20, 2021, that Juneau was the high bidder in the sealed bid process and was seeking to acquire the Moria Assets for itself, BOKF had a duty to disclose its intent to finance the deal for Vendera, *before* Juneau disclosed its confidential information to BOKF on June 29, 2021. Instead, BOKF continued to express interest in pursuing the deal with Juneau.

94.     In reliance on BOKF's stated interest in financing Juneau's purchase of the Moria Assets, on June 29, 2021, Juneau disclosed its confidential information about the assets and its bid, including its bid price and financing strategy.

95.     BOKF then disclosed this information to Vendera as it was negotiating the terms of its own purchase of the Moria Assets. Given that BOKF eventually financed Vendera's bid using the same strategy that Juneau spelled out in its bid, BOKF's disclosure to Vendera of Juneau's confidential information directly benefited BOKF. And with Juneau's confidential

information in hand, Vendera was able to make a more informed decision in purchasing the Moria Assets and further allowed Vendera insight into Juneau's competing bid.

96.     If BOKF had not fraudulently obtained Juneau's confidential information and then shared it with Vendera so that Vendera could use the information to finance the deal and purchase the assets for itself, and if Vendera had not accepted it, Juneau would have purchased the assets, and enjoyed the significant profit it had identified through due diligence, skill, and ability.

97.     However, as a direct and proximate cause of BOKF's fraudulent omissions and misrepresentations, Vendera was able to purchase the Moria Assets and Juneau was stopped from doing so. Juneau thus suffered losses, including the loss of substantial profits, in an amount to be proven at trial.

## IX.  COUNT 6:  UNJUST ENRICHMENT
### (*by Vendera*)

98.     Juneau incorporates herein by reference the allegations set forth in the preceding paragraphs.

99.     As a result of Defendants' tortious and unlawful conduct, Vendera was unjustly enriched by the amount of the Moria Assets value, including its oil and gas reserves, that exceeds the purchase price.

100.     The relationship between Juneau and Vendera is not governed by contract.

101.     Accordingly, Juneau is entitled to recover the amount by which Vendera has been unjustly enriched.

## X.  CONDITIONS PRECEDENT

All conditions precedent to Juneau's claims for relief have been performed or have occurred.

## XI. JURY DEMAND

Juneau asserts its rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## XII.  PRAYER

Wherefore, Plaintiff The Juneau Group LLC requests judgment against Defendants BOKF, National Association d/b/a Bank of Texas, Vendera Management Holdings, LLC d/b/a Vendera Resources, and VR4-Moria, LP for all following amounts as determined by the Court or the jury:

- Actual damages;

- Compensatory damages;

- Exemplary damages;

- Court costs and other compensable litigation costs;

- Attorney's fees pursuant to Texas Civil Practice and Remedies Code §§ 38.001 and 134A.005; and

- Pre- and post-judgment interest.

Plaintiff The Juneau Group LLC requests all further relief, at law or in equity, to which it may be justly entitled.

Respectfully submitted,

*/s/ Ana Jordan*
Ann "Ana" Jordan
Texas Bar No. 00790748
ajordan@carterarnett.com
E. Leon Carter
Texas Bar No.03914300
lcarter@carterarnett.com
Michael Pomeroy
Texas Bar No. 24098952
mpomeroy@carterarnett.com
Monica Litle Goff
Texas Bar No. 24102101
mgoff@carterarnett.com
**CARTER ARNETT PLLC**
8150 N. Central Expy, Suite 500
Dallas, Texas 75206
214-550-8188 [Tel]/214-550-8185 [Fax]

-and-

David M. Prichard
State Bar No. 16317900
E-mail: dprichard@prichardyoungllp.com
David R. Montpas
State Bar No. 00794324
E-mail: dmontpas@prichardyoungllp.com
**PRICHARD YOUNG, LLP**
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216
(210) 477-7400 [Tel]/(210) 477-7450 [Fax]

**ATTORNEYS FOR PLAINTIFF
THE JUNEAU GROUP LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, a true and correct copy of the foregoing document was served on all of counsel of record via the CM/ECF system in compliance with the Federal Rules of Civil Procedure.

*/s/ Ana Jordan*
Ann "Ana" Jordan